IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____

UNIVERSITY OF UTAH RESEARCH
FOUNDATION, A UTAH NONPROFIT
CORPORATION, THE TRUSTEES OF
THE UNIVERSITY OF PENNSYLVANIA,
A PENNSYLVANIA NONPROFIT               CASE NO. 2:13-CV-640RJS
CORPORATION; HSC RESEARCH AND                    2:13-CV-643
DEVELOPMENT LIMITED PARTNERSHIP,
A CANADIAN LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS OF THE
PROVINCE OF ONTARIO; ENDORECHERCHE,
INC., A CANADIAN CORPORATION
ORGANIZED UNDER THE LAWS OF THE
PROVINCE OF QUEBEC; AND MYRIAD
GENETICS, INC., A DELAWARE
CORPORATION,

        PLAINTIFFS,                    SALT LAKE CITY, UTAH

  VS.                                     AUGUST 23, 2013

AMBRY GENETICS CORPORATION,

        DEFENDANT.

===========================================================

TUTORIAL/MISCELLANEOUS HEARING
BEFORE THE HONORABLE ROBERT J. SHELBY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:


FOR THE PLAINTIFFS:
                         PARSONS BEHLE & LATIMER
                         BY:  DAVID G. MANGUM, ESQ.
                              KRISTINE EDDE JOHNSON, ESQ.
                         ONE UTAH CENTER
                         201 SOUTH MAIN STREET, SUITE 1800
                         SALT LAKE CITY, UTAH 84111
                         (801) 532-1234

                         MYRIAD GENETICS, INC.
                         BY:  BENJAMIN G. JACKSON, ESQ.
                         320 WAKARA WAY
                         SALT LAKE CITY, UTAH 84108

FOR THE DEFENDANT:
                         TRASKBRITT, P.C.
                         BY:  EDGAR R. CATAXINOS, ESQ.
                              JOSEPH A. WALKOWSKI, ESQ.
                              H. DICKSON BURTON, ESQ.
                         230 SOUTH 500 EAST, SUITE 300
                         SALT LAKE CITY, UTAH 84110
                         (801) 532-1922

                         MCDERMOTT WILL & EMERY
                         BY:  WILLIAM G. GAEDE III, ESQ.
                         275 MIDDLEFIELD ROAD, SUITE 100
                         MENLO PARK, CALIFORNIA 94025
                         (650) 815-7400

COURT REPORTER:
                         RAYMOND P. FENLON
                         350 SOUTH MAIN STREET, #242
                         SALT LAKE CITY, UTAH 84101
                         (801) 809-4634

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                         (1:30 P.M.)

3              THE COURT:  Good afternoon.  We'll go on the record

4    in consolidated -- cases are not consolidated, but for

5    purposes of this hearing they are.  These are case numbers

6    2:13-CV-640 and 643, University of Utah Research Foundation

7    and Myriad Genetics and the like versus Ambry Genetics in the

8    640 case, Gene By Gene in the 643 case.

9         Counsel, I think we have -- we have plenty of you here

10   today.  Why don't we take a moment.  I have your names here,

11   but why don't you make your appearances, if you would,

12   please.

13             MR. MANGUM:  Thank you, Your Honor.  David Mangum

14   and Kristine Johnson of Parsons Behle for the Plaintiffs.

15   Also with us and Counsel of Record, Ben Jackson, who is Senior

16   Director of Legal Affairs For Myriad Genetics.  At counsel

17   table and hiding behind the easel is Dr. Ben Roa.  He is the

18   Vice-President of Technology and Development and Senior Lab

19   Director for Myriad.  He will be assisting in the technical

20   presentation today.

21        Your Honor, I would just introduce you to also others

22   that are in the courtroom today, Mr. Richard Marsh, who is

23   Executive Vice-President and General Counsel for Myriad, and

24   Matt Gordon, who is the Director of Intellectual Property for

25   Myriad.  Thank you.
```

```
 1                    THE COURT:  Thank you, Mr. Mangum.

 2          Mr. Gaede.

 3                    MR. GAEDE:  Good afternoon, Your Honor.  Good to see

 4     you again.

 5                    THE COURT:  Nice to see you.

 6                    MR. GAEDE:  Bill Gaede on behalf of the Defendants.

 7     I'd like to introduce to Your Honor Dr. David Pribnow

 8     Dr. Pribnow has been a leader in the field since 1975 and he

 9     may also be here to answer any questions that you have.

10                    Mr. Cataxinos:  And Edgar Cataxinos and Joe

11     Walkowski representing Ambry from TraskBritt.

12                    MR. GAEDE:  And of course we have Mr. Hatch here in

13     the courtroom as well.

14                    Mr. Hatch:  Behind the bar, Your Honor.

15                    THE COURT:  Well, good afternoon to all of you, and

16     thank you for making time to visit with us today.  We've

17     appreciated receiving your materials.  You've all obviously

18     spent some time and effort trying to figure out how best to

19     teach a generalist about the subject matter.  We've worked to

20     try to familiarize ourselves generally with some of the

21     information so it won't be totally new to us.

22          We have received some objections and responses to

23     objections to some of the proposed slides and materials.  I've

24     reviewed those.  My view is that we ought to take most of

25     those in turn I think and just see what it is you all intend
```

                                                                    4

to say about it.  Though I will say I think I'm disinclined to
get into a discussion in any way about the claim language of
the claims.  There are several slides that are just
recitations of portions of the claims.  I understand that they
may be offered to provide some context for some of the
scientific terms or technical terms we'll be discussing, but
what we're not doing today, of course, is engaging in some
preliminary claim construction or anything like that.  If
there are disagreements about whether there are terms that are
used in the science that are terms of art that have specific
meanings, then let's see if we can sort that out as best we
can, or at least identify what the dispute is and what
different scientists think about those terms.

But generally I think what we're here to do today is to
try and just provide a background and an educational format
for me and my staff so that we can begin to better analyze the
issues we'll have to tackle at our injunction hearing where
we'll have a chance to argue about what the consequences are
of what we'll learn today.

So with that in mind, Mr. Mangum, you are the plaintiff
and you have the burden on your motion and I think it makes
sense as the patent holder for Myriad -- and I'll just refer
to the plaintiffs generally as Myriad and maybe I'll just
refer to the defendants as defendants since you are discrete
entities.  But, Mr. Mangum, the floor is yours.

```
1            MR. MANGUM:  Thank you, Your Honor.  Let me just
2    introduce Ben Jackson who will be presenting our tutorial.
3    He's counsel of record.  He also, as I indicated, was Senior
4    Director of Legal Affairs at Myriad.  He has a bachelor's
5    degree in molecular genetics from UCLA.
6         As necessary to respond to any questions or to assist in
7    the presentation, Dr. Roa will also participate.  He has a
8    Ph.D. in molecular biology from Northwestern University and is
9    board certified in molecular genetics.  So I'll turn the floor
10   to Mr. Jackson.  Thank you, Your Honor.
11            THE COURT:  Thank you.
12            MR. JACKSON:  Good afternoon, Your Honor.
13            THE COURT:  Good afternoon.
14            MR. JACKSON:  I'm grateful for this opportunity to
15   talk about some exciting technology today.
16            The COURT:  You know, I'm going to interrupt just
17   before we begin.  This is an obvious statement perhaps, and
18   it's a legal statement, but I don't anticipate that we'll be
19   getting into anything today that's confidential.  We're
20   talking about public patents and science, and I think there's
21   been a great deal of discussion about all of this in the cases
22   that preceded the filing of this suit, but I just want to make
23   the attorneys aware that if we begin to venture into anything
24   that any of you deem proprietary or confidential in some
25   manner, notify me about that.  We have an open proceeding
```

```
 1   today and a few folks that are on hand to watch so let's just
 2   be cognizant of that.  I'm sorry, Mr. Jackson.  Go ahead.
 3           MR. JACKSON:  Thank you.  So today we're going to
 4   talk about two main things, the basics of molecular biology
 5   and we're going to talk a little bit about molecular
 6   diagnostic testing.  And this overview shows kind of the flow
 7   of my presentation, and I'll come back to this overview a
 8   couple times just to show us how we're moving through.
 9       In the materials that we -- that we submitted to Your
10   Honor there was an introductory video that were a couple
11   minutes long.  We can watch that again today but I'm hoping
12   that you had the chance to watch that, and if -- it's pretty
13   basic.  If you'd like to watch it again, we can; if not --
14           THE COURT:  I think I understand what we're talking
15   about there.  Go ahead.
16           MR. JACKSON:  Okay.  And this slide sort of
17   recaptures what was in there anyway.  The central
18   (inaudible) --
19           (the court reporter asked counsel to repeat)
20       The central dogma of molecular biology states that DNA is
21   used by cells to make RNA, which is then used by cells to make
22   protein, and then proteins then do the work of the cell.  And
23   this is shown in this illustration right here.  DNA is very
24   simply illustrated here.  These dots show that the DNA would,
25   of course, extend far off onto each side.  Genes will have
```

structures called exons and introns.  We can talk a little bit
more about those.

This DNA is used by the cell in a process called
transcription to make a molecule called RNA.  In that RNA the
introns are removed by the cell and instead there are only
exons left.  Then in a process called translation the cell
makes protein, and then the protein does all that work for the
cell.  It's this mRNA molecule that can be used in a
laboratory by scientists to produce another thing called the
cDNA.  You'll probably hear that term.

Okay.  So remembering back to that video, the video talks
about how changes or mutations in a person's gene can lead to
diseases or any other physical characteristic of that person.
And so I will -- I would like to look at some of the other
videos that are in this presentation.  We'll start with this
one illustrating the role of genetics in disease.

(viewing video)

I forgot to mention at the outset, but I hope this goes
without saying, if any questions arise or anything, just feel
free to interrupt me.

THE COURT:  I won't be shy.

MR. JACKSON:  Okay, good.  So what we learn I think
from these couple of videos and from these slides is that in
biology form dictates function.  The chemical composition of a
gene dictates the chemical composition of a protein.  A change

in the chemical composition of that gene can result in a
change in the chemical composition or the structure of the
protein, which then can affect its function, which can then
lead to large scale changes in that person or that organism,
disease, tall height, red hair, whatever it might be.

And so just going back to this example of the sickle
cell, sickle cell disease.  I like that example because it's
so simple.  A single nucleotide change, this chemical change
from adenine at that one position along the gene to thymine,
leads ultimately to this chemical change in the protein.
Instead of glutamic acid, there's a valine.  And that leads to
a change in the -- the chemical properties of protein, they
stick together, they clump, the cells change their shape and
disease can result.

Cancer is often called the genetics disease in that
genetic changes underlie the development of cancer.  So the
video mentioned BRCA1 and hereditary breast and ovarian cancer
syndrome.  That's a great example.

It also raises a good -- couple of terms that are good to
understand, germline and somatic.  So some genetic variations,
some changes in genes, can happen in what's called the
germline.  That means that they're inherited down through
generations.  They can be passed on from parent to child.
Those are called germline variations.

Other variations are not inherited.  They occur during an

individual's lifetime in just some cell in their body, and
those are called somatic variations.  These are not inherited
or passed along.  And it's -- so most cancer arises randomly
or sporadically, and it's caused by just these somatic
changes.

But some families have more cancer than you would expect
if it was just based on random chance, and these can be caused
by germline mutations in important genes, such as the BRCA
genes that can be passed on through families and you can --
researchers can see a pattern of cancer arising in that
family.

So this kind of closes my discussion of the basics of
what's going on inside the cell.  And I'd like to move on to
molecular diagnostics.  So the idea in molecular diagnostics
is to analyze important chemicals in a specimen taken from a
patient, right, and to use those chemicals or analyze them in
some way to figure out what's going on in that patient, if
there's a disease, if there's a predisposition to disease,
whatever it might be, whatever we're trying to discover about
that patient.  And many molecular diagnostic tests analyze
DNA.

So let's take just a second to I guess differentiate
molecular diagnostics from some of the more classical
diagnostics that we might be familiar with.

THE COURT:  I guess I do have one question that

1   comes to mind now, and that is we're talking about the current

2   state of the art today; is that right?  You're telling me

3   about the state of science as it exists today?

4            MR. JACKSON:  Yes.

5            THE COURT:  Okay.

6            MR. JACKSON:  And still today we do use some of

7   these classical techniques.  Microscopes for example could be

8   used to diagnose sickle cell anemia.  You could see the

9   abnormally shaped cells under a microscope.  But certain

10  things can't be detected that way.  For example, genes

11  generally cannot be seen under a microscope.  Certainly

12  their -- their structure, their fine structure, what you might

13  want to get out of that, can't be seen in a microscope.  So

14  scientists have devised laboratory processes to instead deduce

15  that gene sequence because we can't observe it directly.

16       So what that means is we can deduce the structure of a

17  gene that's floating around in the patient's body by quote

18  sequencing DNA molecules in a test tube.  And we'll talk more

19  about how that happens, but that's -- that's the general idea

20  of genetic testing, and it usually starts with a sample from

21  the patient.  We'll have thousands of cells and just kind of

22  this gamish of -- of DNA coming out of those cells.

23       So what we're talking about here are laboratory

24  techniques designed to do two things.  One is called enriching

25  a sample.  So you want to enrich a sample for the DNA of

interest because it's kind of lost in that whole milieu of DNA that came out of the patient's cells so you want to get more of what you're looking for. And then once you've got that, you can determine the structure of that molecule, and then from that work backwards to deduce what was originally floating around in the patient.

So the first step in this process that I talked about is enrichment. And let's talk a little bit more about that. So as I mentioned, the DNA extracted from the patient's cell is random, whole, genomic DNA. It's just this mixture of DNA molecules, of chromosomes and all that. So the three billion nucleotides of the genome can interfere with an efficient analysis of one particular portion that you might want to study, such as, you know, the 5,000 to 10,000 nucleotides that are in a particular gene that you're interested in.

So what you can do, even if you were to isolate, you know, extract away those genes from that initial mixture, there's still not much material there, and the laboratory processes that are used today are not sensitive enough to really sequence that very well, so that they need more, they need more material to work with. And this is called enrichment and target amplification.

So typically this is done by a process called PCR, which stands for polymerase chain reaction. This is a chemical reaction that is used to synthesize numerous DNA molecules

```
 1    with a specific uniform sequence.  And we'll watch a video
 2    that's going to show how that happens.
 3                        (viewing video)
 4        So that's a little bit -- a little bit complicated, but
 5    the basic idea is that the -- the polymerase -- the reagents,
 6    the primers, the polymerase and all these things are used to
 7    generate a lot more DNA molecules having the sequence -- the
 8    structure of interest so that those molecules can then be used
 9    for sequencing, or whatever else you might want to do.  In
10    this case we're mainly talking about gene sequencing, so
11    that's what you would do with the resulting molecules.  And
12    this was mentioned in the video, the fact that the newly
13    synthesized DNA vastly outnumbers the original DNA.  Again,
14    that's by design.  That's for a purpose there.  And, again,
15    it's these new DNA molecules that form the starting material
16    for a sequencing reaction.
17        Let's talk a little bit about how PCR --
18            THE COURT:  Are there conventions on how long or
19    what portion of the DNA strand is replicated during that
20    process or does it just vary?
21            MR. JACKSON:  It's -- it can be really any portion
22    that you want, but there are some -- there are some
23    conventions when you're designing your reaction; right?  And
24    we talk a little bit about that later when we talk about a
25    primer design, but you want to avoid certain portions of --
```

certain sequences of DNA that might be problematic because
they might be nonspecific for what you're looking for or they
might hit a region that varies between individuals. So
there -- there is some general principles that -- that
scientists use in -- in designing these reactions. But it
really depends on whatever the scientist wants to know; right?
If the scientist wants to know what the sequence is at a
particular point, they can design primers to -- to synthesize
DNA at that region and then they can analyze it.

So we talk about designing a PCR reaction, which may be a
little bit of an unfamiliar term. What we're talking about
there is designing what reagents, what chemical reagents are
going to go into that reaction and what that reaction will
accomplish ultimately. Again, what is your goal here? What
do you want to know? What DNA molecules do you want to come
out of here? And what kind of the key component in there is
the primer, the design of the primer, because that will define
what the ultimate molecule synthesized in that reaction will
look like, yeah.

So an important point here is that the DNA molecules that
are synthesized in a PCR reaction are different from -- have a
different sequence from the DNA that came out of the patient's
cell. And it's --

THE COURT: Say that one more time.

MR. JACKSON: The DNA molecules that are synthesized

```
 1   by PCR are different from and have a different sequence from

 2   the DNA that came out of the patient's cell, the DNA molecules

 3   that came out of the patient's cell.

 4          THE COURT:  Why?

 5          MR. JACKSON:  I'll show you.  So you see this --

 6   this blue molecule is meant to be the -- the patient's DNA.

 7   This is what came out of the patient's cell.  And let's assume

 8   for this example that it's been fragmented, just chopped up

 9   randomly; right?  It will be, let's say for this example,

10   about 1,000 nucleotides long, 1,000 of those bases attached

11   together.

12          Now, the primers are these little red arrows.  Now, this

13   is all very simplified but, of course, it's a molecule.  It's

14   a chemical.  But this is just to show the principle.  These

15   primers are quite a bit smaller.  They're 15, 20, 30

16   nucleotides long.  They will hybridize to that patient's DNA.

17   As we saw in the video, these DNA molecules will be produced.

18          Now, look at these molecules.  They are smaller than this

19   bigger one.  They are, as it says here on the slide,

20   complementary to a region of this original DNA.  But they're a

21   different molecule, and they have a different sequence in that

22   this overall sequence of the patient DNA looked at as a whole

23   is different from this sequence of this PCR synthesized DNA as

24   a whole.  Any two DNA molecules -- basically think of it this

25   way.  Any two DNA molecules that are different lengths by
```

definition can't have 100 percent the same sequence. And also
the sequences at the ends of these will be different; right?
Let's say the end of this molecule has this particular
structure. Well, the end of this molecule is going to be
different.

THE COURT: Of course, the portion that's pulled out
of the original patient DNA, and it's reflected there, that's
exactly identical in every instance?

MR. JACKSON: Sorry. So you're saying --

THE COURT: The strand, to use your depiction here,
does the portion between the primers that is, I'm going to
say, excised or cut out of the patient DNA strand, that's the
portion you're trying to replicate, and for this process to
work, the replication ensures that you have an identical
replication every time, is that true?

MR. JACKSON: Yes, kind of. So remember that --
that this -- this blue streak is the molecule that was excised
out of the patient. So these molecules are not excised out.
These are synthesized, using this one as a starting material
and as part of the process. This blue molecule right here is
what came out of the patient's cell.

THE COURT: Is synthesized a fancy word for copy?

MR. JACKSON: I would say no, in that synthesize is
broader; right? Synthesize means to connect chemical pieces
together to form a larger chemical; right? And so that's kind

```
 1    of a general idea of synthesize.  Does that --

 2              THE COURT:  Let me just think about that for a

 3    minute.

 4              MR. JACKSON:  So think of maybe connecting links in

 5    a chain together.  That would be maybe analogous to

 6    synthesizing a chain.

 7              THE COURT:  I understand.  Okay.

 8              MR. JACKSON:  Now, copy, that's a term that is very

 9    often used in the science to say, okay, we're going to copy

10    this DNA.  Copy, of course, suggests an exact copy, right,

11    which is not what's happening here, at least insofar as an

12    exact copy of this entire molecule.  Instead what's happening

13    is a portion of that molecule is being synthesized.

14              THE COURT:  Well, let me use your metaphor.  And I'm

15    not trying to argue with you.  I just want to make sure I

16    understand as precisely as I'm capable today your

17    presentation.  But let's use your analogy of a chain, and

18    let's assume links of different colors, and it's a 10 foot

19    chain, and you want to replicate one foot from the center of

20    that chain.  Your synthesized chains will be identical to that

21    foot that it existed in the 10 foot strand every time; is that

22    true?

23         That is, each -- if we went and looked at any single foot

24    that's synthesized later, we assemble it with the different

25    color of the chain links, and compare it with the original
```

strand, the original chain, that foot that we were trying to
copy or synthesize will look exactly the same as each of the
other chains that we try to withdraw from; is that right?

MR. JACKSON:  In terms of its sequence of
nucleotides over that stretch, in some applications yes and in
some applications no, because in some applications this
molecule that is being synthesized you'll use maybe modified
nucleotides, you'll add a label or something else.  In fact
often these primers have a chemical label attached to them,
which would then make them different.  So, yes, so that's the
answer.  In some applications, yes, the sequence of those --
of this portion of this molecule will be the same as this, but
in other applications, no.

THE COURT:  By design?

MR. JACKSON:  By design, yes.

THE COURT:  Is there a different word for that if
you are synthesizing or replicating a portion of the strand
that you want it to be different after you go through that
process, is that still called -- is it still synthesized, PCR
synthesized, or is it something different?

MR. JACKSON:  I think you would still call it a PCR
synthesis.

THE COURT:  Okay.  All right, thank you.

MR. JACKSON:  So now let's move on to a little bit
more discussion of primers, unless you want to -- anymore

1  questions on the PCR generally.

2         THE COURT:  Some may come up, but I'm tracking with

3  you so far.  Thank you.

4         MR. JACKSON:  So we've talked a little bit about

5  primers and their role in PCR, but let's talk a little bit

6  more in detail.  We've talked about the general principles of

7  PCR; right?  You use an enzyme.  You have primers.  You heat.

8  You cool.  These are, again, the general principles, but these

9  principles don't allow one to necessarily design a specific

10 PCR reaction for a specific molecule that you want to

11 generate.  For that the most important part is the design of

12 the primer because the primers will dictate what that

13 synthesized molecule will ultimately look like.  And for that

14 you need some knowledge of the sequence, the structure, what

15 are you looking for.

16        The COURT:   That's because the primers define the

17 start point and the end point; is that right?

18        MR. JACKSON:  Yes, exactly.  And so primers are

19 unique to each reaction.  And like we said, the sequence of

20 the primers determine what the chemical composition of that

21 ultimate DNA will be.  And this might help to illustrate a

22 little bit of what we're talking about.

23     Let's imagine -- this might be a little bit hard to parse

24 out, but this is actually two DNA -- two very short DNA

25 strands, one right here that I'm calling a primer, one right

here that I'm calling a target DNA.  So what the scientist

does is he looks at this target DNA and he says, okay, well,

here is an (A), an adenine, a cytosine, a thymine and a

guanine.

So if I wanted a primer that could -- that had the

chemical properties to attach to that -- to this target DNA,

what would I want it to look like?  Well, he'll use his

knowledge of this sequence and his knowledge of these

principles to design a primer that will have this sequence,

and it will have these exact chemical properties such that

they combine.  So oxygen is attracted to this nitrogen.

That's just how it works chemically; right?  And that's how

these things are designed.

So let's move on to a --

THE COURT:  So to select -- well, I'm jumping ahead

of you maybe.  To select the primers that attach at the right

places in the DNA strand, the scientist is examining the

nucleotide sequence and looking for a sequence that is long

enough to be unique so that it -- the scientist can design a

primer that will attach only at that place, and the structure

of the DNA sequence -- or the nucleotide sequence will

determine how long the primer has to be; is that right?

MR. JACKSON:  Yeah, yeah.  Sounds like we might not

need to watch the next video because you got it.

THE COURT:  Let's watch it.

MR. JACKSON: But you're right. That's exactly what we're talking about.

(viewing video)

So just like Your Honor said, the length of the primer and its location, all of these things have to be taken into account if you want to design an efficient PCR reaction. So let's just take just one quick step back.

THE COURT: Why is that important, efficiency? You said to design an efficient PCR reaction.

MR. JACKSON: Well, let's see. So here we're saying that this primer has four nucleotides; right? Typically they'd be 30, but let's just say it's four. Now, let's say this one is supposed to have a thymine right here. Let's suppose instead it had an adenine. It would not bind this target DNA very well. And if that adenine was -- if that wrong nucleotide is at the very end of a 40 base pair of nucleotide primer, it might still bind but not well; right? So you might get some results but not great results, especially if this is at a position that varies amongst people; right? All people have different DNA, and it's different at just random positions all over the place.

And so if this happens to be a position where a certain population has an A, another population has a T, you don't want your primer to sit there, because it will work great for the people with the A but it won't work great for the people

with the T. You've Lost your efficiency, especially in a
large scale laboratory operation.

So this really just sort of reiterates -- this slide
reiterates what we've already seen and discussed. Except for
one last point. This is one about optimization, and we've --
we've kind of hinted at this. And that is that often,
especially again in a large laboratory operation, there's some
optimization that needs to take place. You try the primer.
You design it. You think it's going to work great. You put
it into the test tube. You put it into the thermocycler and
you don't get great results or it amplifies a bunch of things
that you didn't mean to do, whatever the problem might be. So
you go back and you try to figure out what was the problem,
what was the error in this design and you redo it. And that
happens often.

So now just sort of to keep within context and help us
know where we're going. So all that we've talked about here
is just generating enough DNA to do your analysis.

THE COURT: Did we talk about how long that process
takes, that enrichment process?

MR. JACKSON: No, we didn't really talk too much.
So like a PCR reaction can take a couple hours, let's say,
because what you'll -- what you'll do is you put your test
tube into this machine, the thermocycler, and it cycles the
temperature up and down, up and down to 90 degrees centigrade

1     to down, and that just -- and it will do say 30 cycles of this
        2     fluctuation in temperature to repeat this chain reaction.  And
        3     we talk about hours, on the order of hours.

        4          So once we've done this enrichment, now we've got enough
        5     material to work with, we can do the sequencing.  That's what
        6     we'll talk about here.  And again recall -- again, to keep
        7     context and keep track of where we're going, the ultimate goal
        8     here is to learn what is the patient's gene sequence?  What's
        9     the structure of the gene in the patient's body and what might
       10     be the implications for that structure as far as a disease or
       11     something like that?

       12          So once we've got enough of these molecules in a test
       13     tube, we can then do what's called sequencing.  I put quotes
       14     in that because let's talk a little bit about what does that
       15     even mean to sequence a molecule; right?

       16          Okay.  So sequencing is the process of deducing what the
       17     structure of an original molecule was from these other
       18     synthesized molecules.  And I say deduce.  Again, I put that
       19     in quotes and I use that quite a bit in this presentation, but
       20     there's a reason for that, is that as we discussed before, we
       21     don't directly observe the original DNA that came out of the
       22     patient's cell in these processes that we're talking about.
       23     We can't.

       24          Instead, we generate a bunch, numerous, billions of DNA
       25     molecules and analyze those in a chemical reaction and from

1    those deduce what was originally there.  And there are two

2    primary types of sequencing by which we do this.  Let's talk

3    first about Sanger sequencing.

4        Sanger sequences -- sequencing is often called dideoxy

5    sequencing, and the reason for that is there's a special

6    chemical reagent used in that reaction that's called a

7    dideoxynucleotide.  And we'll talk more about why that is or

8    why that's important.  It's in this video, and I can explain

9    more if you'd like to hear a little bit more but, again,

10   Sanger sequencing is generally synonymous with dideoxy

11   sequencing.  So let's watch this video that shows it.

12                          (viewing video)

13       I just want to pause the video right here.  I think this

14   is a good place to stop just for a second to explain what

15   dideoxy is because it's kind of -- it sounds like a very

16   technical word but it's quite simple.  What it really means is

17   it's a nucleotide that can't be added to; right?  All of the

18   standard nucleotides they have these chemical pieces that are

19   just waiting to accept the next nucleotide, its corresponding

20   piece on the next nucleotide.  A chemical reaction can take

21   place to join them.

22       But these dideoxynucleotides are designed to not -- they

23   don't have that receptor spot.  They can't be added to.  So

24   that terminates the chain.  And anytime one of these things

25   gets added, terminates the chain.

THE COURT: Are they A's, C's, G's, T's or something different?

MR. JACKSON: No, they are.

The COURT: They're just modified in a way so that they can't receive -- if it's an A it won't attach to a T for example?

MR. JACKSON: Yeah, it won't attach to anything. Here, let me run real quick. So right here, you see this -- so we talk a lot about these A's, T's, C's and G's; right? These are kind of the working end of DNA, but there's also this backbone part. And right here the structure of this part here determines whether you can add another thing on; right? So here, what if -- if this molecule is missing this P-O-O-O, missing that entire oxygen part, then it can't be added onto. It's chemically inert for these purposes. It's dead; right? You can't add anything more on. So this chain ends right here if that happens.

So if this was a dideoxycytosine instead of a regular cytosine, it would stop right there.

(viewing video)

And, again, this slide really summarizes what we just saw in this video. A lot of the text on these slides are there for -- for your later reference. We won't read everything here today. But primers are used in this -- in this sequencing reaction in very much the same way that

they're used in PCR.  They need to be designed to anneal to a
certain spot and to prime that chemical reaction.

     And, again, this just sort of shows again how you look
at -- or how you detect the molecules as they come off of that
gel and you can then determine what the -- what the nucleotide
was at each position.  So that's Sanger sequencing.  That's
one way to do sequencing.

     Another way that we're going to talk about today is
next-generation sequencing, which is a term that is typically
applied to any sequencing technique really after Sanger.  And
there are a lot of different next-generation systems with a
lot of different chemistry going on, but one common defining
feature is what we call multiplexing.

     What this means is that instead of a single reaction in a
single test tube, instead using next-generation sequencing you
can have hundreds of thousands of sequencing reactions taking
place all out once in one reaction.

          THE COURT:  When did scientists start using
next-generation sequencing?

          MR. JACKSON:  That's a good question.  I'd say one
of the earliest -- I might turn to Ben Roa to help me out
here.

     Dr. Roa.

          DR. ROA:  In the research field it's been probably
in the past five to ten years.  More recently it's been used

1    in the clinical laboratory setting.

 2              THE COURT:  Thank you.

 3              MR. JACKSON:  Thank you, Ben.  Okay.  So beyond the

 4    enrichment that we already talked about, the PCR synthesis,

 5    next-generation involves two additional chemical synthesis

 6    reactions.  Typically there's another amplification reaction,

 7    but then also there's what we would call the real sequencing

 8    reaction.

 9         And what happens there is -- well, actually, if I can

10    take a minute over here at the board.  What happens is -- I

11    don't know if I should use dry erase on the paper.  So you've

12    got your -- so other counsel can see.  You've got your

13    other -- your single strand of DNA molecule that came out of

14    your PCR enrichment step.  And it's say tethered to some

15    surface; right?

16         What will happen is -- there's a little primer here.

17    You'll hear a lot of these things repeated, a lot of these

18    concepts and reagents repeat.  And so polymerase will be used

19    again and new molecules will be added.  Let's change the color

20    just to make it a little bit easier to see.  New nucleotides

21    will be added as you go corresponding to what is on this

22    molecule; right?  Maybe here is an adenine, here is a thymine,

23    here is another adenine, guanine.  And at each step, as each

24    one of these things is added, the machine, a little florescent

25    label will be released and will be excited by a laser.  The

machine will detect that excitation, that light that comes

off, and say -- and so to each adenine there might be a green

label, to each thymine there might be a blue, guanine, red,

cytocene, purple, I don't know, whatever else.  And then as

each one is added, a little flash of light goes off.  And so

then the machine can detect that an adenine was added.

So as this thing is synthesized in this reaction, at each

step the machine is reading each one of these steps and is

saying, okay, an adenine was added there, a thymine was added

there.  And so that's how that works.  It's called -- it's

often called sequencing by synthesis.  That's kind of a common

term.

And that's -- that is in a nutshell next-generation

sequencing.  And the reason that this allows for multiplexing

is that when you're over here on this microchip let's say, you

can have just millions of these set up, and you can do them

all at once, and it allows for this multiplexing that we

talked about to make it more efficient.

So the result of all of this -- so, okay, let's go back

to our overview and kind of touch base again, where are we.

We've enriched for the molecules that we were interested in.

We've made those.  We've now run them through a sequencing

process, through a sequencing chemical reaction, and the

output of that reaction is a sequence, chemical structure, a

depiction of a chemical structure in the form of a sequence, a

```
 1  nucleotide sequence.

 2              THE COURT:  Let me ask you to stop for just one

 3  moment.

 4                           (Brief Pause)

 5              Thank you.  Go ahead.

 6              MR. JACKSON:  So the output of this chemical

 7  reaction is this machine is -- is detecting these flashes of

 8  light that's computationally analyzed, and the machine is

 9  reading out or reporting out, outputting, this sequence that

10  corresponds to the structure of whatever that molecule was.

11  And so you get these, what you've often seen, these strings of

12  letters.  These are called -- we talk about these as

13  sequences.  Now, they correspond to molecules, but these are

14  the sequences; right?  These are the letters; right?

15       Well, now you need to kind of figure out what all that

16  means; right?  That doesn't really help you.  That doesn't

17  help the patient sitting in the doctor's office who wants to

18  know whether she's at increased risk for breast cancer; right?

19       So the next step is we move on to some computer analysis.

20  These molecules that are going to be analyzed and sequenced in

21  the sequencing reaction are typically very short molecules,

22  100 nucleotides, 200, something like that, whereas the gene

23  could be thousands.

24       So what needs to be done is researchers use a computer to

25  analyze the raw short sequence data and to quote stitch them
```

together informatically to deduce a composite sequence that
represents all of those molecules together. And in the
abstract that's kind of hard to -- that's kind of hard to
think about, but I think the video illustrates it fairly well.

(viewing video)

And this process is again summarized here on this slide.
I kind of like this picture because it shows more or less
what's happening; right? We don't know what the patient's
sequence was. Through the enrichment and sequencing chemical
reactions we -- we get a bunch of these very small sequences.
But then computer software is used to align up these raw
sequencing -- these raw sequences, assemble them to where now
they're starting -- we see where they overlap. Where do they
overlap? And as we start to read all of that off, we end up
with a composite deduced patient sequence, and then from that
we can start to make clinical decisions or try to figure out
what's going on with this patient.

So the next step, kind of the final step in that -- in
that computer analysis is now we know what the patient's gene
sequence was. We've now deduced what is floating around in
that person's arm from this process, this long process. We
now have deduced what's in there. Well, what does that mean?
Clinically what does that mean? It doesn't help for me to
know that that's an adenine here rather than a thymine, or
that there's an adenine here. Let's figure out what does that

1  mean.

 2       So what we will do -- well, let's watch the video that

 3  shows how this is done.

 4                      (viewing video)

 5       This might help to illustrate what we're talking about

 6  here, is researchers will use a computer, computer software

 7  and this data that they got out of the sequencing reaction to

 8  try to align these sequences and see what the differences

 9  might be.  Here this shows some reference or wild-type

10  sequences that can be used against maybe a patient sequencing.

11  You can see that right at this position, whereas these two

12  reference sequences have an A, an adenine, this one has a

13  guanine.  That's a difference.

14       Now, we don't -- we may not know what that means

15  clinically, but at least we know this patient has a difference

16  here.  Here is another one.  Whereas this reference wild-type

17  sequence has an AG right here, an adenine guanine, in the

18  patient those two are missing, and that might have clinical

19  significance.  We figure it out.

20       And so if there is a variation, scientists can then go on

21  to try to classify that variation.  Does the variation change

22  the protein in such a way that it doesn't work anymore?

23            THE COURT:  Where is the wild -- where do the

24  wild-types come from?  Are these from public databases?

25            MR. JACKSON:  They can come from public databases,

```
 1    yeah.

 2              THE COURT:  And do you often compare your patient

 3    DNA strand against multiple wild-types or is that silly?  Is

 4    there one that's a standard or do you use -- do multiple

 5    overlays?  How does that work?

 6              MR. JACKSON:  It can depend on what type of -- if

 7    you're doing research to try to figure out how much variation

 8    there are across populations, you might want to compare

 9    multiple reference sequences.

10        I think that typically -- and Dr. Roa can help me out

11    here, but I think that typically in clinical sequencing, if

12    you're trying to figure out stuff for patients, whether they

13    should be treated or not, you'll typically use just one

14    standard reference.

15              DR. ROA:  Yes.

16              THE COURT:  Are there uniform wild-types that are

17    generally accepted among scientists to be the model that you

18    use for a specific gene sequence you're trying to compare

19    against?

20              MR. JACKSON:  Again, I'll defer.

21              DR. ROA:  Usually there is a consensus wild-type

22    that is annotated in the databases and in publications.

23              THE COURT:  Is that true for our BRCA1 and BRCA2?

24              DR. ROA:  Yes, there is a consensus wild-type.

25              THE COURT:  Okay.  And it's a single wild-type, a
```

single -- is strand the right word?  There's a single
sequence?

DR. ROA:  Yes, there is a single sequence that is
entered as a reference.  However, as Ben Jackson pointed out,
there can be variations from that sequence that are benign or
normal.

THE COURT:  Right.

MR. JACKSON:  And so the researchers can use this
single reference sequence, and if they see again a difference,
if they see a difference, they'll try to decide, okay, there's
a difference from the reference but that doesn't mean that
it's harmful.  It could just be a variation, a benign
variation, or could be something that radically changes the
protein and we need to do something about that.

And so this can be used to diagnose disease,
predisposition to disease, like responding to a particular
drug, any kind of the things that we now tend to call
personalized medicine.  These -- these are the diagnoses that
can come out of this whole process.

So that -- that's pretty much mostly what we're talking
about here.  What I've added here at the end is a little
discussion about large rearrangements.  But for the most part
this is the process of molecular diagnostic testing for
Genetic testing.

THE COURT:  Gosh, it sounds really easy.

MR. JACKSON:  I'm sure.  Again, if there's anything
you want me to go back, we can talk about it.

                    THE COURT:  No, but this is helpful I think to
address, so let's talk about this.

                    MR. JACKSON:  Okay.  So now all that we've talked
about so far is typically we've been talking about single
changes; right?  We talked about the sickle cell example.  I
love the sickle cell example because it's so simple.  There's
just one chain and one nucleotide in the gene and that causes
disease, or here, two nucleotides, same thing.  But that's not
all that can happen.  That's not all that can go wrong.  A lot
of other things.

        So what can happen is what's called a large
rearrangement, which is a chain of hundreds of thousands of
nucleotides within this gene can be removed, and this can just
be an error.  As the cells are replicating, something happens,
something was missed.  It's just not perfect.  It's nature.
It's not perfect.  And so these large rearrangements can take
place.

        And these traditional sequencing techniques either cannot
detect those changes, such as in Sanger, or cannot be very
good at it, such as next-generation sequencing.  So you got --
so scientists have devised other ways to detect these large
rearrangements.

        Two laboratory techniques used today are MLPA and

microarray.  Now, MLPA stands for multiplex ligation-dependent probe amplification, which is a mouthful.

THE COURT:  Pause for one moment.

(brief pause)

All right, thank you.

MR. JACKSON:  Sure.  So that's a mouthful.  We'll just call it MLPA, much better.  So this involves binding of a DNA probe to a DNA sample and then detecting that binding or hybridization event in some way.  And much like PCR primers, MLPA probes are relatively small, on the order of 70 or so nucleotides long, and they are also synthetically created and designed to bind to a particular -- hybridize to a particular region or a particular molecule having a particular sequence.

Now, this illustration is possibly more detailed than we need, but we'll try to run through it quickly.

THE COURT:  How do we know -- when do we get to this step commercially?  If you're in the lab, do you start with the Sanger sequencing and next-generation and you run it, and if it -- you get results that seem unusual or not what you expect, then you move on to a different kind of sequencing?

MR. JACKSON:  You could.  You could do it sequentially.  You could do it in parallel.

THE COURT:  I guess a better question, maybe the one that I'm really wondering, is when do you employ any of these different techniques if you're a researcher?

MR. JACKSON: So most -- well, from what -- again, Dr. Roa can help me out if I'm going far afield. But most mutations in say the BRCA1 gene, because that's one that I'm fairly familiar with, are on that small order. They can be detected by just the sequencing reactions that we talked about, Sanger, next-generation. They're small. So most of them can be detected that way.

So one potential approach to doing clinical testing is to do that first because that will catch most patients who might have a mutation. But then if the patient has a particularly troubling family history where you say, boy, I really think something is going on here, but nothing came out of the sequencing, let's do what they might call reflexing. So you reflex to this large rearrangement testing to say there is a good chance this may -- this may catch something that wasn't in the first screen.

So I don't know if that's helpful, but that's -- that's a -- a testing strategy that can be employed.

THE COURT: And the choice to use, if you know, or if there is -- why does a researcher choose to use Sanger or next-generation sequencing? Do each present some advantage and disadvantage?

MR. JACKSON: Yes.

THE COURT: And so it depends on what you're trying to achieve?

1           MR. JACKSON:  Yes, exactly.

2           THE COURT:  All right.

3           MR. JACKSON:  Yes.  And they'll often be used in

4    conjunction with each other, especially now as next-generation

5    is relatively new, relatively.  Sometimes it's not terribly

6    efficient at finding mutations in certain regions of genes and

7    that type of stuff so you might supplement with Sanger, which

8    is battle tested and proven to supplement for those regions.

9    That's -- that's commonly used.

10          So MLPA, again, to try to fund these big changes,

11   basically what happens is you've got your target DNA.  You've

12   got these probes here.  You put them all in solution together

13   under certain reaction conditions, and if this target region

14   is present, the probes will bind.  If it's not present, they

15   won't bind.  And you can then detect was there a binding or

16   was there not?  If there was no binding, or if there's less

17   binding than you expected, you can deduce from that that that

18   region was missing.

19          And that's kind of maybe better illustrated here where

20   you can see that this is kind of a way to think of maybe a

21   gene that has four exons here, four regions of interest here,

22   one, two, three, four.  You do your probe binding and PCR

23   synthesis.  You get a bunch of these PCR molecules.  Then you

24   measure the amount of those molecules.  And if you get this

25   expected amount, you can deduce, hey, that patient had all

four of those regions that I was expecting.

But here, let's say this patient has a mutation, a large rearrangement, where this whole section, which can be thousands of nucleotides long, is missing from her DNA.  So then you do that same process, but when you go to measure the PCR, you notice this is missing here.  And so then you can deduce that that -- that that big, large mutation has taken place.

THE COURT:  Does that just tell you that in that segment that's missing there were one or more nucleotides that were not in the order you expected?  Does it tell you anything more than that?

MR. JACKSON:  It just tells you that they're missing; right?

THE COURT:  That the segment is missing?

MR. JACKSON:  Yes.

THE COURT:  From your result?

MR. JACKSON:  Yes.  But you can deduce from that that they were also missing in the original, in the patient's DNA as well.

The COURT:  But you don't know what or how many nucleotides were not in the order you expected or --

MR. JACKSON:  Sometimes you don't know that fine detail.  Particularly with MLPA you might not know the exact detail of where did this thing get chopped off exactly, or

what was the order -- they get flipped around in order.
You're right.  You won't be able to tell in that fine level of
detail, especially with MLPA.

THE COURT:  Are there probes that are -- I mean is
this like a wild-type sequence?  Are there probes that are
consensus everyone agrees this is a standard probe nucleotide
sequence that will run against this strand, looking for these
segments, or is that -- is that a commercial thing that
researchers view differently?

MR. JACKSON:  It's more the latter.  I mean you can
design the probe however you want, to have whatever properties
you want.  As a practical matter there's really just one main
company that provides say MLPA kits to most organizations, so
in this case there actually is probably a standard probe for
each region that you're trying to go for, but that's more just
a consequence of who provides it.  But if you wanted to design
it differently, you could.

THE COURT:  Is there just one probe that you
typically run against a strand DNA when you're looking for a
specific -- well, here you've got four segments, or would
you --

MR. JACKSON:  So these will be different probes for
each one of those regions.  And that's why they call it -- the
M in MLPA is multiplex, and that's again a term that comes
around every once in a while.  All it just means is you do

multiple things at once.  So you're doing multiple probe

hybridization reactions at once.  So you want to see, hey, is

this -- is region number one there?  We'll use the probe for

region one.  Is region two there?  We'll use the probe for

region two.

THE COURT:  All right.

MR. JACKSON:  So the last thing we'll talk about is

another way of doing large rearrangements.  Remember, there

were two ways of doing sequencing, Sanger and next-generation.

There are two primary ways of doing -- of determining whether

there's a large rearrangement, MLPA and now microarray.

The principles of microarray are fairly similar to MLPA.

It uses probes, synthetic probes, that are designed to hit a

certain region, to hybridize to a certain region, just like we

were just talking about.

The difference being that -- well, here is a little

illustration to show this process.  You can take the patient

and the reference DNA, put them into a vial, pour them onto

this microchip.  Now, if we were to be able to zoom into this

microchip, we'd see that each of these little squiggly purple

lines is actually a DNA molecule.  It's a probe molecule that

is designed to hybridize to a certain region of the DNA, just

like this; right?  It's designed to hybridize here, or here,

or here, or wherever it might be.

And so these little probes can be tiled all the way

across the length of the gene. You throw your DNA onto that microchip. You let it sit there under certain conditions that will allow it to hybridize if it's there or not hybridize if it's not. A machine reads the fluorescence of those DNA molecules. They've been chemically modified to light up when a laser hits them.

The machine reads that and can tell the relative proportion of patient versus reference and can tell whether -- whether this region is missing or not, or maybe duplicated. Maybe there's -- maybe this region appears twice in this person's gene when it really should only appear once. So you'll get twice as much green as you expected. Or if it's missing, you'll get either zero green or half as much green as you expected. That's how you're able to detect on that hybridization or not hybridization. And that's --

THE COURT: Will you go back two slides -- one more. Do you recall if there's a -- oh, there are, okay.

(Brief Pause)

All right. That's very helpful. Why don't we do this. Oh, go ahead.

MR. JACKSON: Can I just make just a couple of closing --

THE COURT: Oh, please.

MR. JACKSON: -- remarks. I was thinking back to your question about are there standard probes for MLPA, is

```
 1    there kind of a standard sequence that you would use.  I think
 2    one way that might be helpful in thinking about probes is we
 3    had kind of a lengthy discussion about primers and how they
 4    are designed, and that for each reaction they are designed to
 5    give whatever properties you want for that reaction, and that
 6    you use the -- the knowledge of -- of a sequence of the
 7    molecule that you're trying to synthesize to design that
 8    primer.  And all of those principles essentially apply to
 9    designing a probe; right?  You will -- you'll get the sequence
10    that you want to detect, to hybridize to.  You'll design your
11    probe in a certain way that might involve some optimization
12    for the same reasons that we talked about primers need to be
13    optimized, the right length, the right portion, does it hit a
14    variable region, all of those same principles apply to probe
15    design.  Yeah.

16          THE COURT:  The techniques that you've talked about
17    in your presentation, these are standard techniques.  They
18    apply both in the context, for example, of BRCA1 and 2 testing
19    but also for example sickle cell testing?  These are uniform
20    principles of genetic, what we would say, sequencing and
21    testing?

22          MR. JACKSON:  At the highest level of generality
23    that's true.  But once you get down to the details of the
24    reaction that's going to take place, they'll not be true.
25    Like let's say a primer that will work well for doing a PCR
```

reaction with BRCA1, a portion of BRCA1, would not work for
sickle cell.

THE COURT:  Right.  And maybe these two are good
examples to contrast with each other.  I gather, given that
the sickle cell question turns on such a discrete issue, it's
easier to isolate, the probes and primers are shorter and the
like, but the processes are the same?

MR. JACKSON:  Yeah.  I mean the general principles
that apply -- again, the general principles of PCR will apply
generally, PCR, sequencing, same thing.  And so then, you
know, just to summarize, we look at the basics of biology.
What -- why do we do molecular diagnostics?  Well, you know,
we've got to get more material.  That's why we do enrichment.
We can do then sequence that material, analyze those results
to get a clinical output, yes or no is there a problem.  And
then we talked a little bit about large rearrangements.  Thank
you, Your Honor.

The COURT:  Thank you.

Mr. Gaede, why don't we take a moment.  I gather you'll
have a significant presentation from your side as well.  We'll
let our court reporter stretch his fingers.  We can swap out
whatever gear you need to swap out.  You do have something
more?  You don't just adopt that presentation wholesale, do
you?

MR. GAEDE:  I wouldn't want to copy it, no.

1          THE COURT:  I understand.  All right.  Let's take a

2     brief recess, about 10 minutes, thank you.

3                    (recess from 2:41 PM until 2:56 PM)

4          THE COURT:  We didn't cover this at the outset but

5     everybody will have a chance to fully respond to everything

6     they've seen from the other side too, so you're all aware of

7     that, Mr. Mangum.

8          All right.  Mr. Gaede, hello.

9          MR. GAEDE:  Hello, Your Honor.  First of all, does

10    the Court need any extra copies of his presentation?  We have

11    those here if you'd like them.

12         THE COURT:  I have them here.  I'm pretty much just

13    focused on this so I don't lose the --

14         MR. GAEDE:  Okay.

15         THE COURT:  -- speaker, but thank you.

16         MR. GAEDE:  Absolutely.  All right.  So let's start

17    out.  I think a little bit of basics would help here and start

18    from the beginning, which is DNA.  And what is DNA?  And what

19    are the rules by which DNA operates, the natural rules by

20    which it operates?

21         So obviously DNA is found in human cells.  It is found in

22    humans in our chromosomes.  As a matter of fact, our

23    chromosomes, we have two copies for each chromosome, one comes

24    from the mother, one comes from the father.  They're not exact

25    duplicates.  They actually vary.  And it also depends on then

```
 1    why we start to vary, why we have brown eyes, why we have blue
 2    eyes, why we have some hair, no hair, all those types of
 3    traits.
 4         And the genes are on both chromosomes.  So BRCA1 is on
 5    both chromosomes, 17, and the duplicate.  And that's important
 6    to remember, and there can be differences between the
 7    chromosomes because they come from the mother, they come from
 8    the father, but it's DNA.  And that's what the chromosome --
 9    and it's one long strand of DNA.
10         And in fact really they think of the whole human genome
11    as one continuous strand from chromosome 1 all the way to the
12    end of chromosome 23, that is then broken up into the chunks
13    of chromosomes, but it's all -- the genome is that entire
14    sequence that runs from number 1 to approximately three
15    billion, give or take, you name it, however many.
16         So you've got your basics.  It's in the chromosomes.  You
17    have then, of course, the familiar double helix structure.
18    We'll talk about that a little bit.  But DNA is DNA,
19    deoxyribonucleic acid, and it's in humans, it's in amoebas,
20    it's in plants, and it can be made by man.  The same molecule
21    can be made by man and by nature.
22         So the question of that molecule made by either nature or
23    by man in your body, Mr. Mangum's body, or in a test tube,
24    it's still deoxyribonucleic acid.  Now, what is
25    deoxyribonucleic acid?  The structure of it is the same.  So
```

```
 1   let's start with the structure, because I think it's important
 2   to understand what the structure here is.
 3       You have your single DNA nucleotide, and you have your
 4   backbone.  So you heard Mr. Jackson talk about the backbone,
 5   the nucleotides.  Well, let's focus on those a little bit more
 6   because I think that's an important concept to make sure that
 7   we have.
 8       Yes, there's the language of DNA.  It's like the
 9   alphabet.  We have 26 letters in our alphabet.  There's four
10   in the language of DNA, T, A, C and G.  And like our alphabet,
11   innumerable words can come out of C, T, A and G.  So we have
12   the four different bases, that's all you're ever going to see,
13   in a strand of DNA, A, T, C and G.  And you see how we've
14   depicted -- the chemical structure is the same whether it's
15   made in a test tube, whether it's made in your body, same
16   structure, A, T, C and G.
17       Then how do those two strands come together?  They come
18   together through a natural law called Watson-Crick base
19   paring.  So James Watson, Francis Crick, famous in the 1950's
20   for discovering the famous double helix structure of DNA.
21   People knew there was DNA in the body.  They just didn't know
22   exactly how it existed.  They knew there were chromosomes in
23   the body.  All that was known.
24       Watson and Crick and their natural law of base pairing
25   figured out the notion that it's two strands of DNA that
```

hybridize -- you're going to keep hearing that word --
hybridize across these nucleotides following this natural law,
A can only bind with T, C can only bind with G.  C cannot bind
with T.  G cannot bind with A.  And that natural principle
governs everything you just heard Mr. Jackson talk about,
everything.  And we'll talk about why that is.

So now we have the second strand.  Obviously the A has to
match that T.  The next nucleotide -- and, by the way, if you
don't mind, sometimes I like to go point at the screen.  Is
that okay?

THE COURT:  Make use of whatever space you need.

MR. GAEDE:  It helps me a little bit.  Each one of
these is a nucleotide, across it's called a base pair.
They're bases.  They have pairing.  So A and T are pairing
there.  That's a base pair.  Obviously G, it's going to fit in
with C then.  And C has to fit in with G there in order for
those to hybridize.

And there's what's called a -- it's a fancy word,
noncovalent interaction between the two that holds them
together called a hydrogen bond.  Think of it like two magnets
that stick together.  They're technically not fused together,
but they are joined together by the hydrogen bonds.  So two
magnets coming together is a useful analogy as a way to think
of it -- not the same, I grant you, because one is magnetic
force, one is a hydrogen bond, but it's similar in concept.

1    Okay.  Now, how does DNA replicate?  Because everything
 2 you just heard takes advantage of the properties of DNA to
 3 replicate.  It occurs naturally.  How does this happen?
 4 Strands separate, and each strand, because of the law of
 5 Watson-Crick natural base pairing, provides a perfect template
 6 for the other strand in order to replicate, because right
 7 there at the end, a T must come in, and lo and behold that's
 8 what it is.  And it must follow this law.
 9    So each strand contains information to replicate the
10 double strand and to replicate itself.  That's important.
11 Why?  Because in our bodies, as we're sitting right now in
12 this room, our cells are constantly dividing.  It's going on
13 in your body.  It's going on in my body.  And that means that
14 DNA has got to replicate because it has to then go into the
15 daughter cells, the replicated cells.  All right.  So that
16 process of separation in a replication is going on all the
17 time in the body.
18    So what happens?  There's the famous DNA double helix,
19 begins to separate.  This just makes the point I made before.
20 It will come in then using what you call -- you heard this
21 term polymerase.  It's a form of a protein that exists.  It
22 helps -- DNA polymerase helps all this process happen.  It's
23 what happens naturally.  So you heard them say Taq Polymerase.
24 That's one that actually occurs in nature.  And we have a
25 polymerase in our body.  All this helps this replication

process happen.

And then you're going to see them come in, so that each strand contains the information to make an exact duplicate of itself.  So each strand is very important because each has the function and the ability and it does make a duplicate of itself.  And so cells need that ability in order for there to be proper replication of the cells, a process which goes on in our body all the time.  So a single strand of DNA contains all the information necessary to specify the sequence of the double-stranded DNA.  Okay.

So you'll have this process.  And you're going to see this, Your Honor, and I don't know the exact reason why.  I'm sure Dr. Pribnow, who actually has a sequence of DNA named after him called the Pribnow Box from 1975 based on his early work in this area, could probably tell you, but you'll see this convention of five prime and three prime, and you probably -- you may have seen that in the things you're looking at.  It talks about the direction of the DNA.

So when you think about the DNA replicating and coming apart here, what's going to happen is it's going to replicate in two directions.  One is going to be this way, one is going to be that way.  And based upon the strands, you're going to have replication going in both directions.  Okay.

So here you have it, continuous synthesis.  You might have a discontinuous synthesis.  And what that simply means --

again, a little bit complicated, but actually I think it's an

important concept.  This is continuing to unwind, and so these

strands are becoming separated, okay.  And you have to somehow

prime it to start it, the sequence of making the double strand

that's being filled in.  So this way it's just following the

strand as it unwinds.  This way though, as more is unwound

because it's going this way, you have to keep priming it.  And

there are natural primers that do that.

I want to make sure.  Dr. Pribnow, did I get that right?

DR. PRIBNOW:  Yeah, sure.

MR. GAEDE:  Okay.  I want to make sure.  So then

just to kind of -- when you think about it in our chromosomes,

this long sequence of DNA, it's going to do this bubble

copying bidirectional directions that we just looked at, and

the single strands will fill in to make the double strands.

And that process will continue, that process will continue,

that process will continue, until we have an exact duplicate

of the chromosome, the whole length of it, that will then be

passed on to the daughter cell, the replicated cell.  Okay.

So DNA synthesis in copying goes on in the cell all the

time, natural process, and it follows that Watson-Crick base

pairing law.  That's required, A to T, C to G.

Okay.  So then, as I said earlier, we have the 23

chromosomes, and in those chromosomes we have genes.  There's

approximately 20,000 genes.  Each -- the strand -- scientists

consider both strands to be the gene.  They orient in both
directions.  You remember the different directions that we
talked about.  They can orient in both directions.  Both
strands are part of the gene.  And you may have intervening
sequences between the genes.  But what you have is just a
series of A's, T's, C's and G's that are all mixed up.

        And this might be I think helpful for Your Honor.  When I
talked about how it's an alphabet where you can make many,
many words out of A, T, C and G, approximately once you get to
15 nucleotides, can sometimes be 17, can sometimes be 12, but
once you get to that length and beyond that, there are no
replicate words in the human genome.

        So think about that.  That means if you have a 20
nucleotide sequence, base pair sequence, based across the
whole thing, it goes 20 nucleotides, that is highly unlikely
to be found anywhere in that three billion sequence, except in
that one place.

            THE COURT:  Is there a reason for that other than
just mathematical probability?

            MR. GAEDE:  You just took the English major out of
his realm, so I'm going to turn to Dr. Pribnow and have him
answer that question.

            DR. PRIBNOW:  It's somewhat of a random chance.
There are genes that are similar to other genes.  There may be
pieces of the genome where some sequences are more commonly

```
1    not -- not identical but close.  And so if you were picking a
2    primer, you'd probably want to make a larger primer or make a
3    primer somewhere else, you know, rather than in that sequence
4    if you wanted it to be unique.  So on average, yeah, 15, 18,
5    20 long will tend to pick out a unique sequence.  But, you
6    know, the sequence of DNA in a human cell is not random;
7    right?  There are signals in there.  There are things like
8    telomeres on the ends where there are sequences that are
9    repeated, you know, from one chromosome to another.  There are
10   things of that nature that would mean that some primers would
11   not be highly specific, and so you take that into account.
12        MR. GAEDE:  So you have the gene.  And let's go
13   through this a little bit more because I think this is
14   important.  The information contained within a gene is
15   expressed -- you've probably seen these words, transcription,
16   translation.  Let me try to break those down a little bit
17   more.
18        So first you have transcription.  So I am speaking words
19   to you.  Those are English words.  The court reporter is
20   transcribing those words into text.  But the word is the same.
21   It's gone from a verbal word to a written word, transcription.
22   Next is we'll talk about translation.  I'm going to take that
23   word, I'm going to translate it.  So we're going to transcribe
24   from DNA, which is a nucleic acid, to RNA.  And you're going
25   to make an exact copy, transcribed, what's called
```

pre-messenger RNA. You're going to be very familiar with the terms exons and introns and what happens. Then there's a splicing process at the mRNA. And the intron sequences are looped up, something in that nature, and then you have the messenger RNA because they're cut out.

So in this example here you have your genomic sequence. Of course it's going this way, it's going this way, but we're just focusing in on a part of this -- this entire continuous sequence on this part for this gene-x, and it will have the exon and the introns. An exact transcription, transcribed copy, will be made of what's called pre-messenger RNA. And then it will splice out those introns.

Why is that important? Because now we have to translate. We have to go from the language of nucleic acids to the language of amino acids, i.e., proteins.

THE COURT: Say that one more time.

MR. GAEDE: We have to go from the language of nucleic acids, DNA, RNA, to the language of amino acids, which are what proteins are made of. So first step transcribed, second step translate. And in the code exists the code for the specific amino acids. And I won't bother Your Honor with the techniques of how all that works. Just take it at face value that there's some redundancy. There may be more than one trip -- it's in triplets is how the language works. But there may be more than one for valine. Just take that at face

value.  We don't need to go into the whole redundancy of the code.

THE COURT:  Are there -- are there 60 some combinations --

MR. GAEDE:  64.

The COURT:   -- and 20 --

MR. GAEDE:  Yes.  20 amino acids, 64 triplets.

THE COURT:  Right.

MR. GAEDE:  Exactly.  And so we translate now into proteins.  Why?  Because proteins are essentially what we are.  They can be hormones.  They can be enzymes.  They can be structural.  They can perform all sorts of functions in the body.  And proteins are how the work in the body gets done.  Our skin, made of proteins.  We're basically to a large extent proteins.  And the whole idea is that DNA is acting like the old, you know, hard disk storage drive.  It's got the information.  Then you're going to put it into RAM, which is kind of similar like mRNA because it's very temporary.  There's all sorts of signals going on, but that's the concept.  And then we're going to go into the proteins.

So DNA is -- some would think of it like a hard drive, long-term storage for the information necessary to make the proteins.  And the proteins are really, for the most part, that's what gives life.

Okay.  And think of it like a necklace with beads on it.

1   They actually are strung on by a process, and then it will
2   kind of fold up in a certain way, and that helps give the
3   protein its function.  So you'll see it look here a lot and
4   people will just show it as sort of a string that gets
5   produced that then folds into a three dimensional
6   confirmation, and that gives it part of its function.

7        So that's the basics of transcription into translation,
8   all of which, of course, is being guided by the rule A to T, C
9   to G, And that you need to also then -- you need to replicate
10  that DNA in the daughter cells because they need to make the
11  protein as well.  So all that information has to continuously
12  be passed on.  The proteins are the large part of what make
13  us.

14       So you've heard Mr. Jackson talk about mutations.  And
15  the reason why mutations are a problem is because it can mess
16  up that translation process into the proteins where you put
17  the wrong amino acid there or for some reason it's not there.
18  It's not coded for.  So the protein, the -- in this case the
19  BRCA1 protein, will either have inserted the wrong amino acid
20  or might even have one missing, and then it can't fold
21  properly in that proper three dimensional confirmation, for
22  example, and perform its function, which is to help the body
23  protect itself from breast cancer, particularly in women who
24  are more susceptible to breast cancer for various
25  physiological reasons.  So that's why these mutations are so

important because they cause an error in the process of going
from the language of nucleic acids to the protein, which is
the BRCA1 protein.

So here is just an example of that at a very high level.
You have for example a single base pair change.  So here we
have the DNA and we have the A-T but underneath the arrow
there, and then we'll have it in the mRNA.  One technical
detail.  We have to be scientifically accurate here.  You see
a U there.  You're probably wondering what the U is.  The U is
in fact -- in mRNA U is the same as T.  It's just the way it
is.  Okay.  And the same law though applies in that an A can
only bind with a U.

So you change it, right, and now you have an amino acid
change because it's the triplets that code for the particular
amino acid and you have that change that's made.  And now you
have a mutation.  You have a mutated protein.  Something is
wrong with that protein that's made by the body.  And that
then potentially can lead to cancer -- not always, but it can.

So that's why understanding mutations can be important.
Because remember how we talked about, Your Honor, that there
was some redundancy in the code.  Some mutations don't matter.
They're called benign; some do.  And our sequences are not the
same for all of us.  There's differences in all of them.  And
these variations, they may have effect; they may not.

The COURT:  Is there a -- is there any significance

```
 1   for this case generally about why the introns are removed as

 2   part of the transcription process?

 3           MR. GAEDE:  Well, I think they are to this case in

 4   the next step that I'll get to when I talk about cDNA.  That

 5   is why they're very important to this case.  So the genomic

 6   DNA, the natural sequence, has the introns and the exons.

 7   That's DNA how it exists in your body with that sequence.  So

 8   let me --

 9           THE COURT:  Well, it exists both ways, doesn't it,

10   naturally?

11           MR. GAEDE:  Well, no, it actually doesn't.  So let

12   me go back to here.  Let me be real clear here because this is

13   an important point for you to understand.  In the body,

14   remember, we've gone from DNA to RNA, not to DNA but to RNA,

15   to proteins.  Okay.  All right.  Now, in that RNA is all of

16   the exons of the DNA with the introns removed, but that's an

17   RNA sequence, not a DNA sequence.

18      I'm not going to go into this.  I think it's fair to say

19   that before the Supreme Court there was isolated DNA and cDNA.

20   You can read the opinion for yourself.  I'm going to explain

21   the difference between the two.

22      So what are your sources of isolated DNA?  One, natural,

23   you can extract it --

24           THE COURT:  Well, before we get into this, let me

25   ask you this question.  Is there some accepted definition of
```

this term isolated DNA within the scientific community or do
scientists vary in their views about that?

MR. GAEDE: To the best of my knowledge, and I would
certainly defer to Dr. Pribnow on that, to the best of my
knowledge it encompasses a piece of DNA that has been isolated
in some form or fashion and sitting in a test tube. And so it
can be made synthetically. It can be made by bacteria. It
can be taken from the human. But isolated DNA to my
understanding, and I would say as expressed in their patents
too, includes all different ways to make it.

THE COURT: Mr. Mangum, do you agree with that or is
there -- this has been the subject of some discussion, of
course, in the legal proceedings, and there may be legal
definitions that are ascribed to this. I'm asking as a matter
of science if there's some general consensus.

MR. MANGUM: We disagree with the statement that
suggests that there's some in science. I mean -- and Your
Honor has appropriately pointed it out. There's issues with
regard to claim interpretation, which are issues about how --
what that means in the patent. There's then interpretation
when one reads the Supreme Court's decision what does the
Supreme Court and specifically Justice Thomas mean when he
uses the word isolate versus extract versus everything else.
No, we don't concede that there is a scientific understanding
of the term isolated DNA. It's an issue of claim construction

on one side and an issue of interpreting the Court's opinion
on the other.

The COURT:   All right, thank you.

Mr. Gaede proceed.  I'm going to assume that for our
purposes today you're providing -- you're using terminology in
an illustrative and demonstrative fashion.

MR. GAEDE:  Correct.  I understand the point of
contention.  I obviously don't agree with it.  So the point
being that when you isolate it, either -- your source, either
you make it chemically or you make it in a bacteria for
example, or you take it from the human, the segment, the
isolated DNA segment, is indistinguishable because it must
follow -- it is DNA and it must follow the Watson-Crick
natural law base pairing rule.

And remember when we talked about chemical structure at
the beginning where we showed it?  Again, you have the
backbone.  Same in all three.  You have then the nucleotides
that are forming the base pairs.  Each has it own chemical
structure.  A has its chemical structure, T has its, C has it,
G has it.  And then of course they hybridize or bind according
to the hydrogen bond according to the principle that A can
only bind T, C only to G.

THE COURT:  Freeze that slide for a moment, will
you?

Mr. Mangum, is there dispute in this case that isolated

DNA segments, whether they appear naturally, other than cloned or chemically synthesized, if done correctly are indistinguishable in each instance?

MR. MANGUM: Well, I think, Your Honor, if the question is, and as I understand the question, is if you look at a particular segment and you have a particular sequence within that segment, whether that segment was created -- was extracted from the body or whether that segment was synthesized in the lab, does it have the same sequence of molecules and therefore have the same chemical property? Yes. But when you look at it from the standpoint of is it the same molecule, that little segment, when it's connected with all of the rest of the segments? No.

I mean if you pull out that segment, it's -- it has a different chemical property than it did when it was in the body when it was connected with others. Have I stated the science correctly?

DR. ROA: Yes.

THE COURT: Let me restate the question back to you and see if we understand each other. I think we all agree the nucleotide sequence will be the same.

MR. MANGUM: Correct.

THE COURT: Chemically, physically will there be something that will distinguish a DNA segment that's found in natural DNA from one for example that is chemically

synthesized?

MR. MANGUM:  If it is --

THE COURT:  Just a discrete segment.

MR. MANGUM:  A discrete segment, no.

THE COURT:  All right.

MR. MANGUM:  Inside the body, yes, outside the body, no.

THE COURT:  I think I understand.

MR. JACKSON:  I think the point is that the -- the sequence will be the same in that region let's say.  The larger molecule will have a particular region in which the sequence is the same.  The smaller molecule will have a sequence that is the same.  The chemical properties of those two different molecules will be different because of their different size and the extraneous sequence that's in that other one.  But along that portion --

The Court:  I think I understand Myriad's position. I just wanted to see where -- trying to vet out where we have agreement and disagreement.

Thank you, Mr. Gaede.  Go ahead.

MR. GAEDE:  Okay.  And so isolated DNA follows the ordering of the natural DNA sequence.  And that's true whether it's a single strand of primer, plenty of examples we'll show you in that, also true if it's in a double-stranded form. It's following that sequence.  Yes, I would agree that this is

not that as a sequence.  But there's no question --

                THE COURT:  Well, we're going to save that
discussion for another day, but let's go ahead.

                MR. GAEDE:  All right, sorry.

                THE COURT:  I'm going to allow me to dabble in that
but not the two of you.

                MR. GAEDE:  Okay.  So let's just make sure on cDNA
we understand.  You asked the question is that found in the
genomic DNA.  And the answer is for cDNA, no, it's not in most
instances, and here is why.

        So, again, remember you can go back to your exon, intron,
exon, intron in the DNA sequence.  You then are going to
transcribe into mRNA.  Those introns are going to be cut out.
Now you have the mRNA RNA sequence.  And then scientists use
something called reverse transcription.  Think about that,
reverse transcribing, I'm going back to the DNA language from
the RNA language that I'm in right now, or I'm going to
transcribe it from that nucleic acid to one other, and I'll
make a DNA.  Okay.  So that cDNA with those three exons is not
normally found in the body as a contiguous sequence because of
the sequence that goes exon, intron, exon, intron, exon.  And
so that's why you see those parts here in this other slide,
same concept, exon, exon, exon going into the cDNA.

        In some circumstances though you can make a cDNA that
would be indistinguishable from the genomic DNA.  So, for

example, there are some where there just isn't an intron in
between.  You have the mRNA coming down.  You're making
then -- and the DNA would be an exact copy of what's up there.
Also you could just take a short piece of mRNA, reverse
transcribe that, and that DNA sequence would reflect exactly
what is in exon 3 for example.  That's the point here about
some could be indistinguishable cDNA made in the laboratory
from a naturally occurring DNA sequence.

Now, again, I put this in just to let you know the word
primer is in there.  There's been obviously a lot of
discussion about primers.  But I think what's important about
primers is this.  And you heard in their presentation to you
the primers bind -- this is in their video -- the primers bind
or anneal to the location that is precisely complementary to
the nucleotide sequence of the primer.  Sounds like a lot of
gobbledygook to me.  Let me try to explain what that means
because that's important.

THE COURT:  Let's try to be free of argument as
we're --

MR. GAEDE:  No.  I wasn't trying to actually do
that.  I was actually trying to say that to get away from the
terminology because the biggest burden I think the parties
face and the Court faces is the terminology, what does that
mean.  So I apologize.  I did not mean it to sound that way.

Here is what I mean.  When it says perfectly

complementary following that natural law, Watson-Crick base

pairing, lines up exactly. So how does that work?

THE COURT: Well, by definition I think, right, I

mean that's the purpose.

MR. GAEDE: Exactly. So you have an example here.

You have the primer. You have the two strands of the genomic

DNA, and in it comes and binds exactly, perfectly

complementary.

THE COURT: How are you using that word

complementary when you say that just then?

MR. GAEDE: It means C-G, C-G, T-A, G-C.

THE COURT: There's a term of art, complementary

DNA, right, cDNA?

MR. GAEDE: Yes.

THE COURT: I'm just wondering if you're using it in

this context when --

MR. GAEDE: No, not at all. Complementary just

speaks to the issue of the base pairs being able to bind

across each other.

The COURT: I just want to make sure we're on the

same page.

MR. GAEDE: You're right. This is another example.

This is from Mr. Roa's declaration. Again, you see the

example of matching up perfect complementary for the primers

to the natural genomic sequence.

```
 1          THE COURT:  This would have been -- maybe I should
 2   have put this question to Mr. Jackson during his presentation.
 3   Will you go back a slide.  This was depicted -- this is
 4   similar to a depiction in Mr. Jackson's slide.  It's headed in
 5   the direction of three prime on the top and five -- well,
 6   three -- says reverse prime on the bottom.  When does it stop?
 7   Is there a primer set both at the beginning and the end of the
 8   sequence on both strands?
 9          MR. GAEDE:  No, no.  It just extends out.
10          DR. PRIBNOW:  To the end of the template strand.
11          MR. GAEDE:  To the end of the template.
12          THE COURT:  The template strand?
13          DR. PRIBNOW:  So if you back up one more slide, the
14   primer is actually operating on a single-stranded DNA like you
15   see on the bottom.  And so the priming reaction just gets the
16   polymerisation started on the DNA (inaudible), nucleotides
17   until it hits the terminal nucleotide and completes the chain
18   and you have a double-stranded molecule.
19          THE COURT:  And in the opposite direction --
20          DR. PRIBNOW:  Same thing happens in the other
21   direction, just copying information on the strand that's being
22   used as a template, uh-huh.
23          THE COURT:  So the entire strand -- none of you like
24   this word, but I'm going to use it for my own lack of
25   sophistication about this.  The entire strand is copied in
```

that process, but one portion of it is copied twice; is that right?

MR. GAEDE: Yeah. I think -- let me go to this slide. I think this might help a little bit because I think this is the point that Mr. Jackson was making.

THE COURT: Actually, let me restate that. Half of each strand is copied -- no, that's not right either. I think I understand.

DR. PRIBNOW: You get two separate strands, each one is copied, one from one end to the other. It's always in the five prime to three prime direction, which is why one goes across in one direction and one in the other direction, the way that they're drawn in a presentation like this.

THE COURT: And one portion of the original strand ends up being duplicated completely because it's copied on both -- once you separate the two, it's copied both the bottom part and the top part. They're inverse to each other in between the two markers. Do I have this wrong?

DR. PRIBNOW: Yeah, they're inverse to each other so you end up with two identical copies of what you started with before you separated the strands.

The COURT: But only for a portion of the strand that we're talking about, no?

DR. PRIBNOW: Yes, I suppose, right. If you're talking about a longer DNA that you began with with the primer

```
 1   sitting down.  I think you're alluding to the PCR process now
 2   in a sense.
 3           THE COURT:  Yes.
 4           DR. PRIBNOW:  So that's actually going to be
 5   addressed, well, soon.
 6           MR. GAEDE:  So this is --
 7           THE COURT:  We'll get back to Mr. Jackson.  Go
 8   ahead.
 9           MR. GAEDE:  Well, this is the point that Mr. Jackson
10   was making.  Remember, you take the genomic DNA.  You're going
11   to break it up into all sorts of pieces.  The primers, which
12   are perfectly complementary to the DNA sequence, are then
13   going to -- they'll be separated, the strands, they will then
14   come in and bind, they'll start the PCR analysis.
15       Mr. Jackson's point was that, well, technically because
16   you've broken the DNA, the genomic DNA up into chunks, and
17   then we're going to make copies of a smaller portion of that
18   chunk, that the ends are different.  But there's no question,
19   and I think we have agreement on this, that the nucleotides
20   that are being copied are being copied faithfully and
21   accurately, because the whole point of testing is to make
22   accurate copies.  Because if we don't make accurate copies,
23   very terrible medical decisions will be made.  A woman could
24   perform a double mastectomy or hysterectomy based upon false
25   information.  So it depends upon the fidelity of the copies.
```

```
 1        Let's go back to ours.  So, again, the primers come in.
 2   They could either be at the end or they could be somewhere
 3   further in.  They separate.  The primers, of course, perfectly
 4   complementary to the DNA.  They bind.  Copy during that
 5   process, similar to what you saw in the chromosome, same
 6   thing, going in both directions because it harnesses that
 7   natural process, and then you have a copy made of that
 8   section.
 9             THE COURT:  Will you go back to slide 59.
10             MR. GAEDE:  Yeah.  Your Honor, I don't know if
11   you're looking at our slides.  They may be off one because we
12   put in that other slide that had the depiction from Mr. Roa's,
13   if you're looking at ours.
14             THE COURT:  I wasn't, but thank you.
15             MR. GAEDE:  Happy to give you the corrected set that
16   has that one example from Mr. Roa's declaration as well.  So
17   the PCR happens and the copies of the natural DNA sequence are
18   made, identical copies.  And then it will cycle through this
19   process called PCR, which was invented I believe in 1985, and
20   the inventor was awarded the Nobel Prize for the discovery.
21        And this right here is just a summary overview of how
22   copies of a particular sequence in the genomic sequence is
23   made.  One way to think of it, Your Honor, is if I took this
24   patent here and I took a page out of it and I made copies of
25   it, that's what we're doing.
```

1      THE COURT:  So this is where I'm getting hung up.
2   Let's look at this slide for a moment.  If you look at the
3   left-hand column, and come up from the -- to the second
4   depiction from the bottom on the left.  Neither your depiction
5   nor the one we saw earlier continues the strands out -- on the
6   top portion it would be to the right and on the bottom portion
7   to the left.  But we're starting -- we're starting the PCR
8   process where we've placed the primers, and the DNA strand
9   continues beyond where the primer was placed, and there's just
10  nothing being copied there.  Is that what happens?
11      DR. PRIBNOW:  So you're being astute in your
12  observation here.  There is a -- something is a little bit
13  misleading.  For the first round the primer will indeed prime
14  a reaction that goes way off in the other direction and who
15  knows where, at the end of fragment that's copying, but now it
16  has a fixed end on the right.  Okay.  Similarly, if you go off
17  and copy in the other direction, that will have a fixed end on
18  the left even though it went off in the other direction.  When
19  those are separated and copied, okay, now the -- gosh -- the
20  one that has a fixed end on the left now is copied from the
21  right and now the enzyme just runs to the end and stops.  So
22  that's where you get your stops.
23      And I apologize, we apologize that we sort of omitted
24  that detail thinking that it would get confusing, but you're
25  absolutely right that it ought to be there for the sake of

completion to show you what happens.  And then those longer
strands just stay there.  They're in the reaction but
eventually there are two of them --

        The COURT:   As Mr. Jackson said --

        DR. PRIBNOW: -- there are a billion other copies.

        THE COURT:  As Mr. Jackson said, they become vastly
outnumbered for this reason because that's the portion and it
continues to be replicated.

        DR. PRIBNOW:  Correct.

        The COURT:   Then I understood it better than I
thought I did.

        MR. GAEDE:  And then you make identical copies of
the sequence of the genomic DNA of a portion of that sequence.
Again, we put this in here just so that -- talk about
sequencing.  You know, I think the bottom line -- I was
listening to Mr. Jackson here when he was talking about how
each one keeps adding one on during the next-generation
sequencing process, all you're doing is just following the
natural sequence that exists.  And I think that's the
important thing when you think about sequencing which has
existed since 1977 with Sanger sequencing.  There's also
another one -- I'm not going to bore you with the details --
it's called Maxam-Gilbert.  Turns out that Dr. Pribnow
actually was in Dr. Gilbert's lab in 1975 and a year later it
was invented in Dr. Gilbert's laboratory.

1    It lays out and it's able for us to be able to read.

2    Once we have sufficient material, copies of the DNA sequence,

3    we then have to be able to read it, and we do that through

4    Sanger sequencing.  We do that through old technique,

5    Maxam-Gilbert.  We can do it through Next-Gen.  But what we're

6    essentially doing is again harnessing the Watson-Crick base

7    pairing that starts again with a primer type substance that

8    again reflects exactly the sequence.  And so you just line it

9    up, and then you'll be able to read that sequence.

10    And of course the whole point is we have to be able to

11    faithfully read the sequence in order to understand whether

12    there has been a mutation in the sequence or whether it's the

13    wild-type sequence or whether if there is a mutation is it

14    benign, is it potentially a problem.

15    So that's why fidelity of the whole process depends upon

16    absolute replication and absolute fidelity in terms of the

17    reading of the sequence that are generated to, not deduce -- I

18    think that word -- we object to that word because I really

19    think that is misleading and understates the issue.  It's

20    important to get it right, and the process depends upon

21    replication.  I agree we don't have -- we don't have a

22    microscope that can yet read the sequence directly.  That is

23    true.

24    THE COURT:  I actually think you're both saying the

25    same thing in that respect.  I mean it's deductive logic that

allows you to infer what's attached.  It's the same process
you're describing.  You're -- both sides are saying the same
thing.  You're relying on the Watson-Crick principle to know
what the strand is by virtue of -- by -- of necessity because
of what attaches to it.

MR. GAEDE:  Correct.  And then you might have -- in
that last claim you might have an allele, a specific type.
That's a fancy word for a specific sequence.  You may have a
mutant.  So you have your hybridization using again sort of --
in this case it's called a probe but it's very similar.  In
other words, it's a single-stranded DNA structure that's
designed to be perfectly complementary to the opposing strand.
And here you have two different sequences that have been
replicated and now we're going to probe them.

And you can see there's a mismatch because C can't bind
to T.  So you're not going to get a stable probe.  Unlike over
here you have a stable one because you have a perfect
complementary going across the entire sequence, the contiguous
sequence.  That segment of DNA has a contiguous sequence.

We also -- he also talked about large changes in genomic
DNA.  I think we would disagree.  We can, of course, detect
these larger changes in the DNA sequence by Sanger sequencing.
You're just going to stop.  You keep sequencing parts and then
for some reason you hit, if you will, a hole, a blank stop.
That would infer you to lead -- to understand that there's

been a deletion.

Right?  Have I got that right?

DR. PRIBNOW:  Well, you can adjust that statement a little bit and say you find the sequence suddenly veers off from what you expected.  It goes into different sequence, right, because the DNA molecule that's being copied is a continuous sequence of something.  So when you copy it and -- in order to sequence, or when you PCR across that interval and then sequence the PCR, you discover you get the sequence you expect and suddenly it goes into something else.

Now, if you know a lot of the distal sequence, you can take the sequence on the other half of your PCR product and ask where does it occur?  And if it occurs a thousand base pairs away, then chances are you have just detected a deletion of a thousand base pairs in the DNA sequence.  Do you understand what I'm saying?

THE COURT:  I do.

DR. PRIBNOW:  So Sanger works very nicely actually to look at deletions, to find deletions.  It may not be the best in all cases but it certainly works.

THE COURT:  My impression is these are different tools for researchers to use for different things.

MR. GAEDE:  Correct.  I'm not going to go into this too much, the whole microchip.  You just have a bunch of specific probes, as Mr. Jackson said.  Each will target a

specific area along that gene sequence, and if you have a big

deletion, there won't be that complementation happening and so

therefore it won't be detected.  And you say, ah, that wasn't

detected because I know that probe is designed to hybridize

perfectly to that particular sequence of the DNA.

And go through it -- remember, you could have the

situation, because we have two chromosomes, right, so we could

have for example a deletion in one but not in the other.  And

so in that case you would say, ah, I've got a 50 percent less

amount.  And I would say, hum, okay, so what's going on in

this human is on one chromosome where the BRCA gene is I have

a large deletion.  On the other one where the BRCA gene also

is, I don't.  So maybe that means that that particular human

will produce less BRCA protein, may or may not.

And I think what helped me a lot to understand it is

this, and it goes back to maybe some basic high school biology

that you may have had many years ago and it may be coming

back.  You remember that when you have a mother and a father,

each contributes one chromosome, and then they combine

together to make the pair of chromosomes.

Now, in order to do that, the mother and the father, of

course, they have pairs of the chromosomes in the cell.  To

make the sex cell, they have to make a cell that just has the

one chromosome in it.  And during that process of that

division where you have the double -- the two chromosomes that

are together and one is being if you will just broken off and put into a single sex cell -- I'm sure I'm being way over simplify -- simple enough but it's an important concept. During that process pieces of DNA can go back and forth between the two chromosomes.  You can have what's called recombining.

And so during that process a piece of DNA up here for example could go over here and this can go over here.  And that gets important because from that you can start to detect through hereditary, which I'm about to go into, traits, and recombining and this concept that you'll hear of markers.

So this slide is a little bit premature in that it doesn't show that actual division happening or separation happening between the -- in the mother and the father where each one is going the donate one, but during that process in particular DNA can go back and forth.

Did I get that right?

DR. PRIBNOW:  Yeah, recombination occurs during miosis which is when the (inaudible) are produced.

MR. GAEDE:  That leads you to the concept of markers.  Because remember, Your Honor, we have three billion base pairs, six billion nucleotides in this long sequence, and trying to find out where a gene is is literally looking for a needle in a haystack.

And so what they look for are what are called markers.

Is it on chromosome 5?  Is it on chromosome 17?  Is it on 19?

They don't know.  And you need to at least know in general

what chromosome first before you then begin to use other

techniques to zero in on what is the DNA sequence that is that

particular gene in that chromosome.

So this is a pretty simple illustration, but geneticists

use this concept of markers to begin to hone in on where the

gene is.  And in this case here it might be a little bit too

complicated, but stick with me for a second because I think

it -- I think it helps.

So you have an affected person in this case, someone who

is more susceptible to cancer because they have a problem and

they have cancer in their family with respect to the BRCA1

gene.  And you have other markers that are passed on between

the father and the mother, because remember each contributes

that chromosome.  Then they combine and you can have different

combinations for the children.  So you're looking for a

marker.

So you're saying here you know that mother doesn't have

this particular marker on her chromosome 5 but you know she's

got a marker on chromosome 17 and in this case 19.  You then

start to look at the children.  And you know this mother has

breast cancer.  And, again, this is much simplified form, but

it gets passed on.

So you say, hum, okay, well, I see now if someone has

breast cancer, the females there in the circle, that must be on chromosome 17.  So I've got a marker now, this concept of a marker, that's tied to the -- what they call phenotype, i.e., the problem, if you will, or could be blue eyes, could be green eyes, could be brown eyes, but some expression.  And that's again very oversimplified but what's going on is geneticists are using this concept of markers, and they're using then genetics and the issue of recombination and understanding that that happens.

And the principle is in the long chromosomal DNA, the closer the marker is to the gene itself, the less likely it's going to recombine away from that gene, because pieces go back and forth.  And so if it's real close, you then start to see that, okay, that's got to be where the gene is located because it's not somewhere else.

Let me give you an example of that.  This is in the patent, and what geneticists do is they identify a series of markers.  And here you see a section, and it's honing in on this part of the chromosome.  Because, again, if there's going to be recombination, the marker is going to tend to go with the gene if it's really close.  If it's not, it will tend not to go with the gene.  And so using this process of markers in genetics, scientists can begin to hone in on where the gene is.

And that's where you're going to hear in this case

terminology around markers, and they are used by geneticists
to locate a location of the gene, likely where it is, and
allow them to hone in as to where it is in that haystack by
using markers, i.e., pieces of colored straw that are in that
haystack to help them get there.

And I'm not going to get into this too much.  It's in the
patent.  But what do they do in essence, you have a piece,
here this piece 17q 12 to 21 of this longer human chromosome,
and then through a process of delineating it down further and
further you will then further hone into the gene.  And you'll
hear this terminology, I apologize for it in this case, you're
going to hear yeast artificial chromosomes, larger sections
being copied, then you're going to hear smaller subclones,
smaller pieces, cosmids.  And then you're going to look for
some mRNA as one technique, say is there a gene there, is
there not?

And through that you're going -- that iterative process
you're going to hone in on where the gene is within that
longer sequence.  And those are methods that geneticists used
at the time that the patent applications were filed.

Now, with that --

THE COURT:  The same techniques that are used today?

MR. GAEDE:  I believe many of the same techniques
are used today.  I'm sure there are additional techniques that
are used today as well, yeah.

```
 1            THE COURT:  Thank you, Mr. Gaede.  Anything else?

 2            MR. GAEDE:  No.  I think that's it, Your Honor.

 3            THE COURT:  Mr. Mangum, anything you or Mr. Jackson

 4  would like to add or clarify?  Would you like a recess for a

 5  few minutes and --

 6            MR. JACKSON:  If we could.

 7            MR. MANGUM:  Why don't we do that.  I think that

 8  will help us winnow down what's important.

 9            THE COURT:  Why don't we do that.

10        And then, Mr. Gaede, we'll hear one more time from your

11  side if it's necessary as well and then we'll wrap this up.

12        Thank you.  We'll be in recess for about 10 minutes.

13                (recess from 3:57 PM until 4:19 PM)

14            THE COURT:  All right.  Mr. Mangum, before we hear

15  from you, this gives me just a little bit of pause, but I'd

16  like to be thinking about some of this between now and the

17  time of our injunction so I'm going to walk up to the pool and

18  dip my toe, and I hope neither of you will push us in the

19  pool.

20        A couple of questions.  Let me put them to Mr. Jackson to

21  start, anyone on your side, and then we'll hear from the other

22  side, and then I'll allow both sides an opportunity to sort of

23  wind up and address anything you think we need to touch on.

24        At times today I know we talked briefly about synthesized

25  DNA.  I'm not sure if we talked about purified DNA.  Would you
```

take a moment and talk about those.

MR. JACKSON:  So by purified DNA, as I hear that word or that term, I would take that to mean DNA that has been purified out of a -- say a natural source, such as a patient's cells.  Is that where -- what you're asking about?

THE COURT:  Maybe I should have started with this question.  Is purified DNA a term of art among scientists in this field?  Does it mean something specific?  Is there an agreed upon meaning of that phrase?

MR. JACKSON:  I'd say probably yes.  I would say if you said to a scientist I've got a sample of human cells and I want to get some purified DNA, what does that mean, I think the scientist could tell you what that means.  Yeah, I think so.

THE COURT:  And what would the scientist say?

MR. JACKSON:  I think the scientist would say it's DNA extracted out of those cells.  The cells would be broken open, the DNA would be pulled out of wherever they were naturally, and separated away from the natural surrounding molecules, proteins, whatever else, and then into -- purified to some degree and then put into a different solution, a different test tube let's say.

THE COURT:  Process of isolating say the DNA strand, the double helix for -- maybe I'm oversimplifying -- pulling that away from the other parts that are found in the nucleus

of the cell?

           MR. JACKSON:  Yeah.  There are processes for doing that.

           THE COURT:  All right.  And that's what you think it means to purify DNA?

           MR. JACKSON:  Yes.

           THE COURT:  And what is synthesized DNA?  Is there a common understanding of that phrase among scientists do you think?

           MR. JACKSON:  Probably less so, probably less standard.

           THE COURT:  What's your view about what that phrase means?

           MR. JACKSON:  When I hear the phrase synthesized DNA, I think of DNA generated through some non-natural process.  Now, the word synthesis is often applied to natural processes, for example, DNA replication we heard about.  You can say that the DNA Polymerase synthesizes the DNA molecule.  That is true.

    But when I hear the term synthesized DNA, to me it implies DNA produced in some non-natural process, such as PCR for a much larger piece.  If you've got a smaller piece for say a primer, you could do that in a separate oligo -- they call it an oligo synthesis machine.  It's a machine that just catalyzes the chemical reaction to add one onto the next.

```
 1              THE COURT:  What is the -- what does an amplicon
 2    refer to?
 3              MR. JACKSON:  So an amplicon -- remember when we
 4    were talking about PCR and we talked about the pair of primers
 5    that are used in PCR, one anneals to one template strand and
 6    the other one anneals to the other, and they prime that
 7    synthesis reaction?  Then they separate and you notice that
 8    after a couple cycles, the molecules tend to be bounded by
 9    that -- those primers; right?  Those molecules that are
10    bounded by the primers are the amplicons.  It's the set of all
11    of those molecules having that sequence bounded by the
12    primers.
13              THE COURT:  Is there a common understanding do you
14    think among scientists about what the term pseudogene refers
15    to?
16              MR. JACKSON:  Yes.
17              The COURT:   What is that?
18              MR. JACKSON:  And, by the way, I think that amplicon
19    is also a pretty standard term, very standard term.  I think
20    you get pretty much that exact same answer.  So as far as
21    pseudogenes, a pseudogene is a portion of genomic DNA that
22    resembles an mRNA in the sense that it's a portion of DNA in
23    just the natural genome that may have introns removed.
24    Because what happened is we've been living around here for a
25    long time, humans, and we've been infected by viruses as we've
```

gone along, and certain viruses perform this reverse
transcription Mr. Gaede talked about.

Normally within humans it's one directional, DNA, RNA,
Protein.  But viruses have the molecular machinery to go the
reverse, to go from RNA to DNA.  And so when they infect our
cells over these eons, they have just by chance that machinery
from the virus reverse transcribe an MRNA into a DNA, and then
that DNA got reinserted into the genome.  And that becomes
what we call a pseudogene.  Those can sometimes themselves be
back transcribed into a partial mRNA.

It's very rare for a pseudogene to be the entire gene,
especially for a larger gene like let's say BRCA1 or BRCA2.
They're very large.  That typically doesn't happen because
this is just -- it's a -- it's a chance occurrence inside
somebody's body.

So, anyway, sorry, that was a very long explanation, but
that's what a pseudogene is.

THE COURT:  And that typically refers to the entire
gene, not just some segment of the DNA that makes it a part of
the gene?

MR. JACKSON:  Well, again it will be -- it will --
for a small gene it could be a reverse transcription of the
entire thing.  That happens sometimes.  Now, there's usually
errors in there.  It won't be an exact copy because the viral
machinery doesn't work that well.  But for larger genes you

```
 1   would probably -- I don't know that you would ever see a

 2   pseudogene big enough to cover a large gene.

 3         DR. ROA:  You can't have pseudogenes that only cover

 4   a portion of the real gene.  Usually pseudogenes usually are

 5   not functional.  You can also have pseudogenes in some cases

 6   that do have some introns (inaudible).

 7              (The reporter asked for clarification)

 8         THE COURT:  You can also have some pseudogenes that

 9   have introns.

10         MR. JACKSON:  Yes.  Because the virus caught the

11   mRNA before it got spliced.

12         THE COURT:  I gather it's an unusual condition.

13   It's not something that's -- most of us as humans are not

14   carrying around pseudogenes or are we?

15         MR. JACKSON:  No, no.  I mean most humans will have

16   the same set of pseudogenes more or less.  Now, there will be

17   more variation between us.  Like my pseudogene for a

18   particular gene, let's say the PTEN gene, which is one I'm

19   very familiar with, my sequence might be very different from

20   yours, your pseudogene PTEN, because it's not functional and

21   there's no pressure to keep it the same; right?

22      There's selective pressure to not change a gene that's

23   functional because it could cause a bad gene.  If there's a

24   change in that gene, it could cause disease; right?

25   Pseudogenes aren't functional, as Dr. Roa said, so they can
```

1  change all over the place.

2          The Court: All right, thank you.  I'll save the

3  last question for the lawyers I think, but Mr. Gaede let me

4  let you first respond to that.  Any disagreement with that --

5  with those answers with respect to understanding of what

6  purified -- what purified DNA is?

7          MR. GAEDE:  Actually I do, because purified just

8  simply means purified, i.e., it's in a mixture of something

9  else.  You purify it out, and you can do that in the

10  laboratory.  It can be purified away from the cell.  You could

11  have a mixture of materials in a test tube and you purify the

12  DNA out.

13      So I would -- I would not agree that purified DNA stands

14  for just simply DNA that is purified from the cell.  I don't

15  think one of ordinary skill in the art would understand that

16  term encompasses just that act of purification.  There can be

17  many, many different types of acts of purification around

18  purified DNA.  But I would agree that one act of purifying DNA

19  would be to extract the DNA from the cell and separate it from

20  the proteins and other associated material.

21          THE COURT:  All right.  What about synthesized DNA?

22  Anything you would add to Mr. Jackson's explanation of that

23  phrase?

24          MR. GAEDE:  I would add the word chemical to it.

25  Synthesis can, as we saw, can be natural synthesis.  It can be

in a bacteria.  It could be chemically synthesized.  It could

be a combination of harnessing natural processes, such as in

PCR because you're using that natural process.

     So I wouldn't necessarily say that the word synthesis in

and of itself is descriptive.  It is more -- chemical

synthesis is typically more descriptive of the process of

chemically synthesizing DNA.

            THE COURT:  Well, contrasting that from other forms

of synthesized DNA is your point?

            MR. GAEDE:  Correct.

            THE COURT:  All right.  A more specific application?

            MR. GAEDE:  Correct.

            THE COURT:  And amplicon, I think I share

Dr. Jackson's -- is it Doctor?

            MR. JACKSON:  Mister.

            THE COURT:  I tried to give you a promotion today.

Amplicon is a commonly understood phrase.  It's what you

described.  Do you agree with that?

            MR. GAEDE:  I agree that it's a copy of the target

DNA.  That can be genomic DNA.  That could be a synthetic

sequence that is made by man only.  You can amplify various

things, but it's a copy of the target DNA that is being

copied.  In this case we've been talking about genomic DNA,

the DNA sequence found in the genome.

            THE COURT:  Through PCR?

1        MR. GAEDE:  Yes.

2        THE COURT:  All right.  Pseudogenes?

3        MR. GAEDE:  You got me on my knowledge there.  I

4   don't know if Dr. Pribnow has anything to add to that.  I'm

5   not as familiar with that subject matter, other than I do

6   agree we have viruses.  We have that process -- it does happen

7   in our body and I know that parts of it can recombine into our

8   genome.  But that's stretching my limits so I'm going to ask

9   Dr. Pribnow to --

10        DR. PRIBNOW:  Well, it's stretching my limits a

11  little bit too it turns out.  I don't know that much about

12  pseudogenes.  But the descriptions that I heard to my

13  knowledge sounded reasonably accurate, so --

14        THE COURT:  All right.

15        MR. GAEDE:  And at a high level I don't have a lot

16  of problem with Mr. Jackson characterizing it.

17        THE COURT:  My last question.  I'll put it first to

18  you, Mr. Gaede, and then, Mr. Mangum, I'll invite you to

19  respond.  What do the defendants contend that the phrase

20  isolated DNA refers to?

21        MR. GAEDE:  It refers to a DNA segment that has been

22  either isolated from natural DNA, recombinantly made or

23  chemically synthesized, and that has in the case of the

24  Supreme Court's decision has a contiguous sequence that

25  corresponds to a portion of a naturally occurring sequence.

```
 1              THE COURT:  Well, does that phrase, isolated DNA,

 2    have some discrete meaning among scientists separate from what

 3    lawyers and judges have done to it?

 4              MR. GAEDE:  Well, I do believe it does in the

 5    concept that in the genomic DNA you have the DNA existing in

 6    the chromosomes in the cell, and I don't think anyone would

 7    look at that as a scientist, based on my years of practicing

 8    in this area, and say that's isolated DNA.

 9         Do you agree with that Dr. Pribnow?

10              DR. PRIBNOW:  Yeah.

11              MR. GAEDE:  Now, obviously once you have isolated a

12    DNA sequence, a segment of DNA, that is an isolated DNA.  How

13    it is made in my understanding is not important.  It's the

14    fact of isolation that's what's important.

15              THE COURT:  Where does that understanding come from,

16    the understanding you just described?  From where does that

17    derive?

18              MR. GAEDE:  Two places.  First I believe that's

19    terminology that is used in the field.  Secondly, that is

20    terminology that has been used since the early 1980's in the

21    patent law.

22              THE COURT:  Is there a distinction that you would

23    draw between isolated DNA and purified DNA?

24              MR. GAEDE:  Again, going back to the purified issue

25    that we talked about, isolated DNA simply refers to the DNA
```

structure that has been isolated and can be made from a number
of different ways. The question is what is that isolated DNA?
What is that composition? What is that product? And that is
the question that needs to be answered for what is isolated
DNA.

THE COURT: All right. Mr. Mangum, do you care to
address that or have someone on your side address this issue
of -- I'm jumping the gun just a little bit on you here.
We'll be receiving some briefing that will relate to this, but
I'd like to digest it a little bit between now and then.

MR. MANGUM: Okay. And I come back to what I said
before. First of all, isolated DNA is not a term of art, not
something that's commonly understood, you know, in the field
as being one and only one thing as opposed to kind of a broad
thing that might have some genus that would have some species
underneath it.

Where I think it comes into play in this case, and where
it comes into play in the briefing that we'll be pleased to be
able to address, is that there -- and it's what I alluded to
earlier. Those are terms -- isolated DNA is a term used in
some of the claims of the patent. And with regard to that
term, using claim interpretation principles and looking at
that term as it's used in the specification, there is a proper
claim construction for that term.

That does not mean that you can then take that term as it

was used in the patents and say, well, anytime anybody uses the word or the phrase isolated DNA they're talking about that isolated DNA as used in the patent, as construed by Judge Sweet, as dealt with by the courts. And I think very importantly, reading and parsing, as we're going to need to do in great detail on September 11th the Supreme Court's decision, there are statements in the Supreme Court's decision where it is clear that the court and Justice Thomas is using the term isolate synonymously with the word extract.

And so when the court is talking about isolating, the Court is talking about -- in my view, and this will be our argument -- is talking about DNA that is extracted from the body, and then he contrasts that and uses other terms when he's talking about chemically synthesized DNA or creation of DNA.

Anything to add to that?

MR. JACKSON: No.

MR. MANGUM: And then Mr. Jackson just had -- I certainly will answer whatever questions the court has -- just two points in rebuttal to Mr. Gaede in terms of the general presentation.

THE COURT: All right, thank you. Well, I'll look forward to our discussion about our claims and terms on September 11th. This is helpful.

Mr. Jackson, a general response to the scientific

portion.

MR. JACKSON: Just two points, Your Honor, I just wanted to emphasize. We talked a lot about primers and PCR synthesis, PCR reactions. And one point that I wanted to emphasize there is the way that the primers work in tandem as pairs, primer pairs. For this type of a PCR reaction you need two pairs that will work together to result in that exponential amplification from PCR. So it's an important thing to remember. I hope that that came across well in the presentation.

The Court: When you say pair, you're talking about the fact that there are of necessity two of them, but they're -- they're not identical. They're different because they attach at different --

MR. JACKSON: Correct. Exactly, correct, yes.

The Court: All right.

MR. JACKSON: And another point we -- I think we probably belabored this point a lot, but I'd like to come back to it, is this issue of segments versus whole -- segment DNA versus whole, whether an amplicon is the same as the larger DNA molecule that was used to generate it. Just a couple points on that.

I emphasized in my presentation or I pointed out that it's a different molecule; right? It doesn't have that entire sequence that the original DNA did, but as we I think pretty

```
 1   well fleshed out, a portion of it does in fact align, a
 2   portion -- the amplicon molecule, let's say, that PCR
 3   synthesized molecule, will share sequence with that larger
 4   molecule.  So we all kind of agree I think on that.
 5        But the -- a couple points to remember are that they are
 6   different molecules.  That the amplicon molecule is chemically
 7   synthesized rather than extracted out of the cell.  And that,
 8   like in the instance of a primer let's say, while it shares
 9   certain sequence with that original DNA, it has different
10   chemical properties, and it was designed to have particular
11   properties.
12        Mr. Gaede talked quite a bit about information.  He used
13   the analogy of the hard disk and the computer.  Analogies can
14   sometimes be helpful.  In that analogy I would say that a
15   primer is more like a piece, a piece that you've created that
16   can be used with say the hard disk; right?  Whereas the hard
17   disk might carry a bunch of information, that little tool,
18   that little primer, really doesn't from a genetic perspective,
19   from a biological genetic perspective.
20        You know, Mr. Gaede emphasized the informational aspects
21   of DNA.  I don't see much information in a PCR primer.  It's
22   not going to tell you -- it won't encode a protein; right?  It
23   won't -- it probably won't be enframed to be able to encode a
24   protein.  It's a tool used in a laboratory to generate a
25   molecule.  So I kind of wanted to emphasize that.
```

1      And the design of that primer is -- we heard a lot about
2   natural laws and Watson-Crick base pairing.  Certainly when
3   someone is designing a primer and they're looking at their
4   target sequence and trying to decide what's this primer going
5   to look like, they definitely consult the natural chemical
6   laws underlying that base pairing, and they apply it.  They
7   say here is what I know about base pairing, about the way that
8   these chemicals interact.  Here's what I know about my target
9   sequence.  And these are important things to know, especially
10  the target sequence; right?  I'm going to apply that in this
11  way and design this primer.  And that's -- that's how they do
12  it.  They -- yeah.  That's how we do it.

13      That's it.  Did you have questions?

14          The Court:  One I think on this point.  Maybe it's
15  an imperfect analogy but it's simple so I like it.  Let's
16  think again about a chain.  I think you're the one who
17  introduced this idea.  Let's think about different colored
18  links representing our A's and T's and C's and G's.  We have a
19  10 foot segment and we want to create an exact copy of the
20  segment that runs from the fifth foot to the sixth foot in the
21  chain.  We can do that by binding colored links and assembling
22  them in the same order.  But in genetics and through PCR will
23  there be something else that will be different about that one
24  foot segment?  For example, I'm wondering about will the links
25  on the end, are they closed in some fashion?  Is there

something physiologically different about the amplicon?

MR. JACKSON:  In some applications they can be.  For instance, when Myriad itself does its Sanger sequencing, the primers have chemical labels attached to the end let's say. And so then they perform their amplification, this synthesis reaction and the resulting molecule then has this chemical modification on the end.  That's what allows us to ultimately see what the sequence is going to be.  So it depends on the application.  It doesn't have to be chemically different.

THE COURT:  Is that something that prevents molecules from bonding on the other side of the primer?

MR. JACKSON:  The directionality of the molecule would already prevent that.  Remember the five prime to three prime?

THE COURT:  Yeah.

MR. JACKSON:  So this label is going to be on the five prime end and you can't add.  That's how it works under chemistry and biochemistry.  It cannot -- you can't add in that direction.  So that's true.  So you put the label there on the end.

THE COURT:  Okay, thank you.

Mr. Gaede, anything more you wish to add?

MR. GAEDE:  No, Your Honor.  I think we've talked about the issues in that respect.  I think it was a little argumentative at the end, but I think we're done.  I do have a

few questions if the Court would entertain them about the structure of the hearing.

THE COURT: Well, let's talk about that and clean up any housekeeping issues we have to address. What's on your mind?

MR. GAEDE: So, first of all, we have the 11th blocked out, and then the morning of the 12th. We have obviously submitted a number of declarations to make the record. You have also said that if a witness -- that a witness absolutely needs to be here for cross-examination for that purpose on the 11th.

And so, first of all, I would just ask that Mr. Mangum tell us does he want every one of those declarants there in advance because we have plane tickets. As you've seen, we have people from all over the country who are -- have submitted declarations. So, first of all, if there's someone that he does not want to be present to let us know in advance would be (A) very helpful, and (B), because of these people coming from all over the country, there might have to be some issue around taking out of order, which would lead me to my next question about how you'd like to structure openings, witnesses, and then closings and your thoughts there.

MR. MANGUM: Your Honor, I guess my point on all this, and I'm sure we're in agreement, is we have a very limited amount of time, and all either of us are interested

in, of course, is being helpful to the court.  And, you know,
frankly it seems to me that there is a hierarchy of issues
here, some of which are going to be more important to the
Court, some of which, frankly, are matters for Congress, and
that what we ought to do is make sure that we're spending our
time and the Court's time on things that are important to the
Court.  In terms of making a record, people can do that with
their declarations.

But I would think that what we would want to do is with
input from the Court, identify what are the issues that are of
most concern for the Court and focus on those, and we can
leave other issues to just declarations or whatever else.  And
I know that's perhaps difficult because we haven't submitted
our responsive papers yet.  And so, you know, some of those --
some of those areas are obvious to me, others it might be.
And I don't know what the Court's schedule is, but I don't
know whether it would make sense that after we've filed our
papers whether there's a half hour period during the week of
labor day where we could just come down to the court and say,
all right, let's identify the issues that are important for
the court and then what the Court wants us to focus our time
on, let's bring the witnesses, if any, that are pertinent to
those issues and everybody else can stay home.

The Court:  This is an unusual motion in many
respects.  It's not unusual insofar as motions for preliminary

injunctive relief.  We've seen that many times before.  But it

is an unusually complex subject matter factually and legally.

My instinct is that most of the time during our hearing will

be devoted to legal argument about the implications of the

rulings that precede our case and some argument about the

facts.

I don't see that there's actually a great deal -- there

are disputes about terms and their application and what they

mean.  I don't -- I don't perceive that there's really a great

deal of debate amongst the parties about the scientific

principles that apply, and so I'm not sure that we'll end up

having much by way of live testimony and examination.

Maybe it makes the most sense to meet and talk again

after we receive the reply.  On the other hand, I'm mindful

that it's the Plaintiffs' motion and it's your burden, and I

think that you need to be given some leave to put on the case

that you think you need to put on and meet your -- well, your

legal and evidentiary burdens.  And my -- I don't know how

much guidance I can give you.  I mean I think maybe the time

would be best spent between the two of you deciding what

issues and areas are genuinely in dispute, and you may not

agree about that.

But I don't want to have 20 witnesses in the courtroom

who have taken time out of their busy schedules to go to Utah

to sit in on an excruciating hearing and then turn around and

fly home.  That's not helpful, is it?

MR. GAEDE:  No.  I appreciate that.  I appreciate that guidance.  Also, I would say though, I do think that there is another all important aspect to the case, and that is also the 102, 103 issues that we raise.  And so I agree with you on the 101 issues there's going to need to be extensive discussion around the Mayo and the Myriad decisions and the record that exists there, but I also think there's also in our view very compelling 102 and 103 issues that we have brought forward.  I assume Mr. Mangum will provide some rebuttal to that, and I do think the Court is going to have to grapple with those issues as well.

THE COURT:  Well, what I'm going to propose is that -- I can't recall now, Mr. Mangum.  We gave you an extension of time to file your reply.

MR. MANGUM:  A week from today.

THE COURT:  A week from today.

MR. MANGUM:  And then two weeks from today for their rebuttal declarations, but I would think that in between those times, if there were a moment to be with the Court where we have talked beforehand, that would be very, very helpful, and I'm thinking 30 minutes.

THE COURT:  Well, I will make myself available whenever we need to meet, if we need to meet.  What I was going to suggest is a meet and confer between counsel after

1   Myriad tenders its reply, give the defendants a chance to
2   digest it a bit, discuss about -- discuss amongst yourselves
3   the ramifications and whether there's some agreement about a
4   course to pursue for our hearing.  And if there's not, maybe
5   identify those issues you'd like some guidance from the Court,
6   and then notify my case administrator and we'll have you in
7   and we'll chat if we need to do that.
8          MR. GAEDE:  That's fine, Your Honor.
9          MR. MANGUM:  Thank you, Your Honor.
10         THE COURT:  All right.  Is there anything else we
11  should touch on?  I don't think there are outstanding
12  substantive issues.  There were some motions for admission pro
13  hac vice and things but I don't think anything significant.
14         MR. MANGUM:  We're approaching entry number 100
15  already.
16         The Court:  We're all very excited about that.  Is
17  there -- I am wondering about one thing, and it's just -- I
18  guess I'm just trying to think of efficiencies.  We have not
19  consolidated these cases.  We spoke briefly about this at the
20  hearing with Gene By Gene.  And I think there's reasons
21  that -- well, these cases will not be consolidated for trial,
22  of course, but I'm beginning to wonder -- we're making
23  separate entries in two different cases as we're proceeding.
24  I'm wondering if there's any reason not to consolidate the
25  cases for the time being.  I think everyone anticipated we

```
 1    would act that way at least through the hearing.  And then
 2    we'll have scheduling orders that will be forthcoming.  It
 3    seems to me discovery should move in parallel tracks, and I
 4    can't think of any reason why we wouldn't consolidate the
 5    cases for those purposes.  And then maybe by the time we get
 6    to expert discovery maybe we need to split them out or maybe
 7    not, but just to streamline the proceedings so everybody is
 8    not making two separate filings.  What's your view about that,
 9    counsel?
10              MR. MANGUM:  We're in agreement with that, Your
11    Honor.  We think the cases should be consolidated for
12    discovery purposes.
13              MR. GAEDE:  You know, Your Honor, I need to speak
14    with both my clients.  I know they're in firm agreement for
15    consolidation through the P.I.  No issue on that.  But I do
16    need to speak to both of them about that issue, if the Court's
17    indulgence as to whether it should be consolidated for
18    purposes of discovery.
19              THE COURT:  All right.  Well, that's fair enough.
20    Of course we want you to have a chance to consult with your
21    clients.  I'm going to treat this as a stipulation to
22    consolidation until the Court resolves the preliminary
23    injunction issues.
24         And then, Mr. Gaede, if your clients wish to separate the
25    cases out again, I'll ask you to make a motion at that time.
```

```
 1   But we'll consolidate the 403 matter into the earlier filed

 2   matter, the 640 matter for now.

 3             MR. GAEDE:  My secretary will be thankful.

 4             THE COURT:  Everyone will I think.  All right.  Is

 5   there anything else, counsel, we should take up while we're

 6   here?

 7             MR. MANGUM:  No thank You.

 8             THE COURT:  I'd like to express my appreciation to

 9   all of you and your clients for the hard work you put in for

10   preparing the materials for the Court.  It was helpful and it

11   was informative and I appreciate it.  So I hope you all have a

12   nice weekend.  We'll be in recess.

13                   (Hearing concluded 4:51 PM)

14                          *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2
 3
 4
 5                    Certificate of Reporter
 6       I, Raymond P. Fenlon, Official Court Reporter for the
 7  United States District Court, District of Utah, do hereby
 8  certify that I reported in my official capacity, the
 9  proceedings had upon the hearing in the case of
10  University of Utah Research Foundation, et al. Vs.
11  Ambry Genetics Corporation, case No. 2:13-CV-640RJS, in said
12  court, on the 23rd day of August, 2013.
13       I further certify that the foregoing pages constitute
14  the official Transcript of said proceedings as taken from my
15  machine shorthand notes.
16       In witness whereof, I have hereto subscribed my name
17  this 30th day of August, 2013.
18
19
20
21                              /s/ Raymond P. Fenlon
22
23
24
25
```