(715AB)

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

UNIVERSITY OF UTAH RESEARCH
FOUNDATION, A UTAH NONPROFIT
CORPORATION, THE TRUSTEES OF
THE UNIVERSITY OF PENNSYLVANIA,
A PENNSYLVANIA NONPROFIT               CASE NO. 2:13-CV-640RJS
CORPORATION; HSC RESEARCH AND                    2:13-CV-643
DEVELOPMENT LIMITED PARTNERSHIP,
A CANADIAN LIMITED PARTNERSHIP
ORGANIZED UNDER THE LAWS OF THE        (CONSOLIDATED HEARING)
PROVINCE OF ONTARIO; ENDORECHERCHE,
INC., A CANADIAN CORPORATION
ORGANIZED UNDER THE LAWS OF THE
PROVINCE OF QUEBEC; AND MYRIAD
GENETICS, INC., A DELAWARE
CORPORATION,

          PLAINTIFFS,                  SALT LAKE CITY, UTAH

   VS.                                 SEPTEMBER 11, 2013

AMBRY GENETICS CORPORATION,
GENE BY GENE,

          DEFENDANTS.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
BEFORE THE HONORABLE ROBERT J. SHELBY
UNITED STATES DISTRICT COURT JUDGE

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:
                          PARSONS BEHLE & LATIMER
 3                        BY:  DAVID G. MANGUM, ESQ.
                               C. KEVIN SPEIRS, ESQ.
 4                             KRISTINE EDDE JOHNSON, ESQ.
                               MICHAEL R. MCCARTHY, ESQ.
 5                        ONE UTAH CENTER
                          201 SOUTH MAIN STREET, SUITE 1800
 6                        SALT LAKE CITY, UTAH 84111
                          (801) 532-1234
 7
                          MYRIAD GENETICS, INC.
 8                        BY:  BENJAMIN G. JACKSON, ESQ.
                          320 WAKARA WAY
 9                        SALT LAKE CITY, UTAH 84108

10                        FISH & RICHARDSON
                          BY:  ELIZABETH M. FLANAGAN, ESQ.
11                             GEOFF D. BIEGLER, ESQ.
                               JONATHAN E. SINGER, ESQ.
12                        222 DELAWARE AVENUE, 17TH FLOOR
                          WILMINGTON, DELAWARE 19801
13                        (302) 778-8472

14   FOR THE DEFENDANTS:
                          TRASKBRITT, P.C.
15                        BY:  EDGAR R. CATAXINOS, ESQ.
                               JOSEPH A. WALKOWSKI, ESQ.
16                        230 SOUTH 500 EAST, SUITE 300
                          SALT LAKE CITY, UTAH 84110
17                        (801) 532-1922

18                        MCDERMOTT WILL & EMERY
                          BY:  WILLIAM G. GAEDE III, ESQ.
19                             ERIC W. HAGEN, ESQ.
                          275 MIDDLEFIELD ROAD, SUITE 100
20                        MENLO PARK, CALIFORNIA 94025
                          (650) 815-7400
21
                          HATCH, JAMES & DODGE
22                        10 WEST BROADWAY, SUITE 400
                          SALT LAKE CITY, UTAH 84101
23                        (801) 363-6363

24   COURT REPORTER:      RAYMOND P. FENLON
                          350 SOUTH MAIN STREET, #242
25                        SALT LAKE CITY, UTAH 84101
                          (801) 809-4634
```

```
 1
 2
 3
 4
 5
 6                          I-N-D-E-X
 7
 8
 9
10    WITNESS                 EXAMINATION BY           PAGE NO.
11    B. ROA              DIRECT BY MR. JACKSON          102
12                        CROSS BY MR. GAEDE             104
13
14    B. SWEDLUND         DIRECT BY MR. SINGER           183
15                        CROSS BY MR. GAEDE             187
16
17    M. KAY              DIRECT BY MR. BIEGLER          194
18
19
20
21
22
23
24
25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                         (9:37 A.M.)

 3            THE COURT:  Good morning everyone.  We'll go on the

 4    record.  This is case number 2:13-CV-640.  This is our

 5    consolidated case now involving Plaintiffs University of Utah,

 6    et al. versus Ambry Genetics and Gene By Gene as Defendants.

 7        I have your names, but, counsel, why don't we take a

 8    moment and have you enter your appearances, if you would,

 9    please.

10            MR. MANGUM:  Good morning, Your Honor, David Mangum,

11    Kristine Johnson, Kevin Speirs and Michael McCarthy of

12    Parsons, Behle & Latimer on behalf of the Plaintiffs.  Also

13    Jonathan Singer and Elizabeth Flanagan of Fish & Richardson on

14    behalf of Myriad.  Mr. Geoff Biegler will also be appearing

15    and will -- but is not in the courtroom right now.  Also at

16    counsel table and counsel of record in the case is Ben Jackson

17    of Myriad.

18            THE COURT:  Thank you, Mr. Mangum.

19        Mr. Gaede.

20            MR. GAEDE:  Good morning, Your Honor, Bill Gaede of

21    McDermott, Will & Emery.  I'll let everyone introduce

22    themselves individually, but I'd also like to introduce

23    briefly to Your Honor, since we didn't have a chance to do

24    that at the tutorial, the President and CEO of Ambry Genetics,

25    Charles Dunlop.  And also sitting behind him is the President
```

```
 1   of Gene by Gene, Ben Greenspan.

 2              THE COURT:  Thank you.

 3              MR. CATAXINOS:  Edgar Cataxinos and Joe Walkowski

 4   from TraskBritt on behalf of Defendant Ambry.

 5              MR. HAGEN:  Good morning, Your Honor, Eric Hagen on

 6   behalf of the Defendants.  I'm also at McDermott, Will &

 7   Emery.

 8              MR. HATCH:   Brent Hatch from Hatch, James & Dodge

 9   on behalf of Gene By Gene.

10              THE COURT:  All right.  Well, good morning everyone.

11              MR. MANGUM:  Your Honor, maybe it would be

12   appropriate for me to introduce the folks from Myriad who are

13   here as well.

14              The Court:  We'd be happy to have you do that.

15              MR. MANGUM:  Thank you.  Dr. Ben Roa, who is Vice

16   President of Technology Development.  Your Honor is familiar

17   with him.  He will be our corporate representative here for

18   the purposes of the preliminary injunction hearing, and then

19   Mr. Richard Marsh, Executive Vice President and General

20   Counsel of the company, and Mr. Ron Rogers, who is Executive

21   Vice President of Public Relations.

22              THE COURT:  Thank you.  Well, you'll all find those

23   wooden benches very comfortable as we move through the day,

24   I'm sure.

25       We have a lot to cover, and not a lot of time to waste,
```

but I want to take just a moment and step on the soapbox for just a moment. Counsel, you've all been busy, of course, preparing your arguments and preparing your witness examinations. You have a number of witnesses present who have been working on your testimony. You've all been very busy. I hope you've all had a chance to reflect for just a moment on today's date and its significance and the many privileges we enjoy in this democracy.

We're here today, of course, in an important commercial dispute between two -- well, many entities. It's a rare privilege that we enjoy here in the United States that a lot of folks around the world don't enjoy, the opportunity to come here in an open forum, in a public proceeding, to have resolution of our disputes and to apply a rule of law that guides us in our resolution of those disputes. We're deeply fortunate for that, and I hope all of you have taken just some time to reflect on that.

A few housekeeping matters. There are many people in the courtroom today who don't know this and might be interested. Counsel, of course, you all know this. We had a call last week and discussed the way that we'd be proceeding. We're here today for preliminary argument and an evidentiary hearing on a motion for preliminary injunction filed by the Plaintiffs in this case. And we'll be proceeding today, I think if counsel are still prepared to proceed this way, sort of

breaking into bits or modules the legal subject matter that
we're going to tackle as part of this motion.  We'll be
receiving today and into tomorrow if necessary preliminary
argument from the lawyers representing the various entities
involved in our dispute.  And then we'll be receiving
testimony from witnesses who will appear here in court subject
to cross-examination.

Following the conclusion of receiving our evidence,
whether that's today or tomorrow, or if we have to go into
another day, the parties will go back, they'll receive copies
of the transcript, they'll prepare proposed findings of fact
and conclusions of law that they'll submit to the court.
We'll review those.  We'll have the lawyers back in, and then
we'll have something akin to final argument on the matter, and
then we'll -- the Court will render a ruling.  So that's how
we'll be proceeding.

There were a number of objections filed by both sides.
We have reviewed those, and let me just make a few preliminary
observations about those.

There are a number of evidentiary objections that the
parties filed.  And I'll just refer the parties to the
Heideman decision in the Tenth circuit, which stands for the
proposition that at least in our circuit the rules of evidence
do not apply to hearings for preliminary injunction.  We will,
of course, be guided by the rules of evidence, even if just in

a somewhat relaxed fashion.

And both with respect to the evidence that the parties submitted by way of affidavit or declaration, as well as the live testimony we receive during the course of this hearing, the Court will very carefully consider the evidence and give it the weight that it deems appropriate given the totality of the circumstances.

The Defendants have also invoked the exclusionary rule for our hearing today, which is proper both under rule 615 of the Federal Rules of Evidence and our local rule 43-1 subpart B.  So I think the only witnesses we're anticipating calling are those witnesses affiliated with the Plaintiffs.

Is that still true, counsel?

MR. MANGUM:  It is, Your Honor.  Just one point with regard to that.  One of the witnesses that they've moved to exclude is Dr. Roa, who is our corporate representative.  Another witness that they've moved to exclude is Dr. Kay, who is an expert witness.  And I believe under rule 615(c) he should be exempt from the exclusionary rule since, among other things, his presence here today is necessary for us to present the case.  And also I anticipate that he will be asked questions about information of other witnesses, arguments made in presentations made by counsel, and having him present would be necessary for him to be able to respond to those types of questions.

1          THE COURT:  All right.  Certainly Dr. Roa, the

2     corporate representative, is entitled to remain here during

3     the testimony.

4         Mr. Gaede, do you have a response concerning Dr. Kay's

5     presence during the hearing?

6          MR. GAEDE:  Yes, just a very briefly, Your Honor.

7     So the exclusion, the issue that Mr. Mangum raises, is that a

8     person whose presence as a party shows to be central in

9     presenting the party's claim or defense.  Given all of the

10    number of witnesses that are in this case, and given all the

11    different testimony, they haven't met their showing that

12    Dr. Kay's presence here in the courtroom is essential to them

13    presenting their case.

14        And, secondly, he will be following their presentation on

15    section 102 and 103.  He's obviously had the ability to confer

16    with counsel.  So I don't see how he qualifies as being

17    essential to preparing their case.

18          THE COURT:  Mr. Cataxinos, did you have something to

19    add to that?

20          MR. CATAXINOS:  No, Your Honor.

21          THE COURT:  Mr. Mangum?

22          MR. MANGUM:  Your Honor, I think under the case law

23    under rule 615 it's customary for an expert to be able to

24    remain.  I think with regard to his presence here, he's here

25    to talk about the prior art, he's here to talk about the

science.  That's going to be the discussion that we're going to have.  It's what the Court is going to be asking questions about, and it will just be much more efficient for us not to have to try to tell him what was said or a question that came from the bench, and so I think we've made an adequate showing with regard to that.  And the practice is for experts to be able to remain.

THE COURT:  Well, and that is our local practice I think for the most part.

Mr. Gaede.

MR. GAEDE:  I would just say, Your Honor, the testimony is already in the record that he's had the opportunity to look at.  They are calling no witnesses of our side that he needs to hear testimony on.  And so I would disagree that they have in any way shown that his presence here is necessary for them to put on their case to establish requirements for a preliminary injunction.

THE COURT:  All right.  Well, I think of the six or seven witnesses that we may be hearing from by way of live testimony, as I said, Dr. Roa is certainly entitled to be here as the corporate representative.  Under the circumstances and given our local practice, I'm going to conclude that Dr. Kay may remain as an essential witness, and I think it will expedite the presentation of our information and evidence, and I'm confident that Dr. Kay's testimony will not be materially

1  impacted by his presence here in any way in terms of molding

2  his testimony in any way.

3       Mr. Gaede.

4       MR. GAEDE:  And then very briefly, I believe

5  Mr. Mangum and I have agreed that Mr. Ford will be excluded

6  until he testifies.

7       MR. MANGUM:  Correct.  Any other witnesses will be

8  excluded.  That brings up one additional housekeeping matter,

9  if I may, Your Honor.  Late last evening we received an e-mail

10 from Defendants' counsel indicating that they did not intend

11 now to call Mr. Swedlund.  Mr. Swedlund, as you may -- the

12 Court may recall, there was an evidentiary objection with

13 regard to the foundation for a document that was an exhibit to

14 his declaration.

15      THE COURT:  Yes.

16      MR. MANGUM:  We, of course, were anticipating

17 putting -- while he was on the stand, lay some additional

18 foundation with regard to that document.  I've talked to

19 Mr. Gaede this morning.  My proposal to Your Honor is that

20 there are three options with regard to that.  One is that we

21 can submit with leave of Court a supplemental declaration that

22 can just provide that additional foundation.  Alternatively,

23 if they wanted to question him with regard to that, we could

24 put Mr. Swedlund on the stand only for purposes of laying that

25 foundation, and then they could do whatever cross-examination

```
 1    they wanted to do with regard to that issue.  Or, you know, if
 2    we ever had an agreement, I guess they could waive their
 3    objection to the -- with regard to the foundation on that.
 4              THE COURT:  And that objection is just with respect
 5    to the document that was attached to the affidavit, is that
 6    correct, Mr. Gaede?
 7              MR. GAEDE:  Correct, Your Honor.  The witness
 8    clearly lacks personal knowledge about the document and how it
 9    was generated because he wasn't there at Myriad at the time.
10              THE COURT:  Is there a genuine dispute that it's a
11    business record?
12              MR. GAEDE:  I don't know, Your Honor.  They filed it
13    in an application.  They have attempted to establish that it
14    was generated by Myriad in the ordinary course of business and
15    they're attempting to establish that by a witness who was not
16    there at the time and who isn't going to testify that he was
17    present as to its preparation.  So I don't know.
18              THE COURT:  Well, we'll receive some foundational
19    testimony then.  I think this seems to be an important issue
20    to the parties, and so let's have some foundation before we
21    conclude.  I don't -- as I think I articulated to counsel last
22    week in our call, this is your day to present your evidence
23    and your argument, and so we can proceed in whatever fashion
24    the two of you have decided is most expeditious and just in
25    terms of organization whatever makes the most sense.
```

```
 1        Are there other preliminary matters we should address
 2   before we begin?
 3              MR. MANGUM:  That's it from our side, Your Honor.
 4              THE COURT:  All right, Mr. Mangum, I think it's the
 5   Plaintiffs' motion.  Why don't you take the floor.  Oh, well,
 6   is this one of the witnesses that's just leaving the
 7   courtroom?  Do we have all of the witnesses out of the
 8   courtroom now who may be testifying other than Dr. Kay and
 9   Dr. Roa?
10              MR. MANGUM:  There are no witnesses other than --
11   and in fact Dr. Kay is not in the courtroom yet.
12              THE COURT:  So I guess I'm just a little bit
13   unclear.  Are there -- there are other witnesses you will be
14   calling, but they're just not present in the courtroom; is
15   that correct?
16              MR. SINGER:  Mr. Swedlund is going to testify, and
17   the other (inaudible) are not here, Your Honor.
18              THE COURT:  I'm going to rely on someone on your
19   side to ensure that those witnesses who are not presently in
20   the courtroom who may be testifying understand that it's the
21   Court's directive that they not discuss their testimony with
22   anyone except counsel until we close this hearing, so just
23   please make sure that that message is communicated.
24              MR. MANGUM:  We're having a little technical glitch
25   here I think, Your Honor.
```

```
 1          The Court:  It wouldn't be the first time in this
 2    courtroom, Mr. Mangum.  Counsel, while you're working on that,
 3    so you can guide yourselves, we'll go for about an hour and a
 4    half or so, and at that point we try to give our court
 5    reporter a chance to stretch his fingers and all of you a
 6    chance to stretch your legs, and so just be mindful of that.
 7    We'll take a break.  We'll figure out lunch as we get there.
 8          MR. MANGUM:  Thank you, Your Honor.  I'm prepared to
 9    proceed now that we've got the technology working.  Your
10    Honor, before we -- when we discussed on the phone, the first
11    of the modules that we're going to talk about is the
12    presentation of our infringement case, but before we do that,
13    just in terms of laying some overview and outline for what
14    we'll be talking about here through the rest of the day, I
15    have some slides I've prepared, just an overview of that.
16          And, first of all, I think it's important to realize the
17    context of what we're dealing with here, particularly as we
18    get to issues about validity and obviousness and everything
19    else.  What we're talking about today, and just so happens
20    that it is essentially 19 years ago almost to the day that the
21    invention -- the discovery was made of the BRCA1 gene.  And to
22    give some context to that and how revolutionary and a landmark
23    discovery that was, it made the press throughout the country.
24    It was on the cover of The Wall Street Journal, the cover of
25    The New York Times.  And as you got a little bit of a preview
```

of, it was the lead story in the news.

(viewing video)

And so, Your Honor, 19 years ago, and I think as I said, it's important that we keep that context, that we're talking about a landmark discovery and that we shouldn't be judging that development, that invention, that discovery through the lens of today as much as we should at the time that the inventions were made.

So also in terms of just kind of overview, you know, it's our view and it's certainly the law, you know, the essence of the patent right is the right to exclude others, and that's what we're here in the courtroom about today.

By statute that period of exclusion is 20 years. Myriad's had 15, 16, years on some of its patents, a little bit more, a little bit less on others, but by statute the period of exclusion that's allowed is 20 years, and we're here to preserve that period of exclusion.

And I think also important because of the mountain of paper that both sides have provided to you, and we've been through it as well, there are a lot of discussions and there are a lot of back and forth out there in the press and in the media and in the industry with regard to public policy concerns.

Now, there are certain public policy concerns that as we get to that point of the presentation we think are relevant

and appropriate, but public policy arguments with regard to that statutory established 20 year period of exclusivity we think are not. And that's supported by the Federal Circuit's decision in the AMP case, and where the court held that disapproving of patents on medical methods and novel biological molecules are policy questions best left for Congress.

So as we've said in our papers, we think there's just a large amount of material here that the Court really does not need to trouble itself with because those are issues that if someone wants to make a change in the patent laws and have some exclusion for genetic research or for medical technology, they have the ability to petition another branch of the government with regard to that.

So now with regard to the elements of our proof for a preliminary injunction, likelihood of success on the merits. The Court has received a lot of material, and we're going to be going through some of it today. But I think it's important to understand as we start that establishing the likelihood of success on the merits only requires that we prove that any one claim that is likely valid -- that is likely of being infringed is also unlikely of being proven invalid.

And as we go through the claims that I'm going to discuss with you in a minute, we think that at the end of the day it's going to be clear that there are multiple claims that they

infringe that are not subject to any serious question with
regard to their validity.  And that's established by the
Astrazeneca case, which says for a patentee to establish that
it's likely to succeed on the merits, it must demonstrate that
it will likely prove the infringement of one or more claims of
the patents-in-suit and that at least one of those same
allegedly infringed claims will also likely withstand the
validity challenge presented by the accused infringer.

Now, of course, the scope of the injunction may and would
vary depending upon which claims the Court finds that we've
proved the likelihood of success on.  But in terms of issuing
an injunction, any one claim that is infringed and is unlikely
of being shown invalid is sufficient.

Now, there are three categories of patent claims that
we're going to be discussing, and I'll be addressing the
infringement aspects here shortly.  The first is what we call
the primer pair claims, and I just listed which ones those
are.  There's a second group of claims, all of which are
method claims, that deal with detecting sequence alterations
within these genes.  And then the last is of the probe
hybridization claims, which are techniques involved, and this
court will recall from the tutorial, involved when you're
dealing with large rearrangement difficulties.

So in an effort to streamline our presentation, I do have
slides that we'll go through each of these, and I'm going to

move fairly quickly, particularly on the infringement issues,
through these and focus mainly on the issues that have been
raised by the Defendants.  But as I said before, it's
important to remember, any one claim that's found to be --
that we're likelihood -- we are likely to prove infringement,
that's also unlikely of being proven invalid.

Finally with regard to the equitable factors that we'll
discuss at the end of the hearing, I think it's important just
as we go into this to realize what it is that Plaintiffs are
asking for.  All we are asking for is a continuation of the 15
year plus status quo up until June 13th.  So all we're asking
for is that during the pendency of this lawsuit, that we not
upset the apple cart and not have these effects with regard to
the market that we'll detail with regard to how those will be
hard to unwind.

Secondly, the clear weight of the evidence I believe from
the past nearly 20 years is that Myriad's contributions and
Plaintiffs' contributions have benefited the public interest
and have been revolutionary as those news reports indicated to
helping people.

Third, and this goes to this whole issue -- we have a big
battle back and forth about people's VUS rates and all of
those percentages.  When it comes to the issue of issuing a
preliminary injunction, the public interest factor really is a
prospective look from the Court's perspective.  The Court

1    looks and says will there be some adverse impact on the public
2    interest from continuing to have Myriad exclusivity for the
3    period of this -- the pendency of this lawsuit?
4        So the issue is, is there something with regard to
5    Myriad's current tests and the use of those tests as compared
6    to the Defendants' test that make it such that it would be
7    important that there be other tests other than Myriad's tests
8    out there and available?  And I submit to you none of the
9    evidence that's been submitted in this case indicates that
10   there is any problem with Myriad's tests in terms of being
11   able to perform the necessary -- provide the necessary
12   information to patients and to their medical professionals,
13   and they have been doing that for the 20 plus years.
14       Finally, we need to remember, and the case law supports
15   this amply, that because there's a limited remaining term of
16   the Myriad patents-at-issue, that that heightens the need for
17   preliminary injunctive relief.  As a practical matter, if we
18   are unable to obtain a preliminary injunction, the -- by the
19   time this case makes its way all the way through the Court
20   system, those patents will have expired, and so the only
21   recourse Myriad has is to seek a preliminary injunction.
22       So now let's move into that first module of our -- of the
23   presentation, the discussion of the infringement case.  Now,
24   I'm going to go through each of those categories of claims
25   that we talk about, the primer pair claims and the other

```
 1    claims and show how the evidence that we've presented through
 2    the declarations, and largely through the declarations of
 3    Defendants, establish each of the elements of those claims.
 4    And as I do that, I will focus on what are Defendants'
 5    arguments with regard to noninfringement.
 6         And just as a preview to that, those arguments aren't
 7    factual arguments.  They're not arguments that say where
 8    there's a dispute between Plaintiffs and Defendants over what
 9    the Myriad -- what the Ambry or the Gene By Gene processes do,
10    they are purely and largely claim construction issues, which
11    as the Court knows are issues for the Court and not matters
12    upon which a factual dispute makes any difference.
13         Okay.  So the first group are these primer pair claims.
14    And we allege and establish that they infringe those through
15    the process by which they generate BRCA1 and BRCA2 amplicons,
16    the PCR process that the Court had the opportunity to learn
17    something about in the tutorial.
18         Two sets of claims.  The 282 patent claims 16 and 17.
19    Those deal with the BRCA1 gene.  Then similar patent claims
20    out of the 492 patent claims 29 and 30 that deal with BRCA2.
21         Okay.  Here is the independent claims -- well, here is
22    the claims from the 282 patent.  A pair of single-stranded DNA
23    primers for determination of a nucleotide sequence of a BRCA1
24    gene by a PCR, the sequence of said primers being derived from
25    the human chromosome 17q, wherein the use of said primers in a
```

polymerase change reaction results in the synthesis of DNA
having all or part of the sequence of the BRCA1 gene.

And then a dependent claim from there. The pair of
primers of claim 16 wherein said BRCA gene has the nucleotide
sequence set forth in SEQ ID No:1. And as the Court will
probably recall, that's the -- that's the sequence that has
only the exons from that gene.

And then under the 492 we have similar claims, a pair of
single-stranded DNA primers of at least 15 nucleotides, the
sequence being isolated from chromosome 13, and the same kind
of wherein clause with the same dependent claim that then
limits it to the exon only portion of that.

So let's deal with the first element of those claims.
And what we have here summarized on this slide is what's shown
in our -- in the briefs. The admissions essentially are
acknowledgment, because there is no dispute about it, that
both Ambry and Gene By Gene, in Ambry's case the genomic DNA
is combined with primer pairs for the BRCA1 and BRCA2 genes.
That's followed by a polymerase chain reaction to produce
synthetic DNA molecules for the purpose of determining the
nucleotide sequencing. And then we have the citations from
the brief to the proof of that.

With regard to Gene By Gene, the genomic DNA is combined
with forward and reverse, so a pair of internal primers for
the BRCA1 and BRCA2 genes in a PCR process to produce these

synthetic DNA molecules for the purposes -- for the purpose of nucleotide sequencing.

And it's established and agreed DNA primers are single-stranded. They're typically at least 15 to 18 nucleotides long, as the Court became familiar with at the tutorial.

So here is just your basic claim chart setting those things up side by side and dealing specifically now with the independent claims of the patents that deal with BRCA1 and BRCA2. A pair of single-stranded primers for determination of a nucleotide sequence of BRCA1. Same thing with regard to 29 except regard to BRCA2. And.

Ambry and Gene By Gene acknowledge that they use a pair of single-stranded primers, and that they use that resulting synthetic DNA to determine the nucleotide sequence of the BRCA1 and BRCA2 gene. So there's no contest with regard to the first element of the -- of these claims.

Now, on the second element, the BRCA1 and BRCA2 genes are located on the human chromosome 17q and 13 respectively. Ambry, there's the summary of the evidence that shows that the primer pairs are designed to target the breast cancer gene coding exons in the BRCA1 and BRCA2 genes. The application primers contain some sequence that hybridizes to the BRCA gene sequence so as to amplify those sequences of the exon. And then summary of the same evidence with regard to Gene By Gene.

1       So now here is where we have our first dispute, the

2   second element of the claims.  And importantly, however, as I

3   indicated, the dispute here isn't about factually what does

4   Ambry do or what does Gene By Gene do in its process.  The

5   dispute is a claim construction dispute.  What does the claim

6   terms mean, and based upon that does the admitted or

7   acknowledged or agreed upon process come within the scope of

8   those claims?

9       So claim 16.  A pair of single-stranded DNA primers, the

10  sequence of said primers being derived from human chromosome

11  17q.  Again, Ambry and Gene By Gene's primers are derived from

12  chromosome 17q because they are engineered to target and

13  hybridize to, and thus there complementary to, the nucleotide

14  sequence of a region in the BRCA1 gene, which is located on

15  chromosome 17q.  With regard to 29 in BRCA2, same proof.

16      And I'm going to -- we'll go through the last element and

17  then I'll go back to their arguments and deal with the claim

18  construction issue.  So the last element of the independent

19  claims.  The evidence with regard to Ambry, they perform PCR

20  target enrichment with primer pairs designed to target breast

21  cancer gene coding exons that will amplify all of the

22  sequences in the exons of the BRCA1 and BRCA2 genes, as well

23  as at least 20 nucleotides of the adjacent intronic sequence.

24  And that's straight out of their declarations filed in this

25  case.

Same with regard to Gene By Gene, except they're talking prospectively. We will use forward and reverse internal primers to target all coding exons and their flanking regions. So, again, no dispute with regard to the fact that they do that.

So now let's look at their noninfringement argument. Defendants' argument of noninfringement is based on the meaning of the terms in the claims derived from and isolated from. Now, as the Court knows from either briefs, they want to take the claim term derived from and the claim term isolated from and have you construe that or interpret it by essentially just adding an adverb. They're not asking you to define -- they're not suggesting that there's some dispute about what the word derived means or in the context of this claim isolated from, they're just saying that when it says derived from, it means derived wholly from and isolated wholly from.

Well, adding terms or adding words into the claim can only take place and can only be justified if you can turn somehow to the patent and to the specification and say, all right, well, even though it says only says derived from, it really means derived wholly from and here is why. Let's look at the patent specification.

So now we turn to, and their argument is, that if you will read the word wholly into this claim, these two claims,

that they therefore will not infringe because their primers,
like the common primers used in the industry, not only have
the target sequence of the BRCA1 or BRCA2 gene, they also have
appended to them a little tag on it that has no effect -- and
I'll show you why that's the case -- has no effect on the
operation during the PCR process, but then facilitates the
later capturing, if you will, of those amplicons and using
them at a later stage in the process.

So only if we can find something in the claim language,
the patent specification, can they take that position.  In
fact, the claim language, the patent specification, and the
case law preclude that interpretation that they're trying to
propose where they want to add the adverb to those claims.

Here is the claim language.  So under the Phillips case
we start with the plain and ordinary meaning, how the term
would be understood by one of skill.  Plain meaning does not
limit the claim language as Defendants propose.  Derive, and
these are just dictionary definitions, means to receive or
obtain from a source or origin.  Isolate means to set or place
apart, detach or separate so as to be alone.

So these meanings indicate that the primers will have
material obtained or received from a source, though it's
derived, in this case from chromosome 17q, or that the primers
are separate or apart from information or molecules or
dictated by the chromosome 13.  So neither of those plain

meanings precludes the use of appended molecules or
nucleotides to the end of these primer pairs.

Now, other claim language also supports our
interpretation of the claim.  The other claim language
requires that, quote, the use of said primers in a polymerase
chain reaction results in the synthesis of DNA having all or a
part of the sequence, closed quote, or, quote, all or at least
15 contiguous nucleotides of the BRCA1 gene or BRCA2 gene.  So
it expressly says have all or part of.

This language indicates that the primers may only have
enough of a BRCA1 or BRCA2 specific nucleotide sequence to
allow for synthesis of part of the BRCA1 or BRCA2 sequence.
And their primer pairs clearly do that.

Other nucleotides attached to the end of a primer will
not affect the ability of the pair of such primers to
synthesize parts of those gene sequences.  And I just want to
show you graphically how that's the case.

So this -- this schematic shows what happens during the
PCR process if you have primers that have no appended
molecules on the end of it.  And the Court is familiar with
this now from our tutorial.  So it goes through the -- you
have the primers for the first stage.  During the next stage
you see that you've got the primers on one end of each of
those segments.  And then as you amplify that target area,
ultimately you end up with millions and potentially even more

than that of these identical amplicons that have the same amplified target area and have the forward and reverse primers on the ends of that.

Now let's look at what happens if you put some appended molecules on the end of those primers. The first stage you end up with same thing, the primer plus the appended molecules. Next stage you end up with that on one side. Finally you end up with all of the various copies of it. And the amplified target area is identical, whether you have appended molecules on there or don't have appended molecules on there.

And that -- this last slide just shows here is the result of the two PCR processes, one where you have the appended molecules, one where you don't. You end up with exactly the same material functions, exactly the same way, and is literally covered within the claims of these patents.

So now let's turn to the patent specification because Phillips tells us that we look at the plain meaning as it would be understood by one of ordinary skill in light of the specifications. So what, if anything, does the specification tell us --

THE COURT: Mr. Mangum, can you go back to the previous slide for just a moment?

MR. MANGUM: You bet.

The Court: Thank you.

```
 1          MR. MANGUM:  And of course we'll supply -- we don't
 2    know at this stage which of these we'll use and won't use, so
 3    we will certainly supply the court multiple copies of every
 4    slide that's used.
 5          So now we turn to the specification.  The primer pairs of
 6    the present invention -- this claim is right out of the spec
 7    of these two patents -- are composed of synthetically made
 8    lengths of multiple nucleotides, i.e., oligonucleotides and
 9    Polynucleotides.  Again from the specification.  The
10    Polynucleotide compositions of this invention include
11    synthetic forms and may be chemically or biochemically
12    modified or may contain non-natural or derivatized nucleotide
13    bases, as will be readily appreciated by those skilled in the
14    art.  Such modifications include, for example, labels.
15          So right here in the specification it acknowledges what
16    was the common usage at that time and that it was contemplated
17    and would be contemplated that you could have these additional
18    things on the ends of these primer pairs.
19          Again from the specification, quote, to facilitate
20    subsequent cloning of amplified sequences, primers may have
21    restriction enzyme site sequences appended to their five prime
22    ends.  So that's giving a specific example with regard to an
23    application of using these appended -- appendages to the end,
24    this one for the purpose of cloning.
25          Therefore, the specifications state that the claimed
```

1  primers can include modifications, non-natural or derivatized

2  nucleotides, and appended molecules, including labels as

3  merely one example.  Thus, they include the use of appended

4  bar codes, tags, and adaptors.  And you can't avoid

5  infringement by sticking these commonly understood things on

6  the end of these primers.

7       Patent specifications continue.  They describe the use of

8  the adapter DNA sequences ligated onto other DNA and the use

9  of such adapter sequences to prime a PCR amplification

10  reaction.  These adapters are described as having tags

11  attached in the form of biotin is one example that allows for

12  later analysis by a specific capture of the nucleic acids

13  generated by use of the primers.

14       So we have all of these examples straight out of the

15  specification of the use and discussion of, and with regard to

16  this last one with regard to probes, that you can also attach

17  a label or reporter molecule, and that suitable labels and

18  methods for labeling probes and ligands are well known in the

19  art.

20       So all of it is contemplated in the patent specification,

21  and there's nothing there in the patent specification that

22  would lead you to believe that only those -- only nucleotides

23  that come right out of BRCA1 or BRCA2 can be used as part of

24  these primers and that you can't put appendages on them.

25       Here is the case law that's important on that.

Because -- and interesting -- well, maybe interesting to me.
But my first patent case was Amstar Corp. versus Envirotech in
front of Judge Jenkins.  And what that case stands for is that
you can't avoid infringement by merely adding something to
someone's claim.

If someone has -- and just to use a very basic example,
if I had a patent on a piece of wood with a graphite down the
middle of it that you could use as a writing implement, a
patent on a pencil, you couldn't avoid infringing that by
putting an eraser on the end and saying, well, I have a pencil
with an integrated eraser on the end of it, therefore, I'm not
infringing your patent.  You'd still be infringing my patent.
And while you may be able to even patent that combination, you
can't practice what I have without getting a license from me.

So modification by mere addition of elements cannot
negate infringement without disregard to the long-established
hornbook law.  Adding nucleotides to a BRCA1 or BRCA2 specific
primer to facilitate later sequencing does not change the fact
that part of the primer's sequence is derived from chromosome
17 or isolated from chromosome 13.

Now, I want to take just a minute and say -- to go to the
subsequent -- the supplemental declarations they filed on this
point because, frankly, you know, we get a second declaration
from Mr. Elliott, we get a separate declaration from
Mr. Mittleman.  Those declarations add nothing new to this

dispute. They don't factually dispute what their process is
and what the primers look like. They essentially repeat or
elucidate to upon what they said in their first declarations.

So with regard to Mr. Elliott, he reiterates that Ambry
uses appended molecules on its primers. They're tags,
adaptors, etcetera, and he illustrates those. So, okay, fine.
There's no dispute with regard to that. But for the reasons
I've just indicated, that's legally irrelevant. It only
goes -- it's only helpful to them if they get a claim
construction that says derived doesn't mean derived, it means
wholly derived from.

So then he makes the point, well, the appendages that you
talk about in terms of specific examples within your patent
don't include the specific types of things that we use. Well,
again, you know, those statements, those examples, are not
restrictive. So the specifications don't state -- they do not
state that the claimed primers are limited to the specific
examples described, therefore, it makes no difference. And
legal precedent also then refutes what Doctor -- apologize for
saying Mister before -- Dr. Elliott indicates.

Under Phillips, although the specification often
describes very specific embodiments of the invention, we have
repeatedly warned against confining the claims to those
embodiments because persons of ordinary skill in the art
rarely would confine their definitions of terms to the exact

representations depicted in the embodiments.

So the specifications very commonly provide an example. They're not exclusive. Even your preferred embodiment, as the Court knows, is not limiting unless there's something specifically called out in that claim that says I mean this and only this to the exclusion of everything else.

The other thing that Dr. Elliott does in his declaration is to reiterate the argument or the fact we pointed out earlier. We do two PCRs at Ambry he says. You know, in the first one we use primers like the ones you're talking about, in the second it's part of our sequencing. We do another PCR, but we use nonspecific primers that are not specific to the BRCA1 or BRCA2 genes. We're only alleging infringement of that first primer pair, not what they do subsequently, so that's just not responsive.

So now let's move to the dependent claims that come off of those claims, claim 17 and claim 30. And those dependent claims, as the Court will recall, those are the ones that then limit themselves down to the exon only sequence of the BRCA1 and BRCA2 genes.

So here is essentially Ambry and Gene By Gene's argument. Ambry and Gene By Gene acknowledge that among the primer pairs that they use, and that they then use to amplify and sequence the BRCA one and BRCA2 genes, some of those primer pairs have introns -- intron regions on them as well as exon regions, but

1  because the BRCA1 and BRCA2 genes have some exons that are so
2  long, at least some of the primer pairs that they use match up
3  only to an exon region of the BRCA1 or BRCA2 genes.

4      And our view then is on these dependent claims, not all
5  of their primer pairs will infringe these dependent claims,
6  but those that are directed at exon only regions do.  And this
7  just shows that that's what they're doing, and that's also a
8  Gene By Gene, tends to the amplify all exons, therefore, those
9  that are the larger ones that are too large for the Sanger
10 sequencing, they're going to need to use tiled amplicons and
11 do what I just described.

12     And then this little graphic here just shows that because
13 of the length of some of these exon regions, you're going to
14 end up using primer pairs that come only out of the exon
15 regions.

16     So then here is the claim chart matching up that for
17 claim 17 and 30, that at least some of their primer pairs will
18 include and be complementary to only exonic regions and
19 therefore infringe claim 17 and 30.

20     SO there's really no dispute with regard factually to
21 what Ambry does and Gene By Gene intends to do and therefore
22 we have infringement of those claims.  They don't deny that to
23 amplify and sequence the BRCA1 and BRCA2 genes there will be
24 at least some primers and amplicons that will not have
25 intronic sequences.

1    Okay.  That deals with primer pairs, so now I'm going to

2    move on to the allegations of infringing claims that deal with

3    sequencing, essentially detecting these variations in the

4    sequence of the gene.

5    Methods for determining alterations in the BRCA1 and

6    BRCA2 genes.  We have the 441 patent.  Claim eight deals with

7    BRCA1, the 857 patent, claim four, deals with BRCA2.

8    Now, here is, again, just follows that same pattern.

9    Here is the language of the claims.  And as the court will

10   recall, claim eight that we're asserting is a dependent claim,

11   and so to show infringement of that dependent claim, I have to

12   show first that all of the elements of the independent claim

13   from which it depends are also net, as well as the additional

14   elements that come from claim eight.  And the 857 patent,

15   claim four, those are the elements with regard to it.

16   So now let's talk about what Ambry does.  And, again, no

17   dispute between the parties about factually what takes place.

18   Ambry does both next-generation sequencing and Sanger

19   sequencing.  And the Court had the opportunity to learn a

20   little bit about that during the tutorial.

21   So Ambry performs next-generation sequencing of all

22   coding exons, plus at least five bases into the five prime and

23   three prime ends of all of the introns and untranslated

24   regions of the BRCA1 and BRCA2 genes.

25   Specifically Ambry -- Ambry's BRCA sequencing tests

```
 1   utilize primers that amplify --

 2                (THE COURT REPORTER ASKED COUNSEL TO REPEAT)

 3        I'm sorry.  Amplify the sequences of the exons and at

 4   least 20 base pairs.  And that comes just directly out of it.

 5   And maybe so I don't blow up Ray's fingers, I won't read

 6   everything that we're all looking at at the time and try and

 7   be a little more summary in that presentation.

 8        So Ambry performs both Sanger and next-generation.  We

 9   allege that both of those types of sequencing infringe.  Gene

10   By Gene does Sanger sequencing, and we allege that that

11   infringes, and this is the support that shows that Ambry

12   performs the Sanger sequencing and that Gene By Gene, again

13   prospectively they say, will utilize PCR to amplify from

14   patient genomic DNA all coding exons and the 50 base pairs of

15   nucleotides of intronic sequence flanking each exon.

16        And then as the Court had the opportunity to learn in the

17   tutorial, Sanger sequencing uses these dideoxynucleotides to

18   stop that process.  And as you sequence the BRCA1 gene, you're

19   going to include all of the nucleotide positions, and that

20   becomes important in some of the subsequent claims.

21        So the analysis of the sequence.  Ambry and Gene By Gene

22   compare the patient's entire human genome sequence, which

23   includes the BRCA1 and BRCA2 genes, as deduced in the

24   sequencing operations.  And they compare that then to a

25   reference or wild-type.
```

Now, And I'll deal with -- this is essentially their noninfringement argument.  They say, well, you say you use these techniques to sequence and analyze the sequence of the BRCA1 and BRCA2 genes.  Well, we compare and analyze the entire human genome.  We sequence everything and we look at everything, as we get to with regard to these slides. Everything includes the BRCA1 and BRCA2 genes.

And so it's a very similar argument to what we were talking about before with regard to Amstar.  You can't avoid infringement by saying, well, I do what you say only you can do, but I also do some other things at the same time.

So Ambry locates all the identified variants, and then classifies them as either benign and does mutation detection. Same thing with regard to Gene By Gene.

So here we now compare element by element the claims that are asserted, along with the proof of what it is that Ambry and Gene By Gene do.  With regard to the first, they perform this step of comparing the germline sequence of the BRCA1 gene.  And here we have an argument from them, and we'll deal with that as it becomes another claim construction argument, about whether or not using synthetically created, synthetically generated amplicons comes within the scope of this claim.

So other than that dispute with regard to does it cover synthetic amplicons and, two, does it -- if I compare

everything, not just the BRCA1 gene, they acknowledge that
they do this step.

Claim eight, again, wherein a difference in the sequence
of the BRCA1 gene is -- to a wild-type is determined.  And
other than disputing whether or not there's synthetic
amplicons coming out of PCR qualify under this claim, they
don't dispute what we say they do.

Next element of these claims, wherein a germline nucleic
acid sequence is compared by amplifying all or part of BRCA1
gene from said sample using the set of primers and then
sequencing.  They acknowledge that they -- both Defendants
acknowledge that they do that.  Same with regard to those
comparable elements in the 857 patent with regard to BRCA2.

So let's turn to their noninfringement argument.  And,
again, the important thing here, there's no dispute about --
factually about what they do.  It's just an argument about
what does the claim mean, which is an issue that the Court has
full control over and is an issue for the Court.

So Defendants assert that they do not analyze the
patient's, quote unquote, BRCA1 gene because they do not
utilize patient mRNA or cDNA.  So essentially their argument
there is, well, we, like you, we use that -- the PCR process
and we use those synthetically generated amplicons to perform
this analysis.  And their argument is that our claims with
regard to the definition of BRCA1 gene is somehow limited

not -- and does not include those synthetic versions.

Again, now, we have to look at the claim language and we look at the specification. And Defendants' argument is contrary to the claim language and to the patent specifications. The claim language requires use of a BRCA1 gene or a BRCA1 RNA from a tissue sample from said subject or a sequence of BRCA1 cDNA made from mRNA. BRCA1 gene from a tissue sample from the patient can be used not only in RNA or cDNA made from mRNA.

Now, what do those terms mean? The patents state that the terms, quote, BRCA1 gene and, quote, BRCA2 gene refer to Polynucleotides and that the Polynucleotide compositions of this invention include RNA, cDNA, genomic DNA, synthetic forms, and mixed polymers, among others. So by definition the patent -- the patentee can be his own lexicographer. He can define terms the way he wants.

By definition, the claim terms BRCA1 gene and BRCA2 gene include all synthetic forms of DNA, which essentially eliminates Defendants' noninfringement arguments. That includes all primers and the amplicons that they produce. Defendants don't deny that they are using the sequence of the BRCA1 and BRCA2 amplicons produced from PCR. And our position and that support from the spec is that that use is encompassed by the claim language. Okay. That's their first argument.

Their second argument is we compare patient sequences to

the sequence of the entire genome, not only in BRCA1 or BRCA2 genes, therefore, we don't infringe.  Well, the claims in the patent do not exclude additional sequencing and do not define additional sequencing as mutually exclusive from what the claims require.

The claims use the transitional word comprising, which has significance in patent law.  Means that the claims are open-ended and inclusive, and thus they encompass anything that includes additional actions or steps beyond those required in the claims.  And defendants acknowledge that law.

A claim using the, quote, the single comprising is generally -- the signal, excuse me, comprising is generally understood to signify that the claims do not exclude the presence in the accused apparatus or method in addition to those explicitly recited.  Then again this whole Amstar notion that we talked about earlier.

Now let me talk about this case that they rely on.  They rely on the Dippin' Dots case, and we recited what the general case law is on this.  This is a unique case that's just totally inapplicable in this area.

In the Dippin' Dots case there was express statements within the patent specification where the patentee -- and this is language from the Court -- had narrowly defined the claim term at issue, beads, and the term could not be broadened because the patent made clear that the process at issue must

produce beads and only beads and could not include production of irregularly shaped particles.

So under those unique circumstances where you had a patent that said -- here it would be the equivalent of saying, you know, you can -- it would be analyze and compare the BRCA1 and BRCA2 gene sequence, but in all -- but don't look at the rest of the human genome. That -- that expressly excluded from the scope of this claim is looking at the entire human genome, including BRCA1 and BRCA2. That's just not the case here.

So Defendants cite only statements that analyzing the BRCA1 genes means that the BRCA gene sequence must be analyzed for various possible variations and mutations. They point to no patent language that BRCA1 and BRCA2 gene sequences must be analyzed to the exclusion of others in all instances. And then that's the general case that applies that principle, with Dippin' Dots being the exception.

So I'm now going to be really very quickly here. With regard to these -- analyzing the claims that deal with detecting these modifications and alterations, there is a subset of those that deal with very specific regions within the BRCA1 and BRCA2 genes that's called the omi haplotype claims.

And essentially our infringement position with regards to those tracks the earlier one. Their noninfringement arguments

```
 1    are essentially the same, as I'll show you, and so I'm not
 2    going to take the time, unless the Court has some specific
 3    questions with regard to those claims, to deal with -- with
 4    each of the different elements.
 5              THE COURT:  I understand your argument on that.
 6              MR. MANGUM:  Okay.  That's just calling out what the
 7    claims require.  And, again, we don't have a dispute here
 8    with -- that Ambry and Gene By Gene look at those regions and
 9    perform that function.  So essentially then, you know, again,
10    uses the term comprising.  The arguments are the same with
11    regard to those claims.
12         So, finally, the final group of claims are their -- are
13    assertions against Ambry with regard to infringement by large
14    rearrangement analysis.  And this is where we get into the
15    multiarray, MLPA, that we talked about during the tutorial.
16         Two claims that deal with hybridizing a BRCA1 or BRCA2
17    gene probe, 441 patent claim seven that we've asserted, and
18    that deals with BRCA one, 857 patent claim four that deals
19    with BRCA2.
20         The 441 patent claim seven is identical to what we
21    discussed before on claim eight, except that instead of
22    requiring that the comparison includes amplifying with a set
23    of primers and sequencing the amplified product, it requires
24    the comparison of a patient's sequence to a reference sequence
25    that includes hybridizing a BRCA1 gene probe which
```

specifically hybridizes to a BRCA1 allele, which we talked
about at the tutorial, to genomic DNA isolated from said
sample and detecting the presence of a hybridization product
wherein a presence of the said product indicates the presence
of said allele in the subject.  And 857 essentially the same
with regard to the BRCA2 and in substance.

So what does Ambry do?  And here this assertion of
infringement is only against Ambry.  We don't have any
information with regard to Gene By Gene and the techniques
that they intend to use here, so we have not asserted any
current infringement claim against them with regard to that.

Ambry's large rearrangement analysis looks for large
deletions and duplications of nucleotides, and they have two
types of tests.  They either use MLPA or a comprehensive
full-gene gross deletion/duplication analysis, part of which
is the BRCA1 and BRCA2, and then microarray analysis to detect
large rearrangement.  And the citations showing that that's
what their tests do are here in our briefs.

So Ambry's MLPA, microarray processes use synthetic
probes targeting the exons or flanking intronic sequences in
the BRCA1 and BRCA2 genes.  The probes are complementary to,
and thus hybridize to, their respective target section if that
section is present and has the same nucleotide sequence.  And
the probes are specifically targeted to the wild-type BRCA
genes and thus are specific for the wild-type alleles.

42

```
 1          So, again, those are the steps in the patent, and they

 2     perform those steps.  Let me get to their assertions with

 3     regard to noninfringement.  Here is Ambry's argument.  Ambry

 4     says we don't infringe 441 patent claim seven because we do

 5     not use probes that are specific for any known variations of

 6     BRCA1 that predispose the patient to certain cancers.

 7          So what they're saying there, they're saying, well, when

 8     we do this analysis, our probes aren't designed specifically

 9     to capture some of these mutations within the genes.  Our

10     probes are designed to go for the wild-type probes.  So the

11     problem with that is these patents specifically cover using

12     probes that are designed to catch the wild-type alleles.  So

13     the fact that they do that, which they acknowledge, is enough

14     to prove infringement.  That -- that our claim also says if

15     you do that to try to catch a mutated gene, you will infringe

16     us is just of no moment here.

17          So quoting the patent specification, Ambry admits that

18     the language, quote, a BRCA1 gene probe which specifically

19     hybridizes to a BRCA1 allele should be interpreted to mean a

20     BRCA1 gene probe that hybridizes either to the wild-type BRCA1

21     allele or a sequence of a known mutation of the BRCA1 gene

22     sequence which predisposes to certain cancers.  That's right

23     in their opposition brief.  And in Elliott -- in Dr. Elliott's

24     declaration they admit that they use probes that are specific

25     for the wild-type BRCA genes.
```

```
 1        So Ambry asserts noninfringement of these two claims
 2   because they say the reference to the BRCA gene and BRCA1 gene
 3   and BRCA2 gene in those claims requires that the entire genes,
 4   including all the introns and exons, are screened.  So, again,
 5   this is a claim construction argument.  It's not a dispute
 6   about what they do.  It's their argument that this claim
 7   should somehow be interpreted to exclude what they do.
 8        Ambry then argues that Plaintiffs have not demonstrated
 9   that Ambry's large rearrangement tests screen for
10   rearrangements in all portions of the BRCA1 and BRCA2 genes.
11   Our position is that's based on erroneous claim construction,
12   and once you properly construe the claim, then infringement is
13   clear.
14        The terms BRCA1 gene and BRCA2 gene are not limited in
15   the manner that Ambry asserts.  The patents define both terms
16   to include expressly fragments and portions of each gene, not
17   all portions of those genes.
18        Here is the language out of the 441 patent, defines the
19   term BRCA1 gene as, quote, Polynucleotides, all of which are
20   in the BRCA1 region, closed quote.  That definition
21   demonstrates that the term means some number of nucleotides in
22   the BRCA1 region, not that every nucleotide in that gene must
23   always be included.  Specification does that.  So we look at
24   the claim language.  We look at the spec.
25        These terms, when applied to nucleic acid, refer to a
```

nucleic acid which encodes a BRCA1 polypeptide or fragment,
and that the nucleic acids of the present invention
will possess a sequence which is either derived from or
substantially similar to the natural BRCA1 encoding gene or
one having substantial homology with a natural BRCA1 encoding
gene or a portion thereof.

So throughout the specification, BRCA1 gene, BRCA2 was
not defined to be -- or require the entire gene.  It's the
gene or any portion thereof.  And with that understanding, as
set forth in the patent and specification, then what they --
what Ambry admits it does infringes.

So just to sum up, Your Honor.  I'm through with that
first module.  So on the primer pairs, what's required, and we
have a coordinated pair of synthetic molecules, and they
perform each of those steps in their method.  And with regard
to the method claims, we've laid out again how they infringe
those.  We need only show infringement of one claim.  We
believe we've established a likelihood of success on each of
these claims.

They're noninfringement arguments in our view fail.
They're based on erroneous claim constructions, as we've
pointed out.  And they try to avoid infringement by arguing
that they do more than the claims require, and that's just a
legally insufficient basis to try to avoid infringement.
Thank you, Your Honor.

```
 1          THE COURT:  Thank you, Mr. Mangum.

 2     Mr. Gaede.

 3          MR. GAEDE:  Your Honor, I'm going to get right to it

 4  because we'll be addressing those other issues that were

 5  raised in Mr. Mangum's opening later on in our presentations.

 6  I don't see the point of going to it now, except just to point

 7  out that the subject matter in the NBC News report is

 8  unpatentable subject matter.  The gene itself is, of course,

 9  not patentable subject matter.

10     Let's start though here with infringement.  First of all,

11  it's their burden with pinpointed evidence.  And, you're

12  right, there are claim construction issues here that you are

13  going to have to resolve.  It's not largely disputed in many

14  respects how next-generation sequencing, amplification and

15  sequencing works.  And we'll talk a little bit about that, but

16  the bottom line is it's a claim construction issue in a couple

17  of different places, and we'll focus in first, as Mr. Mangum

18  did, on the primer claims.

19     I think it's important to point out too as well that they

20  have to find literal infringement because they have not argued

21  Doctrine of Equivalents in their briefs and therefore they

22  have waived that argument.  So they must show it is more

23  likely than not that Ambry and Gene By Gene literally

24  infringed the claims.

25     All right.  I think again the basic rules of claim
```

construction, Your Honor knows them in the Phillips case, but
it's important here because I noticed in Mr. Mangum's
presentation he was glossing over the plain language of the
claim.  And it's the claim that defines the invention.  And
it's important that we focus in on the claim, as well as the
specification, as well as, of course, there's any prosecution
history evidence, citing them.  And then, of course, extrinsic
evidence is admissible only if there's an ambiguity.

But the primary language, the primary governor of what is
within the scope of this claim and what these claims comprise
is the claim language that is drafted.  And why is that so
important?  Because that's what the patentee puts the world on
notice of is the scope of their invention.

And what you have here is the scope of an invention that
reflects the state of the art in 1993, 1994, and what they're
trying to do now is expand it out to cover -- which as you
heard at the tutorial, next-generation sequencing wasn't
developed until the 2000s, of course as you'll hear today at
some point, I'm sure, the human genome wasn't even sequenced
until 2000 or 2001.  So let's get to the claims themselves.

Again, let's go ahead and go right to the claims.  Now,
Mr. Mangum focused on derived from human chromosome 17q, but
what's important is that he glossed over the issue of
nucleotides and says where the language of the claim -- which
clearly is limited because it doesn't use the word comprising.

It says the sequence of said primers being derived from human
chromosome 17q.

What does that introduce?  That is a structural
limitation by reference to a source.  This is a structure,
this is a composition of matter, and it defines the structure
of the primer by reference to this source.  And it's well
accepted in the case law that you can define a composition of
matter, a structure, by reference to a source.  And that's
exactly what they're doing here.

Note that it doesn't say a pair of single-stranded DNA
primers for determination of a nucleotide sequence of a BRCA1
gene by a polymerase chain reaction.  The sequence
comprising -- or the sequence of said primers comprising
nucleotides being derived from human chromosome 17q.  It
modifies the entire element of primers, and it puts in place a
structural limitation by reference to that source.

The same is true of claims 29 and 30 of the 492 patent.
That makes it even clearer because it says the sequence of
said primers being isolated from human chromosome 13.
Structural limitation in the claim defining the structure of
the primers by reference to this source.

Now, I don't need to go through their chart.  I think we
all agree that they are not contending that our primers are
isolated from 17q as a whole.  It's undisputed.  And that
means we do not literally infringe the structural limitation

of those claims.

     Go on here a little bit.  So what do they do?  They argue
in the plain claim language, and it's the plain claim language
that has primacy.  They also cite to irrelevant portions of
the specification.  I would also submit that their -- they
introduce evidence from the dictionary that confirms our
construction as well.

     I'd cite to the Court the Amgen v. Hoffman-Laroche case
at 580 F.3d 1340, 1367.  And that is the case where a
structure was defined by reference to a source, i.e., it must
be -- in this particular case it's referenced to the source of
being purified from certain mammalian cells.  I can get into
and explain to you why that was important, but the bottom line
was that it was to distinguish the Amgen composition from the
naturally occurring composition.  And they did that by
reference to how it was made, i.e., a source limitation that
defined a more defined set of structures.

     That's what those claims do, those primer claims.  They
define the structure of the primer in the claim by reference
to the source.  And that's well accepted as a way to claim
within the patent law.  But what isn't well accepted in the
patent law is to define a claim by reference to a source of a
structure and then to say but we only mean part of it.
There's no language in the claim that says that.

     And think about the implications of what they are

arguing, Your Honor.  You could have three or four nucleotides

in a primer.  The rest of it could be 20, 30 nucleotides,

clearly not isolated from another chromosome -- from the

referenced chromosome, clearly not, and they would lay claim

to that through their reading of the patent claims.  It's an

incorrect reading of the claim, and they need to be held to

the structural limitation by the reference to source they put

into the claim.  And they certainly could have drafted it

differently had they meant a different -- had a different

meaning.

So also as you can see in their dictionary.com

definition, it means it comes from the source of origin.  It

doesn't mean part of it comes from the source of origin.  It

means it comes from the source of origin.  And it's limiting

language of the claim.

So let's take a look.  This is -- Mr. Mangum referenced a

few arguments here, and he talked about some of the language

with amplification and cloning.  But I think this language in

the specification, which they rely on as well, proves our

point exactly.  Look at how this language is used.  So it says

in order to facilitate subsequent cloning of amplified

sequences, primers may have restriction enzyme site sequences

appended to their five prime ends.  Okay.  That's another

structure that they're not claiming.

But what do they go on to say?  Thus, all nucleotides of

the primers are derived from BRCA1 sequences or sequences
adjacent, except for the few nucleotides necessary to form a
restriction enzyme site.  So here they acknowledge that
derivation refers to just the sequences itself, and then it
says except these other ones.  They're not swept under the
language of derived by reference to the source.  And so here
they're using the term derived in the way that the claim uses
it as well to define a set of structure of a primer by
reference to that sequence in the chromosome.

They also talk about adding labels.  You remember
Mr. Mangum making that argument.  A label is not the sequence.
A label is you put like a florescent tag on it.  That's not a
sequence.  That's not adding sequence, i.e., the sequence is
still the same even though you add a label to it.  So it
doesn't change the fact that the sequence comes from or it
must come from chromosome 17q or chromosome 13 in the case of
the 492 patent.

Now, Dr. Elliott has provided additional information to
you on this, just to make this point, that the modifications
do not add the nucleotides to primers, that they either modify
or they substitute a non-natural nucleotide.

Then they also go to adapters.  Again, Dr. Elliott -- I'm
going to go through this quickly because it's all evidence in
the record, all of which establishes a substantial question of
noninfringement.  Again makes reference to adapters.  Those

are not part of the PCR primers, the section in the spec that
they're referring to.  Universal primers, not part of the PCR
primers.  And as Dr. Elliott tells you, that the patent here
describes a section of the probe and addresses their argument.
So you'll have those, and we'll give you a set of these
slides.

So when we're adding the word wholly, what we're trying
to do is to prevent the misconstruction of the claim that
Plaintiffs are attempting to argue for by reading out the
structural limitation of the claim that makes clear that the
primer must be defined, the sequence of said primer with
reference to the chromosome.

So that's why it puts the word wholly in there because
all you're doing is giving meaning to the structural
limitation introduced into the claim by reference to the
source, i.e., the sequence that occurs on chromosome 17q or
chromosome 13, depending upon which claims you're looking at.

No question, of course, that our primers contain
sequences other than the human chromosome sequence.  I don't
think we need to go into this in too much detail.  I think
that point is undisputed.

I will though -- I think it's important just to kind of
take a quick look at this slide right here.  This is in
Dr. Elliott's second declaration, and it references exactly
what Ambry does to explain this point.  You'll see in the

```
 1   first round of PCR the primer is a composition of some
 2   nucleotides from the chromosome sequence, some from clearly
 3   artificial other -- other -- not sequences related to
 4   chromosome 17.
 5       You make a PCR product that is a combination of the two.
 6   You then come in with a second round of primer that is
 7   completely -- doesn't in any way even bind to the genomic
 8   sequence in the second round, purely artificial.  They're
 9   reading -- I don't know if they're reading that act as an act
10   of infringement, but clearly that can't be an act of
11   infringement to use those types of primers.  And then you get
12   your PCR product, which you can see here is a combination of
13   different types of sequences.
14           THE COURT:  I got it.  And I'm confident --
15   Mr. Mangum will tell me if I'm wrong about this.  They're just
16   focused on the first round.  They're not alleging infringement
17   in the second round of PCR.
18       Am I right about that, Mr. Mangum?
19           MR. MANGUM:  That's right, Your Honor.
20           MR. GAEDE:  Okay.  What about the case law?  Case
21   law is pretty clear.  The limitation that follows is not prior
22   to the word comprising in this claim.  It's a structural
23   limitation of the claim in and of itself of the structure of
24   the primer.  So the cases that they rely on about additional
25   elements or comprising -- let's take Mr. Mangum's analogy of
```

the eraser and the pencil.

What is being described here is not a primer that defines eraser and the pencil.  The primer itself is the eraser, and the primer itself must be all those sequences from 17q or chromosome 13.  And so the fact that you attach that eraser, which does not infringe, to a pencil is irrelevant because it goes to the issue of the structure of the eraser itself.

Another example is a motor in a car.  If you had a claim to a motor and you put that in the car, he has it right, if the claim is addressed to the motor, you don't defeat infringement by putting the motor in the car, just like you don't defeat infringement by putting an eraser on a pencil. That's correct.

But that's not what this claim says.  It doesn't have a language of comprising.  It says has a language of limitation. In and of itself said sequence of the primer being isolated from or being derived from the chromosome itself.  So the claim itself is addressing the motor, i.e., it's a six cylinder motor, and the claim is addressed to a six cylinder motor.  We don't have a six cylinder motor.  We have a new type of motor.  My analogy is going to run out on me here, Your Honor.  But we have a new type using next-generation sequencing that didn't even exist back then.  And so we do not infringe, not because of the additional elements issue.  We're not making that argument.  The motor in itself, the structure

of the primer in and of itself is defined by the claim.

Amstar is the same thing. Amstar was a process claim where there is comprising language. That's not the issue here, different case law, means plus function, apparatus claim.

Okay. Let's move on to -- are there any questions on that, Your Honor?

THE COURT: There's not.

MR. GAEDE: Okay.

THE COURT: And we'll go another 15 or 20 minutes before we take take a short break. Go ahead.

MR. GAEDE: Okay. So claim eight. Now, I think it's important here as well that you focus a little bit also on claim one, which is invalidated by Judge Sweet and also by the Federal Circuit.

THE COURT: Oh, we have to; right? This is a dependent claim.

MR. GAEDE: Exactly. And what's important to recognize is in this independent claim it requires a mental comparison of comparing the sequence. And what it requires is a comparison of sequence for the mental step exactly and an intention to compare directly to the BRCA1 sequence. Now, why is that true? Because we know the state of the technology at the time. That's what they could do. They couldn't compare it to a whole genomic sequence because the whole genomic

sequence didn't exist.  The mental step of the comparison

didn't exist in 1993 and 1994 when the patent application was

filed.

So what do we have here?  Amplifying all or part of the

BRCA1 gene from said sample using a set of primers.  Yes, we,

of course, do amplify some sequence, but we don't perform the

mental comparison step of claim one.

So it's not -- it's not disputed that we don't use cDNA,

that we don't use mRNA.  What we're arguing about is the claim

required a direct mental step comparison to the wild-type

BRCA1 sequence or to the genomic sequence, which is the mental

step that is undisputed that we do.

Now, it also has the definite article "the", making

reference to the BRCA1 sequence, the BRCA1 gene.  Indicates an

alteration in the BRCA1 gene, said subject.  And so the

specification also makes reference too that it's the invention

of comparing to the BRCA1 sequence, not to the genomic

sequence of the human as a whole.  And then again the

specification makes reference of comparing to just the BRCA1,

the wild-type, not to the genomic sequence as well.

So they don't dispute that we amplify and sequence exons

and a few bases of the introns, and that we compare the

patient exon in flanking intron sequences to the entire human

genome.  We do that for a reason too, Your Honor.  It's not

just sort of a cute design around argument, quite frankly.

1      There actually are the issues of pseudogenes which you

2   raised in the hearing earlier during the tutorial.  And there

3   can be pseudogene sequences elsewhere in the -- in the genome

4   of the human being and that can be detected through -- by

5   nonspecific amplification, so you want to take those out.  So

6   there's not only just an argument, mental step, is that what

7   we're doing is comparing to just -- comparing to the human

8   genome, but there's also a legitimate reason for doing that,

9   which is to remove any of that sort of confounding factors or

10  irrelevant data from the comparison.

11     And, again, I don't think there's any real dispute here

12  that the limitations have to read literally on the accused

13  process.  We have to literally -- we have to literally compare

14  the two sequences, and we literally do not compare the two

15  sequences.  We compare to the genomic sequence as a whole.

16     Going on to the 857 patent claim four.  This is

17  essentially the same issue that we just talked about.

18  Mr. Mangum's correct on that, that essentially is the same

19  issue that you need to resolve.  And for the reasons we just

20  stated, we don't practice this claim.

21     Again, just noteworthy, claim two, of course, is an

22  invalidated claim, and it's a mental comparison, and that's

23  really what is being looked at there.

24     Let's take a look here at the 721 patent claim five and

25  155 patent claims two and four.  So here -- here is the point

that was glossed over in the claim. And, again, it's the
claim language that governs. If you look in the claim where
it says comparing the determined nucleotide sequence from said
female individual to SEQ ID NO:263 -- and I hate to say this,
Your Honor, but SEQ ID NO:263 is essentially the cDNA
sequence. Like in the other claims you have SEQ ID 1, this is
the cDNA sequence, the coding region sequence only.

Now, of course, the coding region as a sequence doesn't
exist in nature. In other words, the -- it exists as with
introns, exons, it is the entire genomic sequence. So the
coding region sequence as a contiguous linear sequence does
not exist in the natural genome for BRCA1 or BRCA2. So do we
compare the nucleotide sequence from the female to the cDNA
sequence? No. We compare it to the genome.

Here, again, same thing in claim two and claim four of
the 155 patent where you're comparing the sequence to the
sequence of the SEQ ID NO:1, which is also the cDNA, the
coding region sequence. That, of course, doesn't exist
naturally in the human as a contiguous sequence.

And, again, there's no evidence that we in performing
that mental step literally compare the patient's sequences to
the contiguous cDNA sequences, therefore, no literal
infringement. Same case law.

Now, this is another noninfringement argument just for
Ambry on 155 patent claims two and four. You'll see here in

claim two and claim four -- and of course this follows the
comprising language so these are limitations of the claim that
you have to perform.  You have to -- it says (b) sequencing
said amplified fragment by dideoxy sequencing.  And then it
goes on to say repeating steps A, amplifying, and B, i.e.,
sequencing by dideoxy sequencing, until said individual's
BRCA1 coding sequence is completely sequenced.  So what that
means is you have to use dideoxy sequencing for the entire
sequencing, to sequence the entire BRCA1 coding sequence is
completely sequenced.  That's a limitation of the claim.

So, first of all, they don't contend that the
next-generation sequencing is dideoxy sequencing.  Instead,
they point to the Sanger sequencing that Ambry does use in
part, and that evidence is right here in front of you by
Dr. Elliott.

So what happens is if there's a variant identified, Ambry
will only sequence by dideoxy sequencing, i.e., Sanger, just
that part.  It's not going to sequence the entire coding
region sequence.  And so we do not Sanger sequence the entire
BRCA1 or BRCA2 sequence as the claim requires.  It's an
additional ground of noninfringement for Ambry.

I agree with Mr. Mangum that they've only asserted large
rearrangement analysis against Ambry.  Gene By Gene is not
accused so the preliminary injunction could never rest on
infringement of these claims that follow against Gene By Gene.

There's no contention.

So come to claim seven of the 441 patent, and it comes down to this very specific issue. It's undisputed that Ambry does not use mutation specific probes for purposes of detecting an alteration in the allele, I.e., the probe of a mutation. Your Honor understands mutation will be a change in a nucleotide sequence, and that means you're going to have a probe that is specific for that mutation. And you're going to come in, and under the Watson-Crick natural base pairing it's going to detect, affirmatively detect, that mutation by using that type of probe.

Specifically hybridizes to a BRCA allele to genomic DNA isolated from said sample and detecting the presence -- the presence of a hybridization product wherein a presence indicates the presence of said allele in the subject. So it's a method for screening for the alteration, claim one. That's the invalidated claim. Presence of the hybridization product indicates the presence of the alteration. Ambry does not use a probe that affirmatively binds to the alteration, the mutation in the gene, to detect that presence.

And we could actually in large rearrangement analysis. You could have -- you know, you remember from the -- from the tutorial that there are pieces of the DNA that -- larger pieces that are essentially just missing. We could certainly have a probe that would come in and just probe where that's

missing by having it detect the gap, if you will, because

you've taken the gap out and then having a probe that hits

both sides where the deletion will have dropped out and that

will come together.  So you have a probe that would then

bridge that.  No question that would be specifically

hybridizing to the mutation and detecting it, but that's not

what the claim -- that's not what we do.  All we do is we use

probes that go to the wild-type and do not specifically

hybridize by definition to the mutation.

So, again, the definition in the claim, probes:

Polynucleotides, polymorphisms associated with BRCA1 alleles

which predispose to certain cancers, i.e., mutations, or are

associated with most cancers, i.e., again, mutations from the

wild-type, are detected by hybridization with a polynucleotide

probe which forms a stable hybrid with that of the target

sequence under stringent conditions, i.e., you're probing for

the mutation.

And that will tell you, if you have it there, that you

have a predisposition to cancer because you have affirmatively

detected that that exists.  Also have the probes are allele

specific.  And they're right that we do not affirmatively

detect the mutation.  And that's what the claim requires, and

they need to be held to the scope of their claim, and they

also need to be held to the scope of what they write in their

specification because that's what they tell the public.

1   That's the public notice function of claims.

2      And in essence -- and we'll get to this in the next

3 time -- if you find that the claim is that broad, that they

4 preempted any probing, you cannot probe the BRCA1 gene.  Can't

5 be done because you're going to detect mutations, you're going

6 to detect wild-type.  Those are the two other types of

7 polymorphisms.  In essence, they're reading the claims so

8 broadly that it preempts the gene itself.  We'll get to that

9 in the next section, but that's in part the problem that

10 exists with their claim.

11      So the claim requires an identification of a variant

12 through actual hybridization of a probe specific for that

13 allele.  We do not probe to any specific allele.  The probes

14 don't tell what if any mutation or rearrangement the patient

15 has.  It just tells the clinician that the wild-type BRCA is

16 present, and therefore there's no literal infringement.

17      I won't at this point -- let me just cover one last point

18 here.  Again, they're arguing -- same argument with respect to

19 the 857 and the large rearrangement analysis there as well.

20 And, again, you can see the specifics of the allele to detect

21 that alteration, to affirmatively detect it, literally

22 required.

23      Same as here.  I think it's time for a break, unless Your

24 Honor has any questions.

25          THE COURT:  I don't.  Did you have in mind that we

```
 1    would -- you had any examination of any witnesses on the
 2    infringement issues?
 3              MR. GAEDE:  So what we're going to do, Your Honor,
 4    is Dr. Roa has a few overlapping areas in here, but also that
 5    relate to the section 101 issue.  So what Mr. Mangum and I
 6    agreed to is that at the conclusion of his 101 section,
 7    Dr. Roa would then take the stand, we would perform
 8    cross-examination that would go to both elements, and then we
 9    will go into our 101 presentation to you.
10              THE COURT:  Great.  Mr. Mangum, is there anything
11    that you wanted to add very briefly by way of a response
12    before we break or will it take more than five minutes if we
13    open that --
14              MR. MANGUM:  I think it will take more than five
15    minutes.
16              THE COURT:  I think so too.  All right.  Why don't
17    we break.  The lunch hour is approaching.  Why don't we take
18    about a 10 minute break and then try to go for about an hour
19    or so until roughly 12:30, and then we'll break for lunch then
20    so we can get another hour of argument in.  We'll be in
21    recess.
22              (RECESS FROM 11:21 am until 11:42 am)
23              THE COURT:  Mr. Mangum, I think I regret my last
24    question to you.  I think we'll proceed without replies today
25    so we'll get through what we have to get through.  We'll leave
```

something for argument when we all come back.  I understand
your positions with respect to infringement, and of course
I'll ask questions as we go if there are things that arise
that I don't understand.  But you'll have a chance to respond
when we come back after we've received some post hearing
briefing.

MR. MANGUM:  Very well, Your Honor.  The next module
that we had intended to talk about was to head right into the
section 101 issues with regard to the asserted claims and that
they cover patent eligible subject matter.  I've prepared a --
I'm kind of a visual guy, but I've prepared a slide that at
least helps me.  Perhaps it will help the Court.

It seems to me that really I want to talk about this
slide because I think it presents the question that's in front
of Your Honor, and then I'll go back with you through the
Court's opinion and essentially build this continuum and
discuss how it is that the Court sets up this continuum.

But the ultimate question, particularly with regard to
the pair of primer claims with regard to section 101 in my
mind, is we have a pair of primers that are synthesized and
designed to work as a coordinated pair within PCR to amplify a
target region of the BRCA1 or BRCA2 gene.  Where does that lie
in terms of its continuum that the Court has established with
regard to patent eligibility?

And as I read -- and I'd like to walk through in some

detail with the Court the Supreme Court's decision.  What the
Supreme Court does is talks about -- and the law -- is about,
well, we have products of nature, and we have things that are
the result of human ingenuity or the product of the hand of
man.  And depending upon how close you are to the product of
nature or how far down the continuum you are towards a product
of human ingenuity determines whether or not something is
patent eligible subject matter.

Now, in the AMP versus Myriad decision the Supreme
Court -- that we'll walk through, the Supreme Court
establishes essentially two points on that continuum.  They
say a human gene that's merely isolated from the body by
breaking the covalent bonds, that's not enough of the hand of
man to make that patent eligible.

Now, Judge Lourie of the Federal Circuit, along with one
of his colleagues, thought that that was sufficient.  Supreme
Court said no, that's not sufficient, so that's ineligible.
The Supreme Court then says, however, cDNA synthesized from
mRNA, that is patent eligible.  That's sufficiently down
there.  It does not occur naturally in nature.  It involves
synthesizing in the laboratory.  That's sufficient.

So we have those two points on the continuum.  And
ultimately the question for this Court is where does this pair
of primers that's synthesized and designed to coordinate and
work together to amplify this target region, where does it

lie?  And unless the Court concludes that it lies to the left
of cDNA synthesized from mRNA, then it's an easy
determination.  Because we don't know -- there may be things
that fit within this area between cDNA and the human gene
that's only isolated by breaking covalent bonds that is
nonetheless patent eligible, but the Court didn't reach that.
But if it's further down towards the hand of man, not
occurring in nature, product of human ingenuity, then -- I
don't want to say it's a no brainer, but it's clearly then
patent eligible, because if the court found cDNA synthesized
from mRNA sufficiently involved human ingenuity to be
eligible, then this must.

So let's go through with some detail the Court's
decision.  And the reason I think this is important -- and I
know Your Honor I'm sure has poured over this decision like I
have poured over this decision, and all of us have, is that
largely what we have sometimes in the briefs and on both sides
are characterizations of what the Supreme Court said rather
than citations to what the Supreme Court said.

So I'm going to just limit myself here for the next five
minutes as we go through, I'm going to go essentially page by
page through the Court's decision and just look at what the
Court said, not -- going to try not to characterize it.

So the court lays out here are the issues to be decided.
This case requires us to resolve whether a naturally occurring

segment of DNA is patent eligible by virtue of its isolation
from the rest of the human genome.  Issue one.

Issue two.  We also address the patent eligibility of
synthetically created DNA known as complementary DNA, cDNA,
which contains the same protein-coding information found in a
segment of natural DNA but omits portions within the DNA
segment that do not code for proteins.

So this next slide I just highlight a couple spots.  The
question:  Is it patent eligible by virtue of its isolation?
That's what the court was asking with regard to the genomic
DNA.  With regard to cDNA, is it eligible, since it's
synthetically created in the lab, even though it contains the
same protein coding information found in the segment of
natural DNA?

So we have this dichotomy here about is it the
information that makes it?  Is it the molecules, the
nucleotide sequence that makes something patentable or not
patentable, or is it its source, its origin?

So here is their holding, and this is their brief holding
right at the start, right after they state those issues.  We
hold that naturally occurring DNA segment is a product of
nature and not patent eligible merely because it has been
isolated.

And this actually in this slide is the same sentence.
They then say, but that cDNA is patent eligible because it is

not naturally occurring.  We, therefore, affirm in part and
reverse in part the Federal Circuit.  So key language there.
Not patent eligible merely because it has been isolated.
Patent eligible because it is not naturally occurring.

So back into the Court's decision.  Here this -- again,
there are back-to-back sentences within the Court's decision.
What words do they use when they're describing the product of
nature?  What words do they use when they're talking about
something that's the result of human ingenuity?

And I was working off the slip opinion.  I don't know
which version Your Honor has, but it's not a long opinion.
It's fairly easy to find.

So a product of nature.  Scientists can extract DNA from
cells using well known laboratory methods.  These methods
allow scientists to isolate specific segments of DNA, for
instance, a particular gene or part of a gene, which can then
be further studied, manipulated or used.  So when they're
talking about genomic DNA, they're talking about extracting it
to isolate it from specific segments of DNA.

Now, when they describe cDNA, or synthetic DNA, quote, it
is also possible to create DNA synthetically through processes
similarly well known in the field of genetics.  One such
method -- one such method begins with an mRNA molecule and
uses the natural bonding properties of nucleotides to create a
new synthetic DNA molecule.  This synthetic DNA created in the

laboratory from mRNA is known as complementary DNA or cDNA.

The Court then recognizes the implications of its holding.  What's going to happen if we rule one way on this issue or the other way on another issue?  Myriad's patents -- this is the product of nature notion.  Myriad's patents would, if valid, give it the exclusive right to isolate an individual's BRCA1 and BRCA2 genes, or any strand of 15 or more nucleotides within the genes, by breaking the covalent bonds that connect the DNA to the rest of the individual's genome.  That's what happens, as I say, okay, those claims are patentable.  With regard to the others, the patents would also give Myriad the exclusive right to synthetically create BRCA cDNA.

The Court then set up this -- these two issues.  Now, what are the underlying policies that are to be applied to decide where something rests on this continuum?  Product of nature.  Laws of nature, natural phenomena, and abstract ideas are not patentable.  Rather, they are the basic tools of scientific or technological work that lie beyond the domain of patent protection.  Without this exception, there would be considerable danger that the grant of patents would tie up the use of such tools and thereby inhibit future innovation premised thereon.  Continuation right in that same paragraph.

The rule against patents on naturally occurring things is not without limits, however, for all inventions at some level

embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas, and too broad an interpretaton of this exclusionary principle could eviscerate patent law.

So I think that discussion sets up that what we have here is a continuum not a dichotomy. It's not a hard and fast this is a product of nature and there's a clear dividing line between these things, because every invention involves at some level the application of natural laws or the use of naturally occurring materials that you then modify or apply in some particular way.

The Court then now says -- all right, went up to page 16, 17, 18 of the decision. There's two known points on this continuum. What is too much a product of nature to be patent eligible? Quote: We merely hold that genes and the information they encode are not patent eligible under section 101 simply because they have been isolated from the surrounding genetic material.

So, okay, Judge Lourie, you're wrong. Judge Moore, you're wrong. Just breaking covalent bonds isn't enough to make something patent eligible.

cDNA, the Court continues, does not present the same obstacles to patentability as naturally occurring, isolated DNA segments. Petitioners concede that cDNA differs from natural DNA but nevertheless argue that cDNA is not patent

eligible because, quote, the nucleotide sequence of cDNA is
dictated by nature, not by the lab technician.  That may be
so, but the lab technician unquestionably creates something
new when cDNA is made.  As a result, cDNA is not a product of
nature and is patent eligible under section 101, except
insofar as very short series of DNA may have no intervening
introns to remove when creating cDNA.  In that situation, a
short strand of cDNA may be indistinguishable from natural
DNA.  So two known points on the continuum.

Now I want to turn -- and I think this is -- this is the
critical language of the Court's decision where both
Defendants and their amici essentially try to drive a bus
through this one clause.  As a result, cDNA is not a product
of nature and is patent eligible under section 101, except
insofar as very short series of DNA may have no intervening
introns to remove when creating cDNA.  In that situation, a
short strand of cDNA may be indistinguishable from natural
DNA.

The question for you, what did the Supreme Court mean?
What did it mean when it said that?  Did it mean what
Defendants and the amici say they meant?  Let's get into
exactly what was in front of the Court, what they said and
what they didn't say.

This figure two is out of the Federal Circuit's decision
in the Ambry versus Myriad case right before it goes up.  So

what do we mean when we talk about short strands of DNA that
don't have any intervening introns?  Well, we're not talking
about BRCA1 or BRCA2 because those are long and very
complicated genes.  They have very long exon regions.  They
have introns.

So when you take BRCA1 or BRCA2 and you, through the
natural process to get to mRNA and then the synthetic process
of getting cDNA, you end up with a sequence that does not
exist in nature because you have removed -- the splicing has
removed those intervening introns.

But not all genes are long and complicated like BRCA1 and
BRCA2.  Some genes consist of only one exon, so there are no
introns that get removed in that process.  And the Defendants
admitted that and talked about that with you, and we both did,
at the tutorial.  This is from page 62 going over to 63 of the
tutorial on the 23rd.  In some circumstances, though, this is
Mr. Gaede talking, you can make a cDNA that would be
indistinguishable from the genomic DNA.  So, for example,
there are some where there just isn't an intron in between.
And then they use this graphic to show that.

Well, that would be what you'd get with cDNA from a -- an
mRNA or a DNA or a gene that does not have any introns.  So
not BRCA1, not BRCA2, not something that was before the Court,
but that's what you would get.  And that's what the Court was
talking about.  Well, maybe -- what's going to happen in that

circumstance?

So what did the Court mean?  With genes consisting of only one exon and no introns, as we just talked about, the cDNA made from the mRNA will have the identical sequence as the original genomic DNA because there were no introns spliced out in the natural process whereby the mRNA was created.  Such a circumstance was not before the court, the Supreme Court, therefore the Court need not and did not address that point -- I mean what the court says is clearly identified by it as dictum -- very short series of DNA may have no intervening introns to remove when creating cDNA.

So they're clearly talking about this natural transcription process that gets us down to the mRNA.  So there may be some of those where you don't have any introns to remove.  In that situation, a short strand of cDNA may be indistinguishable from natural DNA.

So why did the Court bother to talk about that if it wasn't in front of it?  I mean it clearly identifies it as dictum.  If you go back to the briefs before the Supreme Court, you get some enlightenment about why Justice Thomas either felt compelled or at least thought it -- at least that he should say something about this.

Here is -- this is taken directly from page 51 of AMP's brief.  Although cDNA is frequently created in the laboratory using the above-described process, scientists have documented

the existence of the BRCA1 pseudogene1.  And this is an issue
that came up when Your Honor asked a question about it.  A
segment of the BRCA1 cDNA in the human genome.  A ruling that
DNA is not patentable because it is a product of nature
necessarily would require a ruling that pseudogenes or cDNA
are not patentable for the same reason.

So AMP's position before the Supreme Court was you should
not only find that genomic DNA, something isolated by breaking
the covalent bonds, is not patent eligible, but you should
also find that cDNA is not patent eligible because of this
anomaly or this phenomenon that can occur where you can have a
segment of the BRCA1 cDNA in the human genome existing as a
pseudogene, which as we talked about at the tutorial performs
no function.  It doesn't -- it doesn't have any coding
information that can be used.  It's essentially a defective
piece that's sitting there.

So the Court addresses AMP's argument by that language we
talked about, the except language, and specifically talks
about it in footnote eight, which was a footnote that when I
read it I went what in the world.  They go to footnote eight
and they hold there that the possibility of there being a
synthetic molecule -- the possibility that there's a synthetic
molecule that's similar to one found in nature does not affect
patentability.  And here is the first half of footnote eight
and the next slide has the next half.

Some viruses rely on an enzyme called reverse transcriptase to reproduce by copying RNA into cDNA.  In rare instances a side effect of a viral infection of a cell can be the random incorporation of fragments of the resulting cDNA, known as a pseudogene, into the genome.  Exactly what was talked about in the brief.

Such pseudogenes serve no purpose.  They are not expressed in protein creation because they lack genetic sequences to direct protein expression.  That footnote continues.  Perhaps not surprisingly, given the pseudogenes' apparently random origins, AMP has failed to demonstrate that the pseudogene consists of the same sequence as the BRCA1 cDNA.

And then here is the holding language.  The possibility that an unusual or rare phenomenon might randomly create a molecule similar to one created synthetically through human ingenuity does not render a composition of matter nonpatentable.

So what did the court mean?  I think we have now some context for what the court was talking about.  Specifically is saying this issue is not in front of me because BRCA1 and BRCA2 are long and complicated genes and so I don't have to look at this notion that, well, boy, in some instance you could have a cDNA that's identical to the genomic DNA.  And they reject this notion that the fact that there might be

something out there floating in space within somebody's body that matches up with a synthetically created molecule just isn't important.  It does not render that nonpatentable.

So, thus, AMP argued that cDNA should be found unpatentable because it was possible that a similar naturally occurring molecule, i.e., an exon-only segment of the BRCA1 or BRCA2 gene, existed within the body in the form of a pseudogene.

Nonetheless, the court held that this mere possibility was insufficient to render cDNA, and by extension other molecules created synthetically through human ingenuity, unpatentable.

So we're back to our continuum.  Where does this pair of primers synthesized and designed as a coordinated pair to amplify in PCR a target region for the BRCA1 and BRCA2 gene?  That's what the court tells us and that's what we then go on to address.

So I think what's important here, Your Honor, is we have picked very narrow claims, very narrowly defined claims to assert in this case.  So while I've told you what my view is of this continuum, the Court does not need to go so far as to hold that all synthetic DNA is patent eligible, although I think the Supreme Court's decision supports that.  You don't have to go that far to enter an injunction in this case and find that we have a likelihood of success on the merits

because the primer pairs at issue here are clearly patent eligible under AMP.

So let's look at those factors that the Court talked about. We have a pair of single-stranded DNA primers. They're designed to work in conjunction with each other in a PCR chemical reaction to prime the artificial synthesis of a new molecule having a portion of the BRCA1 and BRCA2 sequence. That does not exist anywhere in nature.

You don't have a -- first of all, you don't have DNA primers that exist in nature. You don't have a pair of them that are specifically designed because the design requires the human ingenuity. They're designed to work in conjunction with each other to prime this PCR chemical reaction. PCR cannot -- does not occur in the body. It does not occur in nature. And you create a new molecule. You create these amplicons that we talked about at various times during the tutorial and otherwise that have a portion of the BRCA1 and BRCA2 sequence that don't exist in that form in nature.

And I submit to you, Your Honor, that when we think back about that continuum, that, the pair of primers, involves much more of the human ingenuity than does taking a naturally occurring mRNA and through a process convert that to cDNA in the laboratory synthetically.

And since the Supreme Court found that taking mRNA and making cDNA out of it was patent eligible because it involved

enough human ingenuity, you know, these pair of primers is far
down that continuum from cDNA.

So here -- this summarizes our points about why we
believe that the primer pairs are patent eligible under AMP.
They're synthetically created in the laboratory.  They're not
extracted from the body.  So when we get back to the Supreme
Court's decision where it talks about extracting something by
isolating it from the body versus synthetically created -- and
Dr. Pribnow acknowledges that in his declaration, that
primers, primer pairs, are synthetically created in the
laboratory.  They're not extracted.

Point two, no comparable element exists in nature.  A
matched pair of single-stranded DNA molecules that hybridize
to preslected ends of the target region on the BRCA1 or the
BRCA2 gene.  It does not exist in nature.  The primers are
carefully designed and defined by scientists, often after
significant optimization through trial and error.

So they sit there and look at that BRCA1 and BRCA2
sequence and try to figure out, as we talked about in the
tutorial, well, where is there not a lot of duplication?
Where is there a region that doesn't vary a lot between
different individuals so that I can get a targeted and
efficient amplification?  So, thus, involves much more of the
hand of man than cDNA made from mRNA.

And this chart just kind of summarizes that.  A pair of

primers designed to prime a PCR reaction involves much more of
the hand of man than cDNA from BRCA mRNA.  Just side by side
think about that.  BRCA cDNA, you take a naturally occurring
mRNA that's extracted from a cell and you use that as the
starting point.  So right up until the time that you go to the
lab and you start to make your cDNA, it's all a natural --
naturally occurring process.

In contrast, a synthesized specific -- BRCA specific
primer pair is synthesized from scratch with no starting
material extracted from the cell.  Yes, you need to know --
you're using knowledge about what the BRCA1 and BRCA2 sequence
is like so that you're using knowledge that comes from nature,
but what you're making and what you're designing is
synthesized by you from scratch based upon your decision or
the scientist's decision about what's going to be an efficient
pair of primers to achieve this.

BRCA cDNA.  It contains the same protein coating
information found in the segment of natural DNA -- undisputed.
That's what the Supreme Court talks about.  Petitioners say
that, well, it can't be patentable because the technician's
not deciding the sequence.  That's dictated by nature.  The
Court says that's not -- but that's what's true with BRCA
cDNA.

Think about it over here with a primer pair.  Those
primers do not code for a protein.  They don't perform any

comparable biological function as a segment of natural DNA while the cDNA codes for proteins the same way that the exon regions of the genomic DNA would.

That's not true of the primers. They don't code for a protein. They're the equivalent of a tool. You know, you have formed a tool, synthesized it, and now you're using that tool that you designed to perform a function that doesn't exist in nature, PCR, that then amplifies the target regions that you've dictated. And I submit that's much more human ingenuity, much more the hand of man than cDNA.

And this is a slide -- it's a slide, I think it's 46, from Defendants' tutorial, which just shows the process by which cDNA is made. And it just emphasizes the fact that the only thing that involves work in the laboratory is just that last step as contrasted to what we're talking about with primer pairs.

So the claimed primer pairs are patent eligible -- this is an additional reason -- because they are distinct from naturally occurring DNA. In the case law in this area, a lot of the discussion is through the process that you're applying, do you create a distinct molecule, something that is distinct from something that's naturally occurring?

So that's true here with regard to these primer pairs. A pair of relatively short molecules with different chemical structure and function than anything that exists in nature.

So it's distinct from the naturally occurring DNA. It's different -- so it's different in structure. It's different in terms of the range of uses that it can be put to. It's capable of catalyzing a chemical reaction to synthesize a specific DNA molecule of interest. And used in -- it's used in PCR, a process that has no analog in nature.

And those two things, I mean particularly that second, that's something that cDNA cannot do. I mean cDNA cannot catalyze a chemical reaction. It can't be used in PCR. And yet cDNA, even though what it does is the same thing that the naturally occurring molecule does, which is code for a protein, is explicitly found patentable by the Supreme Court.

So, Your Honor, we've now covered the primer pair, the -- the composition of matter claims and now I'm going to turn to the method claims and discuss why those are also eligible under AMP and Mayo.

THE COURT: Thank you.

MR. MANGUM: I think one thing that's really important to look at at the outset is that it's important to remember that the AMP versus Myriad case is the -- is a case that is returning to the Supreme Court after it has been remanded for reconsideration in light of Mayo. Am I making myself clear about that?

The Myriad case, it gets -- certiorari is granted in the Supreme Court. In the interim the Court has issued their Mayo

decision and they say, okay, Federal Circuit, take another

look at this now that we've looked at Mayo, now that we've

rendered the decision in Mayo.  The Court does that.  The

Federal Circuit comes to essentially the same conclusion it

did before Mayo and it comes back up to the court.

       So the Supreme Court's acutely aware of its Mayo

decision, immediately prior term, when it's looking at AMP

versus Myriad.  And I think that's significant because if we

now look at -- and, again, not characterization but

citation -- the Court's statements in AMP regarding method

claims and Myriad's ability to patent methods of applying its

discoveries, those comments by the Supreme Court make

absolutely no sense if Defendants' view of the Mayo decision

are correct.  If Mayo totally wipes out any notion of there

being method claims like the ones that are asserted here, you

know, why would the Supreme Court have gone out of its way to

say here is not what's in front of us, and do more than that.

Let me show you exactly what they said, again, citation not

characterization.

       So the Court, AMP Court, emphasizes the narrowness of its

holding and that it did not affect Myriad's claims.  They say

it is important to note what is not implicated by this

decision.  First, there are no method claims before this

court.  Similarly, this -- and this is, again, the next

sentence from the Court.  Similarly, this case does not

involve patents on new applications of knowledge about the
BRCA1 and BRCA2 genes.

Then they cite with approval what Judge Bryson said
below.  Judge Bryson aptly noted that, quote, as the first
party with knowledge of the BRCA1 and BRCA2 sequences, Myriad
was in an excellent position to claim applications of that
knowledge.  Many of its unchallenged claims are limited to
such applications.

What we submit to Your Honor is that the method claims
that we're talking about here fit exactly into this area.
They are applications of knowledge from the discovery that
Myriad made of the sequence of the BRCA1 and BRCA2.

THE COURT:  Of course Judge Bryson goes on in his
opinion to recite three specific claims in three specific
patents.

MR. MANGUM:  He does.

THE COURT:  So do we compare those with these to get
some idea for whether this is the kind of claim that Judge
Bryson had in mind?

MR. MANGUM:  I think we -- I do.  I think we have to
look at the specific claims that we are asserting, and
particularly the notion that comes out of Mayo -- and I'm
about to launch in and talk to you about Mayo -- that are the
claims that -- the method claims that are asserted by Myriad
here, are they mere mental abstraction application steps or

are there discrete, transformative tests types -- type tests.

But I think that's a very fair analysis to do, to compare how these claims that we've asserted, these method claims, match up to what was found insufficient in Mayo and what was found, some of them, insufficient by the Federal Circuit in terms of Myriad claims, what were found sufficient.

And then there's another important case in this, and that's the Diehr case from the Supreme Court, Diamond versus Diehr because that -- you know, unlike some of the other cases, that's a method case, method claim. And if you look at Diamond versus Diehr, it talks about how method claims in particular should be viewed. And I don't think Diamond versus Diehr is cited in either of the briefs, but there are some great -- there's some very pertinent language in Diamond versus Diehr that I'll see if I can direct the Court's attention to here.

THE COURT: That's a Federal Circuit decision; right?

MR. MANGUM: No, it's a Supreme Court, Your Honor. It's -- the cite on that is 450 U.S. 175, 101 Supreme Court 1048, if that's an easier one, Diamond versus Diehr. Diamond, of course, at that time, the Commissioner of Patents, 1981 Supreme Court decision.

And I'll just point out to the Court, you know, they're dealing with method claims. It's an interesting -- it's a

method claim for galvanizing rubber.  And the whole issue
that's before the court is that there's an equation out there
that says how long you should cure rubber for -- you know, how
long you should heat it up to get what you want, what
temperature and everything else.  And so you're applying this
natural equation.  And there's a method that's designed and
patented that talks about how to specifically apply that.

And what justice Renquist says, speaking for the Court,
he says, it is now commonplace that an application of the law
of nature or mathematical formula to a known structure or
process may well be deserving of patent protection.  So
particularly with regard to method claims, I think Diamond
versus Diehr is a very important authority for the Court to
look at along with Mayo.

So let's talk about Mayo, how Mayo and Myriad are
different.  On the left side here it's talking about Mayo.
It's important to recognize that everything that was in Mayo's
claim was known and in use at the time of the filing of that
patent application.  Okay.  The drug that it's talking
about -- I have it on another slide and I won't be able -- I'm
probably not able to pronounce it even when I read it off the
slide let alone from memory.

But there was a known drug metabolite that was used as a
known biomarker.  That was known prior to the time that
Prometheus filed its patent application.  Second, the

association of that biomarker to a particular clinical characteristic was known, well known. Third, the assay techniques, so the extent they had any methodologies for that specific biomarker were known. So it's -- it's not -- not equivalent to saying, well, PCR was known. It's that that -- the assay techniques that were specifically used for that biomarker were already known. So you already had the information that you needed to be able to do the specific technique.

So what did the patentee offer? All the patentee did was refined a previously known therapeutic range and instructed the physician about the relevant natural laws. You give the person this drug. You then test for it in their body. If it's too low, what do you do? You give them more. If it's too high, you cut down on the dosage. So all of that was known, and all they did was they -- there was a therapeutic range before that was this broad, and after Prometheus they said, well, let's put it here.

So how is that different from the situation in Myriad? At the time that patent applications are filed, the -- we're talking about now a previously unknown biomarker, the BRCA1 and BRCA2 genes. There were people out there looking for them, but they didn't know where it was or what its sequence was. That biomarker was not known at the time that Myriad filed its patent applications.

There is a new clinical indication, unlike before where
there was already known that there was this association.
They're now -- we know that this sequence and different
variants of that and mutations within it have -- are
clinically indicative of hereditary breast and ovarian cancer,
not known before the patent claims were filed, known
afterwards.

And then you have specific applications of these
generalized techniques, like PCR and sequencing, to develop
new assays for the new biomarker.  So, yes, I mean I'll
concede immediately PCR was known, sequencing was known, but
what's claimed in these patents isn't PCR and sequencing.
It's performing PCR using these specific designed pair of
primers to target a specific region of the BRCA1 or BRCA2 gene
and then sequencing that.  So that's the difference with
regard to that.

Other differences.  There are more differences between
these two cases than you can fit on one slide.  Mayo, these
differences look about -- about the differences in the claims
that were in these two cases.  In Mayo what you had were
claims to, quote, administering and determining steps that are
articulated at a very high level of generality.  And
essentially I think it was Justice Stevens that said -- maybe
not Stevens -- abstract suggestion that the physician take
into account these relevant natural laws when it's treating

the patient.  So abstract high level of generality steps not specific steps.

In Myriad, our method claims, the claims are directed to specific application of techniques, amplifying, sequencing, probing by hybridization and screening that are specifically tied and directed to this newly discovered -- these newly discovered biomarkers, the BRCA genes.  The claimed applications and attendant primers, probes and amplicons didn't exist before.  They were unknown, and indeed they were really, as a practical matter, impossible to know until the gene sequences were known.

So here are some sample claims between these two cases. Under Mayo, step, administering a drug providing 6-thioguanine to a subject, and then determining the level of that same drug in the subject.  That was their claim.  Have them take the pill, shot, check their body, see how much is there, and then make some decisions based upon that.

In contrast, claim seven in the 441 patent, hybridizing a BRCA1 gene probe which specifically hybridizes to a BRCA1 allele.  So it's tied into that very specific new discovery, so like the Diehr case, applications of knowledge of this newly discovered information.

Claim eight of the 441 patent, amplifying all or part of the BRCA1 gene from said sample.  So not administering and determining.  And the other thing, I think, just to be fair,

there are certain of our claims that have elements of those
method claims, that have some of these comparison type steps,
but the important thing is that it doesn't only have that. If
we had a claim that just said do this and then compare, you
know -- strike that. If we had a claim that said compare the
sequence of the patient's BRCA1 gene to the sequence of the
wild-type, that wouldn't be patentable under Mayo. But we
don't have those types of claims. We have those steps plus
some very specific application steps that distinguish us from
the Mayo situation and put us more in line with the Diehr and
other cases.

So Mayo. Here is the claim language. Determining the
level of 6-thioguanine in said subject. Contrast Myriad.
Claims recite specific chemical assays that were, importantly,
not routine at the time the patents were filed. In Mayo the
procedures that we're talking about were already known and
routine, specific procedures tied to that specific drug and
biomarker, not true with regard to Myriad.

Indeed, the specific assays that we're talking about with
Myriad's claims were impossible as a practical matter without
prior knowledge of the BRCA1 and BRCA2 sequences. So asserted
method claims are patent eligible under AMP and Mayo.

And this really overlaps a little bit with what we'll
talk about later when we get to the obviousness and things.
Just bear with me on that. Defendants cannot properly

attempt -- attempt to use Myriad's own discovery of the BRCA1 and BRCA2 gene sequences to invalidate its method claims.  The proper question is whether Myriad's specific claimed methods were routine, conventional activity previously engaged in by scientists before the patent was filed, not whether, having the benefit of Myriad's landmark discovery, one of skill would know how to develop such methods.

That's the difference.  When you're looking at patent eligibility and you're looking at this, you're not -- you don't get to say, well, once we had this discovery, would somebody else have been able to do what you came up with?  Or, you know, if we waited long enough would somebody else have come up with that?

And I think this is probably the final point.  Otherwise, if that were the law, the Supreme Court's statements in AMP regarding Myriad's ability to patent methods of applying its discoveries regarding the BRCA1 and BRCA2 genes would make no sense.  I mean the Court was fully aware of Mayo.  Why would they have made those gratuitous statements if they thought that it's -- their own decision in Mayo has wiped out any ability to claim that.  And that would have been contrary to their own precedent in Diamond versus Diehr.

So it's important to note -- and this is the language that I started with From the Court.  It's important to note what is not implicated by this decision.  There are no method

claims before the court.  Similarly, this case does not
involve patents on new applications of knowledge about the
BRCA1 and BRCA2 genes.  That's what's at issue in this case,
applications on method claims, applications of the knowledge
of BRCA1 and BRCA2.

     One additional ground why the method claims are eligible,
patent eligible.  They're eligible in and of themselves, but
they're also eligible for the additional reason and
independent reason that those method claims incorporate the
use of the primer pairs, the novel patentable compositions of
matter, the primer pairs, the amplicons and the probes that I
addressed previously.  And that comes right out of the Federal
Circuit's decision in AMP on remand.

     And this is what the Court says.  Once one has determined
that a claimed composition of matter is patent eligible
subject matter, applying various known types of procedures to
it is not merely applying conventional steps to a law of
nature.

               THE COURT:  Is the converse true also?

               MR. MANGUM:  No, because what I said before is the
method claims can be patent eligible independently, but if you
find -- if you find that the composition of matter is
independently, then a method applying that carries that over
but the inverse is not -- is not.

     With that, Your Honor, unless there's some specific

questions or areas, I certainly have additional materials with

regard to this.  And I guess what I'd indicate is I possibly

want to go through some of those additional materials if

you're not going to contemplate rebuttal on the presentation

with regard to the 101 issues.

THE COURT:  Well, I'll hear whatever you want to

present today.  We're here for the purpose of creating a

record, but we'll be back for final argument after you've had

a chance to digest conclusions and findings.  But if there's

something more you think is relevant today -- I also

understand that notwithstanding the volume of the briefing,

we've very carefully digested it and all the case law.  But

this is helpful.  It's a helpful exercise for the Court, and

it's your opportunity.

MR. MANGUM:  One thing that I think is -- maybe two

or three slides that I just want to address.

The Court:  Of course.

MR. MANGUM:  I want to drop back now and just talk

about what -- what does -- what would -- if Defendants' view

of the law were adopted, what mischief would that cause in

terms of what would not be patent eligible out there.

THE COURT:  I'd actually like to talk about the

forest a little bit today and not just the trees.  I've got a

really close look at the trees in your briefs, and I'm

interested in your -- relatively, both of you, your

perspectives on the forest.

MR. MANGUM:  Okay.  And this ties back into in some respects the chain analogy that we talked about during the tutorial.  And the point I want to make -- and I just want to give you a couple of examples.  How dramatic -- you know, we talk about A, C, D, G, but the concept is we're talking about a chemical compound, and we're talking about chemical molecules and how dramatically different a chemical molecule is once it's extracted or once even one little link is removed.  And I want to just give you a couple of examples of that.

Here, as you'll see depicted, there's two chemical compounds, the only difference of which is that there's this little called a hydroxyl life, now I understand, that's a link that's down there on that -- on that one spot.  The other one doesn't have it.

So here we have an example.  We have the naturally occurring nucleoside that's converted to an active therapeutic drug by that hydroxyl being eliminated.  So it's not -- so you could do it by taking that off or you could do it by synthesizing the molecule without that on it.

So the compound on the left, it's name is there.  That's as far as I'm going to go.  It's found naturally in the DNA of a virus, okay?  Exists in nature.  That same compound removed the hydroxyl from the three prime location, or synthesized

that same molecule and omit the hydroxyl from that location,
an entirely different molecule.

And while I won't pronounce the name, I will point out to
you that you'll notice it's a dideoxy.  You'll recall from the
tutorial that that's -- that's that nucleotide that stops --
stops the reaction, stops something from replicating itself,
dideoxynucleotide.

So it's the same as the DNA from that virus, but it's
missing the hydroxyl group from the three prime.  What
happens?  That is a drug, Amdoxovir, an HIV drug.  It is a
patented composition of matter, and its only difference is
that one molecule.

So how does that drug work?  And this goes back to what
we talked about during the tutorial.  By removing that
hydroxyl and making this into a dideoxynucleotide, that drug
inhibits the replication of the virus.  So it's that same
principle that would stop a PCR reaction where you wanted it
to stop that applies in the human body to stop an HIV virus
from going wild and replicating itself.

So the natural compound is used by the -- so the virus we
talked about, the left side, is a natural compound that's used
by the virus to hijack the cell operations, and it forces the
cell essentially to make copies of itself.  That's what it
does in nature.  You take the dideoxy version of that natural
compound, this drug, and it causes a termination of that DNA

synthesis and therefore is retardant to the progression of
HIV.

SO what would happen if the Court were to go, or the law
were to go -- the law were to go to the point where these
types of submolecules are not patentable?  So a submolecule of
a naturally occurring larger molecule in this example gains
dramatic new utility by the simple act of removal of the one
hydroxyl group, the removal of one of the chains essentially
for your analogy.

So you looked at -- think back about that picture we had
up in front of you.  If you look at the left side, can you see
the molecule that's on the right side within that?  Yeah, you
see it.  It's the same thing without that on there.  So the
mere fact that you can look at it, look at that chain and say,
well, here's the 10 foot chain, but I can see that one foot
chain there in the middle of that 10 foot chain.  That has
dramatic consequences within it.

Now, you can see the difference between those two
molecules a lot quicker than you can see the difference
between a primer pair or an individual primer for that matter
that's 15 to 30 nucleotides versus the 81,000,000 plus
nucleotides that are on chromosome 17 or a one foot segment
can be seen within a 10 foot chain.

So Amdoxovir, by missing one small chemical group from
the naturally occurring DNA, once you synthesize that, missing

that in part, it functions entirely different.  Same thing

occurs.  Its analogous to the BRCA1 specific primers.  They're

missing more than 81,000,000 nucleotides from chromosome 17,

and they're missing at least 100,000 nucleotides from the

genomic BRCA1.  But because of that, they perform -- they

perform none of the functions -- and this is critical I think.

That primer performs -- the pair of primers perform none of

the functions that that sequence does when it's within that

bigger chain.  Within that bigger chain, if you know exactly

where to read the codons, each of those three pair, you know,

that combination of three, is going to express an amino acid

and develop protein.  Primer pairs don't do that.  They don't

code for the proteins.  They perform an entirely different

function.  They prime the PCR, targeted PCR amplification that

does not occur in nature.

Let me give you one more example because I thought this

was kind of cute.  What can Gusperimus teach us about chains?

So here we have again two molecules, one, the top one, an

antibiotic isolated from Bacillus laterosporus.  Below it the

exact same molecule, except that one, again, Hydroxyl group is

missing from that one link.  So it's the same thing, and it's

Spergualin with just one hydroxyl group removed.  And it's an

immunosuppresive drug that can be used for a variety of

hyperreactive inflammatory diseases such as autoimmune

diseases, and it's patented.

1    So now we take it back to that multicolored chain.  We
2    take one of those links off.  We can see the smaller segment
3    within the larger one, just one link has been removed, yet the
4    molecule has a new, expanded range of utilities.  And that's
5    one of the things that the case law really points out.  You
6    make a change such that the new molecule has an expanded range
7    of utilities that the old molecule did not.  That's talked
8    about in Funk Bros.   It's talked about in Chakrabarty.
9        So the analogy in my mind is clear.  You know, when you
10   make these pair of primers, you haven't just removed a side
11   link from a small chain, which is what the scientists did was
12   design an entirely new pair of small chains which happen to
13   share some links with the larger natural chain, and together
14   they have new and expanded range of utilities, namely priming
15   this PCR reaction.
16           The COURT:   Would you say in the language of Funk
17   Bros. and Chakrabarty, would you say that the two examples
18   you've just provided to us -- I'm looking for the specific
19   language.  Do they have markedly different structures without
20   the single molecule in both instances?  They have, you've
21   convinced me, different utility.  Do they have markedly
22   different structures?
23           MR. MANGUM:   Well, I think the question there, as a
24   chemical compound, yeah, because that -- that one -- you know,
25   I'll use terms that I think you and I as nonscientists -- that

one little difference -- so if you looked at it from a

standpoint of saying, well, those two pictures, are they

markedly different?  Well, is the removal of just one little

thing markedly different?  I mean it would be much easier to

say that the difference between the primer pair is markedly

different than that full sequence of the gene or even an

amplicon.

But even with these things, I think the point of all this

is when you're talking about chemical compounds of what

visually would look like a very small change has a dramatic

effect on that chemical compound, that chemical -- not just

its functions but the chemical compound itself can look

entirely different the way it would, you know, spin up or work

or anything else.

The Court:  Well, do you think that Judge Bryson has

it right when in his portion of his -- of that appellate

decision he says that we should view -- I think he's talking

just specifically about Chakrabarty, but I think this is also

true in Funk Bros., or could be, that we have to look

separately at whether there's a significant difference both in

structure and purpose.  And does your answer to my last

question collapse those two?

MR. MANGUM:  I don't think so.  I mean I'm not a

chemist, but my -- what I am concerned about in terms of --

you know, is that from a chemical standpoint, would we look at

a model of a molecule and we say, well, this thing is taken

off from it?  If we look at it as an economics major, we look

at it and say, well, boy, you know, it's not very different.

That's just one thing over there is gone.  Or if we look at

the chain analogy, well, you know, I had this 10 foot chain

but now I can see this one foot in here and -- but I think

when you then translate that to say we're not talking about a

model and we're not talking about a chain, we're talking about

a chemical compound.  Apart from the fact that it's function

may be significantly different, its structure to a chemist and

the way it would look in nature, you know, if you could see

it, the model -- I guess the point is the model or the chart

is an abstraction of what that molecule really is.

And I believe for purposes of what Judge Bryson is

talking about, the appropriate thing to do would be look at

the difference of that molecule in terms of its structure and

independently its application.  And its structure, even though

to me or to a common looker may look very similar, it wouldn't

to a chemist.

And I guess kind of take that to the next step.  It's

interesting, Judge Lourie, who wrote the opinion, is a

chemist.  He's a patent lawyer and a chemist.  Judge Bryson

was a lawyer in the Justice Department.  So I can't answer

your question from a chemical standpoint, but I don't think

I'm collapsing the two together.

1          The COURT:  And I think it was Judge Bryson who
2    suggested that maybe it was the view of a geneticist, which is
3    the right lens through which to look at this, but I gather the
4    response would be the same.  You flip a G and a C for an A and
5    a T in a sequence and you can have a profound difference.
6    You're going to build a different amino acid.  You're going to
7    build a different protein.  So it may seem minute in
8    structure, the difference, but the ramifications are profound.
9          MR. MANGUM:  Absolutely.  And I don't know if it
10   would be helpful, Your Honor.  I did anticipate that there --
11   I'm prepared to kind of walk you through Funk Bros. and
12   Chakrabarty and those things, but --
13         The Court:  You can't imagine how much time I've
14   spent reading them.  I think I understand.
15         MR. MANGUM:  All right.  With that, Your Honor, I
16   submit this issue.
17         THE COURT:  All right, thank you.  I think this is
18   probably a good time to break for lunch and give everyone a
19   chance to eat and breathe rather than to break up your
20   presentation, Mr. Gaede.
21      Normally with lawyers I -- we just come back and start
22   sooner rather than later.  I think there's a lot of people
23   with interest here and a lot of people that probably have some
24   things to do, so let's take a full hour.  Let's plan to come
25   back and resume at quarter to 2:00, and we'll get a good bit

more water under the bridge today.  We'll be in recess.

(RECESS FROM 12:46 pm Until 1:53 pm)

THE COURT:  All right.  We'll go back on the record.

Mr. Mangum, hi.  There you are again.

MR. MANGUM:  Thank you, Your Honor.  The next step is we'll be putting Dr. Roa on the stand.  But to follow up with one question from the Court, having the lunch hour, we couldn't resist one more slide.  That's that comparison that you had asked for, and that's a comparison between one of the specifically identified unchallenged claims from Judge Bryson comparing that to one of the claims at issue here.  And as you see, they match up essentially.

One is talking about RNA, one is talking about genomic DNA isolated in terms of the method claim hybridizing step, detecting step, so that there is a nice correspondence between those types of claims and claims that are asserted here.

With that, Your Honor, we'd call Dr. Benjamin Roa to the stand.

THE COURT:  Thank you.  Dr. Roa, come forward, if you would, please, and be sworn.

MR. MANGUM:  And Mr. Jackson of our team will be doing the examination just to put him on and lay the foundation for his declaration.

THE COURT:  We'd be happy to hear from him.

MR. MANGUM:  Thank you.

```
 1              The CLERK:  Please raise your right hand.

 2              (BENJAMIN ROA, PLAINTIFFS' WITNESS, SWORN)

 3         Thank you.  Please be seated.  Please state and spell

 4    your name for the record.

 5              THE WITNESS:  Benjamin Roa, B-E-N-J-A-M-I-N, R-O-A.

 6              THE COURT:  Please.

 7                        DIRECT EXAMINATION

 8    BY MR. JACKSON:

 9    Q    Thank you.  Dr. Roa, if you could just again please state

10    your name for the record.

11    A    My name is Benjamin Roa.

12    Q    Okay.  And who are you employed by?

13    A    I'm employed by Myriad Genetic Llaboratories.

14    Q    And what is your title at Myriad?

15    A    My title is Vice President for Technology Development and

16    Laboratory Director.

17    Q    Okay.  In general terms, what are your duties at

18    Myriad?

19    A    So I oversee a group that does development of new tests

20    for the clinical labs, and I also will receive the clinical

21    reporting of our tests.

22    Q    Thank you.  Could you please give the Court a general

23    overview of your academic credentials.

24    A    So I obtained my Ph.D. in molecular biology from

25    Northwestern University.  And I did postdoctoral training in
```

molecular and human genetics at Baylor College of Medicine,

and I'm also Board Certified by the American Board of Medical

Genetics in clinical molecular genetics.

Q    Thank you.  Have you prepared and submitted a declaration

in this case?

A    Yes, I have.

Q    Let me hand you a copy of that declaration.

Your Honor, may I approach?

THE COURT:  Please.

MR. JACKSON:  I'll also hand a copy to the Court and

to opposing counsel.

THE COURT:  Thank you.

Q (BY MR. JACKSON)  So is this a copy of the declaration that

you submitted in this case?

A    Yes.

Q    Do you understand that this declaration is the equivalent

of sworn testimony in the case?

A    Yes.

Q    Is that your signature on page 18 of the declaration?

A    Yes.

Q    And did you in fact sign that declaration on July 9th,

2013?

A    Yes.

Q    When you signed that declaration, did you understand you

were attesting to information contained in the document under

```
 1   penalty of perjury?

 2   A    Yes.

 3   Q    Have you reviewed your declaration recently?

 4   A    I have.

 5   Q    Did you see anything in your declaration that you feel

 6   requires correction or clarification?

 7   A    No.

 8   Q    Would your testimony today be any different than what is

 9   set forth in this declaration of July 9th?

10   A    No.

11   Q    Do you adopt your declaration as your testimony to the

12   Court?

13   A    Yes.

14            MR. JACKSON:  Thank you, Dr. Roa.

15        Your Honor, we pass the witness.

16            THE COURT:  Mr. Gaede.

17                      CROSS-EXAMINATION

18   BY MR. GAEDE:

19   Q    Good afternoon, Dr. Roa.

20   A    Good afternoon.

21   Q    If I can move this and get set up in a way that might

22   help us.

23        Good afternoon, sir.  You recognize your declaration also

24   on the screen there?

25   A    Yes.
```

1    Q    Okay.  It might be easier if we could all look at that

2    together.  First of all, let's make sure on one point here

3    that we're in agreement on.  Now, here in paragraph 12 of your

4    declaration you state that BRCA1 and BRCA2 are the names of

5    two genes that can provide information relating to a patient's

6    susceptibility to develop breast or ovarian cancer.  Do you

7    see that?

8    A    Yes.

9    Q    And so you agree that the BRCA1 and BRCA2 genes do

10   provide information relating to a patient's susceptibility to

11   developing breast or ovarian cancer; correct?

12   A    Yes.

13   Q    And that that information is contained in the sequence of

14   the BRCA1 or BRCA2 gene; correct?

15   A    Yes.

16   Q    So we agree that DNA can contain information; correct?

17   A    Yes.

18   Q    All right.  Now, this is a schematic that you put into

19   your declaration, correct, for the Court?

20   A    Yes.

21   Q    And here what you're showing is two primers; correct?

22   A    Correct.

23   Q    And we can agree that the sequence that is displayed in

24   the forward primer is the exact same sequence as is set forth

25   in the three prime to five prime strand, that portion of it;

```
 1   correct?

 2   A     For the forward primer --

 3   Q     I'm sorry, five prime to three prime I mean.

 4   A     Yes.

 5   Q     Sorry, my mistake.  And that the reverse primer on the

 6   five prime to three prime also contains the exact sequence

 7   that's predicted shown on the lower part from five prime to

 8   three prime; correct?

 9   A     Yes.

10   Q     Okay.  And so the sequence that is there is exactly the

11   same as a portion of the larger sequence that is depicted;

12   correct?

13   A     The portion of that sequence, yes.

14   Q     Okay.  Now, is that what you call in this case where

15   every nucleotide has a complement to the sequence on the

16   opposing strand precisely complementary?

17   A     Yes.

18   Q     Okay.  So when you use the word precisely complementary

19   in your declaration, you mean that every nucleotide will

20   bond -- in that primer will bond by Watson-Crick base pairing

21   to the opposing strand; correct?

22   A     Yes.

23   Q     Okay.  And so when you write in your declaration at

24   paragraph 16, quote, primers are specifically engineered with

25   a laboratory-designed sequence of nucleotides that is
```

1  precisely complementary to a region of a single strand of the

2  target DNA to be sequenced, such as the BRCA1 region of

3  chromosome 17q and/or the BRCA2 region of chromosome 13, or

4  more typically a small portion of one of those genes, such as

5  the tiled amplicons shown in figure three, what you mean by

6  that is a primer will have a complementary nucleotide in the

7  BRCA sequence; correct?

8  A    Yes.

9  Q    Okay.  And all nucleotides in the primer will have that

10 complementary to the opposing sequence in the BRCA2 or BRCA1

11 sequence; correct?

12 A    As depicted in this diagram, yes.

13 Q    And as stated in your declaration, that such as for the

14 BRCA1 region of chromosome 17q, the primer will be precisely

15 complementary; correct?

16 A    Yes.

17 Q    Okay.  So precise complementarity is dictated by the

18 BRCA1 sequence or the BRCA2 sequence; correct?

19 A    Correct.

20 Q    All right.  And of course the BRCA1 and BRCA2 sequence is

21 naturally occurring; correct?

22 A    The sequence is, yes.

23 Q    Of course.  I mean Myriad didn't make the gene;

24 correct?

25 A    Correct.

1    Q    The sequence has been around for millions of years

2    likely; correct?

3    A    Correct.

4    Q    Okay.  So all Myriad did was to identify that sequence

5    that already existed in nature of the BRCA1 and BRCA2 gene;

6    correct?

7    A    Myriad made the association and with hereditary breast

8    and ovarian cancer with this specific gene sequence.

9    Q    With the specific gene sequence but not the fact that

10   BRCA1 was potentially involved in causing breast cancer;

11   correct?

12   A    That's what I mean by the association with breast

13   cancer.

14   Q    So you're saying that before Myriad discovered the BRCA1

15   actual gene sequence, it was unknown that there was an

16   association between BRCA1 mutations and breast cancer?

17   A    Yes.

18   Q    You're saying that?

19   A    Yes.  The discovery of the gene was this is the gene

20   sequence for BRCA1 wherein mutations are associated with

21   hereditary breast cancer risk.

22   Q    You, of course, have read the patents in the suit?

23   A    I'm sorry?

24   Q    You've read the patents that Myriad is asserting

25   against --

1    A    Some of them, yes, not all of them.

2    Q    You recognize that a lot of the patents have a common

3    specification?

4    A    I'm not a patent lawyer.  I can't really say.

5    Q    You don't know?

6    A    I don't know.

7    Q    Have you read the 282 patent?

8    A    I'm not sure.

9    Q    Okay.  Well, let's take a look.  It's already in the

10   record.

11        Your Honor, would you like a copy of it or would you like

12   to see what's on the screen?

13             THE COURT:  Either is fine.

14             MR. GAEDE:  You already have a copy of it.

15             THE COURT:  I'm sure I could use more paper.

16   Q (BY MR. GAEDE)  We've marked this, your copy, Doctor, as

17   Defendants' Exhibit 1.  Do you recognize Exhibit 1?

18   A    I have to say I have not specifically reviewed this

19   patent in preparation for my testimony today.

20   Q    Have you reviewed the patent in the past?

21   A    I don't recall.

22   Q    You don't recall?  Okay.  You see the term background of

23   the invention?

24   A    Yes.

25   Q    Do you see that where it says right here at column two,

```
 1   breast -- at line 55, 56, quote, breast cancer has been
 2   subdivided into two types, early-age onset and late-age onset
 3   based on an inflection in the age-specific incidence curve
 4   around age 50, period.  Do you see that?
 5   A    Not from where I'm sitting, I'm sorry.  Which page would
 6   that be?
 7   Q    If you look at -- let me --
 8        May I approach the witness, Your Honor?
 9             THE COURT:  Please do.
10             MR. GAEDE:  Thank you.  Help him get there faster.
11   Q (BY MR. GAEDE)  Background of the invention, column two,
12   we're right there.
13   A    Okay.
14   Q    Okay?  Do you have that before you, sir?
15   A    Yes.
16   Q    Okay.  So here in the background of the invention, Myriad
17   and the other parties that are associated with this patent
18   represent, quote, mutation of one gene, BRCA1, is thought to
19   account for approximately 45 percent of familial breast
20   cancer, but at least 80 percent of families with both breast
21   and ovarian cancer, citing to Easton in 1993.  Do you see
22   that?
23   A    Yes.
24   Q    Okay.  So it was known prior to Myriad isolating the
25   sequence of the BRCA1 gene that mutations in the gene were
```

```
 1    thought to be an approximate 45 percent of familial breast
 2    cancer causes; correct?
 3    A    That's what it says.
 4    Q    Okay.  And so it was known prior to Myriad isolating the
 5    gene that mutations in that gene had a role in breast cancer;
 6    correct?
 7    A    It was known that there was a gene, but it was not known
 8    what exactly or where exactly that gene was.
 9    Q    Okay.  But it was known there are mutations, correct, in
10    that gene?
11    A    It was assumed to have mutations, yes.
12    Q    Now, let's go back to your declaration, and specifically
13    if we could go to paragraph nine of your declaration.
14    A    Yes.
15    Q    And here you talk about the broader sequence of the gene
16    being created by nature, and that the primer is defining the
17    boundaries, the beginning and the end points, of the sequence
18    to be amplified; is that right?
19    A    Yes.
20    Q    And we can agree that using a primer that is precisely
21    complementary to the BRCA1 sequence, two primers, it will make
22    an exact copy of that genomic sequence; correct?
23    A    It will make an exact copy of the sequence in between,
24    yes.
25    Q    Right.  So amplicons have an identical sequence to that
```

```
 1    portion of the sequence of the genome that is being amplified;

 2    correct?

 3    A    To that portion, yes.

 4    Q    And so that portion will have the same nucleotide

 5    sequence as is found in that portion of the genomic DNA;

 6    correct?

 7    A    Yes.

 8    Q    Okay.  So the primer will have the same sequence and the

 9    amplicon will have the same sequence as a portion of the

10    genomic DNA; correct?

11    A    Yes.

12    Q    And that's important because the whole purpose of

13    sequencing is to accurately read the naturally occurring

14    sequence of the woman; correct?

15    A    Correct.

16    Q    Okay.  So we have to make exact copies; correct?

17    A    Yes.

18    Q    All right.  Now, also you're familiar with the concept of

19    chemical synthesis of DNA; correct?

20    A    Yes.

21    Q    To your knowledge, how long has DNA been chemically

22    synthesized?

23    A    In term of oligonucleotides?

24    Q    Yeah.

25    A    I don't know the exact date, but I know that in the 80's
```

```
 1   that was being done.
 2   Q    I'm sorry.  During the foundation part, and maybe in your
 3   declaration, when did you receive your Ph.D.?
 4   A    In 1991.
 5   Q    And your undergraduate?
 6   A    In 1985.
 7   Q    Okay.  And were you aware at that time that DNA was being
 8   chemically synthesized?
 9   A    While I was in graduate school, yes.
10   Q    And you're aware that genes had been chemically
11   synthesized; correct?
12   A    Entire genes, the viral genes, yes.
13            THE COURT:  Will you say that one more time.
14            THE WITNESS:  Yes.  Some viral genes, yes.
15   Q (BY MR. GAEDE)  Okay.  Are you familiar with somatostatin?
16   A    Somatostatin?
17   Q    Yeah.
18   A    No.
19   Q    It's a short peptide.  Have you ever heard of that?
20   A    Peptides, yes.
21   Q    Okay.  So the somatostatin gene that was chemically
22   synthesized, the human somatostatin gene that was chemically
23   synthesized in 1977, are you aware of that fact?
24   A    No.
25   Q    Okay.  You're not aware that Genentech was founded upon
```

1  that fact?

2  A    No.

3  Q    You do know who Genentech is?

4  A    Yes.

5  Q    Could you explain for the Court briefly, in case the

6  Court doesn't know, who -- what Genentech is.

7  A    Genentech is a biotechnology company that, among other

8  things, that had antibody technology for recombinant

9  (inaudible).

10            (THE REPORTER ASKED THE WITNESS TO REPEAT)

11  A    Recombinant antibody technology.

12  Q    Also a protein, such as human growth hormone; correct?

13  A    Yes.

14  Q    Insulin?

15  A    Uh-huh.

16  Q    Right?

17  A    Insulin is a growth hormone, yes.

18  Q    Yeah.  And Genentech is widely considered to be one of

19  the pioneers in the biotech industry; correct?

20  A    Yes.

21  Q    And so what Genentech did in 1977 was chemically

22  synthesize a human gene and put it in bacteria and make human

23  somatostatin; isn't that right?

24  A    That's what you say, yes.

25  Q    And you have no reason to believe that the protein wasn't

```
 1   made, the human protein wasn't made in the bacteria using that
 2   chemically synthesized gene; right?
 3   A    I know that bacteria can be used to synthesize exogenous
 4   genes, yes.
 5   Q    Right.  So exogenous, you mean not natural genes of
 6   bacteria; right?
 7   A    Yes.
 8   Q    SO you take a human gene, coding for a human gene, you
 9   put that in the bacteria and it will make a human protein;
10   correct?
11   A    Correct.
12   Q    And you can do that making a chemically synthesized gene;
13   correct?
14   A    You can if all the elements of the gene are there, yes.
15   Q    Right.  The natural coding region and the natural coding
16   of the gene is present; correct?
17   A    And the regulatory elements.
18   Q    Right.  You're correct on that as well.  Now, the Human
19   Genome Project, you're familiar with that?
20   A    Yes.
21   Q    When was the complete sequence of the human genome first
22   published, entire sequence, to your knowledge?
23   A    Approximately around 2000, but there's always been some
24   debate as to what constitutes the complete genome exactly.
25   Q    Can we agree that at the time of 1994 when Myriad filed
```

```
 1    its patent application the complete sequence of the human
 2    genome had not been published?
 3    A     Yes.
 4    Q     Next-gen sequencing, to your knowledge when was that
 5    developed?
 6    A     There are different methods for doing next-gen
 7    sequencing.  I would say probably the last -- in the last
 8    decade.
 9    Q     Okay.  And you would agree that next-gen sequencing did
10    not exist as of 1994 when Myriad filed the 282 patent
11    application; correct?
12    A     Not at the time.
13    Q     Yeah.  Just a few final points here.  Let's go to
14    paragraph 18 of your declaration.  Here you talk about what
15    primers do.  And primers prime the reaction for the synthesis
16    of DNA that draws upon DNA polymerase; correct?
17    A     Correct.
18    Q     And DNA polymerase is a naturally occurring molecule;
19    correct?
20    A     Correct.
21    Q     And so a primer is being used when being used in a BRCA1
22    section to make an exact copy of the BRCA1 gene, that portion
23    of the gene; correct?
24    A     In PCR, yes.
25    Q     In PCR, yes.  And so it's not being used in that
```

1   application to treat some other disease; correct?

2   A    I'm sorry, I don't understand the question exactly.  The

3   use --

4   Q    Sorry.  You go ahead and finish.  Are you finished with

5   your answer?

6   A    I -- could you restate the question?

7   Q    Sure.  Let me withdraw the question and state it again.

8   Is the primer being used as a human therapeutic?

9   A    No.

10  Q    Right.  It's being used to make a copy of a portion of

11  the naturally occurring genomic sequence; correct?

12  A    In the process of PCR, yes.

13  Q    Yes.  And that's so the naturally occurring sequence can

14  be read; correct?

15  A    So that the natural occurring sequence then can be

16  deduced, yes.

17          THE COURT:  Dr. Roa, why do you keep saying in the

18  process of PCR?  Is there another application for primers

19  that's relevant to our discussion today?

20          THE WITNESS:  There are other uses for primers, such

21  as primer extension for instance where you make some copies

22  but not in the kind of numbers that PCR would generate.  So

23  for PCR you always have a pair and you amplify a sequence

24  that's in between the primers, whereas, primers for instance

25  can be extended and used to make probes, as an example.

1    Q (BY MR. GAEDE)   Just a couple of other questions.  You heard

2    Mr. Mangum discuss under section 101 certain issues this

3    morning because you were here in the courtroom; correct?

4    A    Yes.

5    Q    To your knowledge, in 1994 when Myriad filed this patent

6    application, did it develop a new method of using PCR to

7    amplify a portion of the BRCA1 gene?

8    A    No.  And in terms of the technology, the technology was

9    there, but the application to BRCA1 was novel.

10   Q    Okay.  So Myriad didn't have to make any new inventions

11   in terms of how to amplify a portion of the BRCA1 gene once it

12   had the sequence; correct?

13   A    Correct.

14   Q    Okay.  And that's also true for sequencing those portions

15   of the gene; correct?

16   A    There were methods in existence at the time, yes, to do

17   sequencing.

18   Q    Right.  And to your knowledge, Myriad did not invent a

19   new method of sequencing at the time the patent was filed with

20   respect to the BRCA1 gene; correct?

21   A    Not in the method, no.

22   Q    Okay.  And that's also true with respect to the BRCA2

23   gene that was filed in late 1995; correct?

24   A    Yeah.  Again, it's the application.

25   Q    Okay.  By the way, Doctor, do you know Dr. Anne

Bowcock?

A    I'm sorry?

Q    Do you know of Dr. Anne Bowcock?

A    She is or was at the University of Texas Southwestern and was one of the investigators looking for the BRCA1 gene.

Q    Right.  And Dr. Simon Gregory, do you know of him?

A    No, not Dr. Gregory.

Q    So you're aware that Dr. Bowcock was working in the field of BRCA1 in 1993, 1994 time frame?

A    Yes.

        MR. GAEDE:  Okay.  Thank you, Your Honor.  No further questions.

        THE COURT:  Mr. Jackson, any follow-up?

        MR. JACKSON:  I have nothing, Your Honor.  Thank you.

        THE COURT:  Dr. Roa, thank you.  You may stand down if you'd like.

        MR. GAEDE:  Your Honor, if you give me one second to change over here.  Your Honor, I realized I neglected last time to give you a copy of the slides.  I'm sure you have more materials, but in the spirit of you saying you're not opposed to more paper, I've got our presentations and we'll give you a binder here.  You can put them in as we go through them in case you want to write any notes on those if that's helpful.

        The Court:  That would be helpful, thank you.

```
 1          MR. GAEDE:  So here is the first one.  I apologize,
 2    I forgot to give that to you.  But secondly would be the
 3    patentability one right here.
 4        Would you all like a copy too?
 5          THE COURT:  If you have a second copy.
 6          MR. GAEDE:  I'm sure we do.  If you could make one.
 7    I'll give it to you here in a second.  So let me not delay
 8    things any longer because I want to make sure we get going.
 9          THE COURT:  Does Mr. Mangum have a copy of these
10    slides as well, Mr. Gaede?
11          MR. GAEDE:  No.  He hasn't given me his.  I'm happy
12    to give it to him.
13        Would you like a copy?
14          MR. MANGUM:  Sure.
15          MR. GAEDE:  How can you turn it down, more paper.
16          THE COURT:  We do want to ensure, both for the court
17    reporter and for the aid of the Court, that we have complete
18    copies of these.  In fact I'll ask both sides to submit after
19    the hearing electronically at our chambers copies of your
20    slide presentations and then we'll -- in fact I'd like you to
21    submit two so we can give one to our court reporter as well.
22    And then I want to ensure that you both exchange those copies
23    so everybody has everything that I've seen and will be relying
24    on; right?
25          MR. MANGUM:  Will do, Your Honor.
```

```
 1            MR. GAEDE:  No problem.  We'll do that, Your
 2   Honor.
 3            THE COURT:  Great.
 4            MR. GAEDE:  Okay.  Let's start from what I think is
 5   an important principle.  Basically going to look at three
 6   basic areas, Your Honor, particularly in light of the evidence
 7   we just heard and some other evidence that we've submitted to
 8   you, that the Myriad Supreme Court decision addressing the
 9   invalidated patent eligible subject matter that went to
10   synthesized DNA that has the same sequence as the naturally
11   occurring DNA, the genomic DNA.  We'll talk about that for a
12   minute.
13        Secondly, in any event, the evidence before you
14   establishes that the primer claims do not satisfy the
15   Chakrabarty markedly different test.  They make reference to
16   the hand to man.  Of course, there's language out of
17   Chakrabarty, but they don't run through the whole Chakrabarty
18   analysis.  And that has been done earlier, of course, by Judge
19   Sweet, but the evidence here will show you that the primers do
20   not meet the Chakrabarty test because, after all, what are we
21   arguing about?  We're arguing about whether a primer is a
22   product of nature and therefore patent ineligible.
23        Obviously we're not in this courtroom to argue that the
24   full chromosome is a product of nature.  The issue comes down
25   to, the rubber hits the road, as to there's no question
```

there's some differences because we have a molecule that is not the same as the chromosomal DNA. That's true. That's why we have this dispute because obviously you can't patent the whole chromosome in naturally occurring DNA. No question about that.

So then the question is, okay, how far can you go until something is not a product of nature and is patentable subject matter? Now, you heard Mr. Mangum before the break talk about a couple of examples. There's patents issued on them. With all due respect, the PTO issued a patent on subject matter the Supreme Court struck down. So the fact that the Patent Office has granted a patent on something does not somehow make it patentable subject matter. In fact for 20 years the Patent Office got it wrong. They just got it wrong.

And when you read the Myriad decision, the Supreme Court gave it zero deference to Patent Office policy, and said the issue just hasn't been in front of us. The fact that the Patent Office has been wrong for 20 years doesn't change the fact that the Patent Office is wrong.

And you have to analyze a product of nature under the Chakrabarty analysis, informed by Mayo. We'll talk a little bit about that. But I agree that when you read Myriad, that the Court looks to Chakrabarty, looks to Funk Bros. and those two cases informed by Myriad.

So also you're going to see the positions. They're

estopped also on the principles of collateral and judicial
estoppel, because the issue in -- hold on.  I'll get to that
in one second.  Let me get to this and I'll go back.

     The Myriad Court had an issue before it just like you do.
They were reviewing a judgment, and they're reviewing a
judgment to this, to an isolated DNA coding for BRCA1
Polypeptide to the isolated DNA of claim one, to an isolated
DNA having at least 15 nucleotides of the DNA of claim one.
So the claims all have the word isolated in them.

     Now, what's the effect of that?  That's the subject
matter that was before the Supreme Court.  And what did the
Supreme Court understand that subject matter to be?  We'll
talk about that in a minute.  But before we get there, I want
to show you one other I think very important principle.

     This comes out of the June -- I forget the exact date --
June 2013 Ultramercial case by the Federal Circuit.  And
you'll notice what they say here.  I didn't hear any
discussion of what the standard is and how you're supposed to
assess section 101 in light of the evidence that's been
presented to you.  Is it a question of law like claim
construction or is it also a factual issue?

     And the Federal Circuit makes it crystal clear right here
in Ultramercial what it is.  So first it says while ultimately
a legal determination is rife with underlying factual issues.
That's important to the question of whether they have shown

that there is no substantial question here, and whether we
have raised a substantial question. It's ultimately a factual
issue in the context of section 101.

And look at what this -- you heard Mr. Mangum's
discussion, and you heard about the various types of language
in the Mayo decision. And look what the Federal Circuit says.
Factual issues -- this comes about the fifth line -- factual
issues may underlie determining whether the patent embraces a
scientific principle or abstract idea.

Next it goes on. If the question is whether genuine
human contribution is required, and that requires more than a
trivial appendix to the underlying abstract idea, and were not
at the time of filing routine, well understood, or
conventional, factual inquiries likely abound. Almost by
definition, analyzing whether something was conventional or
routine involves analyzing facts.

So I'm going to go to the Myriad, but what you just heard
is that from Dr. Roa and what you have also in the
uncontradicted and unaddressed declarations of Dr. Tait is
that using the amplification is exactly that, analyzing
whether something was conventional or routine, involves
analyzing facts. The facts before you establish that there
was nothing new in the applications in terms of amplifying or
sequencing that high level once you had the BRCA1 and BRCA2
sequence. That's the evidence before you.

```
 1              THE COURT:  I don't think Myriad disputes that.

 2         Am I wrong about that, Mr. Mangum?  I mean --

 3              MR. MANGUM:  That's right.  That high level

 4    abstraction, that's the very point I was making during my

 5    presentation.  It's the application of it to the specific

 6    circumstance.

 7              MR. GAEDE:  And this right here is more than trivial

 8    to the underlying abstract idea, and the application was not

 9    routine and well known.  We'll talk about that.  So it's not

10    just enough to say that there's a comparison, I append another

11    element of the claim to that and all of a sudden I'm in

12    patentable subject matter.  This makes clear it's a factual

13    issue.  It's an ultimate legal issue with underlying factual

14    issues, and we'll talk about how what Myriad's claim do is

15    effectively preempt the gene itself.

16         But let's go first to the primers.  So the subject matter

17    is isolated DNA.  And I think it's important when you think

18    about the Myriad decision to focus on a couple facts.  One is

19    claim two references cDNA.  That's how they characterized it,

20    but the term is isolated DNA that is being addressed in claim

21    two.  And because of the reference to the gene, of SEQ ID

22    No:1, that specific cDNA coding region sequence, that means

23    that isolated DNA includes synthesized DNA.  Addressed right

24    there in claim two, that subject matter as well in claim one.

25    Isolated can't be construed in different ways in two claims.
```

And I'll show you why it includes obviously synthesized DNA as well.

But also I think what is important to the argument you heard this morning is claim five. An isolated DNA having at least 15 nucleotides of the DNA of claim one. So that claim was before the Supreme Court, and the Supreme Court found that claim not to be patent eligible.

So they characterized the Supreme Court, and they're aware of this issue, that it wasn't the entire gene we're talking about excising somehow from the genome. We're also talking about shorter sequences. We're talking about, as the Supreme Court says, the practical effect of claim five is to assert a patent on any series of 15 nucleotides that exists in the typical BRCA1 gene.

And interestingly enough, as we'll get to this point, the Court's decision with respect to cDNA didn't rest on the fact that it was chemically synthesized, chemically made in a laboratory using laboratory techniques. It rested -- so that in and of itself doesn't take a product of nature out of a product of nature and make it patent eligible. It rested on the sequence, which was a sequence because of the exons that is not found in nature. So the act of just chemical synthesis is insufficient to take a short 15 nucleotide sequence and take it out of the product of nature exception to patent eligibility.

They also understood that there might -- in the cDNA 15
nucleotides of the claim.  And so you got to go back to the
claims.  And again you remember we talked about the structure
and the source limitation that comes from the structure?  So
this claim is to a sequence of primers that come from the
naturally occurring sequence by definition in this claim.
It's naturally occurring subject matter that is then in a
shortened version in a primer, and it contains -- and if you
say it might be broader than that, there's no doubt that it
contains that subject matter.  And if any of the subject
matter in the scope of a claim is unpatentable subject matter,
the whole claim is patent ineligible.  You can't save part of
it.

So there's no question, as you heard Dr. Roa testify,
that primers that exactly match the sequence of the BRCA1 gene
is within the subject matter of this claim.  So that means
that patent subject matter is part of the scope of this claim,
and that's exactly what the Supreme Court was looking at.
Same is true 29 isolated, 15, 16 derived.

Your Honor asked the question at the tutorial that I just
wanted to make sure that we answered for you.  You asked the
question is isolated DNA different than purified DNA.  And I
thought that this quote from the Federal Circuit decision,
Judge Lourie's opinion, sort of elucidated the difference in
that, as he says here, isolated DNA (unintelligible) --

(THE REPORTER ASKED COUNSEL TO REPEAT)

Isolated DNA results from human intervention to cleave or synthesize a discrete portion of a native chromosomal DNA. It goes on to write: As the above description indicates, isolated DNA is not just purified DNA. Purification makes pure what was the same material but was combined or contaminated with other materials. Isolated is removed. It is also in the change because it's not the entire genomic sequence. So hopefully that helps in terms of elucidating the difference between the two. And what the subject matter was before the Supreme Court, of course, was not purified DNA. It's isolated DNA.

Seems like we're going to argue over some of the same language in the Supreme Court decision. I'm going to move pretty quickly through this since I know Your Honor has read it, but I think it's important to see how they frame the issue that a naturally occurring DNA segment is a product of nature and not patent eligible merely because it has been isolated. So a DNA segment. And, of course, isolated means synthesized or excised in some other fashion out of the cell, merely because the act of isolation doesn't take it out of the product of nature exception.

Mr. Mangum also related to this one, but I think this is an important point. They were certainly aware of the synthetic subject matter with chemically synthesizing before

them.  And they write it's also possible to create DNA
synthetically through processes similarly well known in the
field of genetics.  Then it goes on to say one such method to
describe cDNA.

The other types about the chemical synthesis were clearly
articulated to the Court.  We provided to you their brief that
say that.  I have one quote here.  I'll quickly go past that.
But there's no question that they understood that isolated DNA
constituted as well synthesized DNA, consistent with the
construction of the term that -- in the patent claims that
were before them.

And then also that they also understood that short DNAs
were at issue, not the entire gene, but the short DNAs.  As
you reflected on the Federal Circuit decision, you notice that
in the concurrence Judge Mallick (phonetic) distinguished
between the shorter and then the longer sequences of DNA as
well.

So no question that everyone understood they're short
sequences.  Any strand of 15 or more nucleotides within the
genes.  But it goes on to say, but isolation is necessary to
conduct genetic testing.  They understood that, that you had
to have these tools as they call them, the primer, the
amplicons, in order to conduct genetic testing.  They
understood that fact.

Here are the (unintelligible) --

```
 1              (The reporter asked counsel to repeat)
 2         Sorry, trying to save some time.  I'll go a little
 3    slower.  Here when they talk about Judge Lourie they also talk
 4    about the synthesized point.  So there's no question the
 5    Supreme Court understood that that was subject matter.  And,
 6    of course, the cDNA is made by man, synthesized.
 7         The other thing is Judge Sweet and how he construed the
 8    term in the District Court where that claim term was expressly
 9    before him.  And as he made clear in his construction, it
10    includes as well DNA synthesized through chemical or
11    heterologous biological means.  So isolated DNA includes this.
12    What did he base that on?  There's in the patent the
13    discussion -- the definition that isolated includes
14    synthesized DNA.
15         And Dr. Kay, who you'll hear from later today, submitted
16    a declaration which is attached to my declaration in which he
17    says one of ordinary skill would understand that isolated DNA
18    has been extracted from the cell and excised from the
19    chromosome, or chemically synthesized.
20         You've seen this slide before.  I don't think there's any
21    debate.  You just heard Dr. Roa talk about that, if you have a
22    chemically synthesized gene, it can be used to make a protein
23    and a bacteria chemically synthesized can make a human
24    protein.  Again, synthesized DNA has the same functionality
25    as, if you will, a piece of DNA purified out.  There's no
```

difference in the structure, also cloned DNA. All that's the same. DNA is DNA.

And then, of course, the sequence follows the same, ordering of the native nucleotides. They also, of course -- you've seen this in our brief, but you have these quotes in our slides and my second declaration as well that they were representing to the Supreme Court that the primers and isolated DNA molecule, that amplicons are copies of the genomic DNA. As you just heard Dr. Roa say that portion that makes an exact copy of a portion of the BRCA1 DNA. I don't think there's a lot of dispute on that issue.

They also, of course, argue the significant utility that you just heard this morning in terms of an argument. They made that argument to the Supreme Court, and the Supreme Court did not accept Myriad's position.

And I think what's important is where they talk about Chakrabarty. I don't think there's any real dispute that Chakrabarty is applicable here, that the markedly different characteristics is how Judge Sweet looked at it, it's how the Supreme Court looked at it through this here. And what they found is that, of course -- and, remember, claim five, 15 nucleotides was before them. To be sure, it's an important use of a gene, but separating that gene is not an act of invention. And that they contrasted that to Chakrabarty. And, of course, groundbreaking, innovative and brilliant

discovery does not by itself satisfy the section 101 inquiry.

The question is the composition, is it a product of nature, not how it is made because synthesized DNA is the same as natural DNA as cDNA in terms of the structure of DNA.  The question is the sequence not the process.

And the claim before you in the primer claims and the claim before the Supreme Court were not process claims for how to make a DNA.  They were to a composition of matter.  And the question is is whether that composition of matter somehow was no longer a product of nature by virtue of the rest of the genomic DNA being taken away from a particular part of that genomic DNA.

Primers rely on DNA's genetic information.  And I think this is important.  Claims aren't saved by the fact that isolated from the human genome severs chemical bonds.  Why is that important?  Because when you're synthesizing DNA you've effectively excised and broken the chemical bonds that exist in that longer strand of DNA.  It's not the physical act of the process.  It's not a process claim.  It's the fact that the product of nature has broken those bonds because it exists separately and doesn't then have the bonds to the rest of the DNA.

Now, you've heard this, but I think this is important again just to emphasize.  When it looked to the cDNA, the Supreme Court relied on the exons.  Didn't rely on how it's

made, which is clearly a man-made process, clearly a process
that was done in a laboratory.  Relied on the fact that it's
an exons only molecule, which meant that that sequence of DNA
does not exist in nature because you have the various parts of
the --

            THE COURT:  It does though, doesn't it?  Can't we
find it in the mRNA?

            MR. GAEDE:  You can find it in the mRNA, I agree,
that you can find that sequence in the mRNA.  But the question
is, again, it's a composition of matter claim to a DNA.  And a
DNA is a structure and is a composition of matter, and that
DNA composition of matter does not exist because you have the
intervening introns.

      So it's not a question of whether you're making a copy of
mRNA, which is a different nucleic acid and a different
naturally occurring nucleic acid.

            THE COURT:  But the question under Chakrabarty is
whether it exists in nature, right, not whether it exists in a
specific place.  Does the analysis hold up if we find the same
sequence in the mRNA that's in the cDNA?

            MR. GAEDE:  No, because --

            THE COURT:  How is that different?  How is that
different than --

            MR. GAEDE:  It's different for the reason that we
talked about earlier in that the natural -- you're making a

1   DNA that does not contain the same contiguous sequence of DNA
2   as found in a naturally occurring DNA.  That's the difference.
3              THE COURT:  That you're making a DNA?
4              MR. GAEDE:  You're making a DNA.  And the claim as
5   to the primer claims and the isolated DNA claims in front of
6   the Supreme Court were to a DNA not an RNA.  And that's where
7   they split the difference.  I think, you know, you could even
8   argue the cDNA, of course, is a naturally occurring product of
9   nature, but that has been litigated.  And the distinction
10  rested on not how made but the sequence itself and that DNA
11  sequence is not found naturally in nature.  That segment of
12  DNA does not have that sequence as a contiguous sequence.
13      And that's in that language that they have that the lab
14  technician in question creates something new because it
15  retains the naturally occurring exons, but it is distinct from
16  the DNA from which it was derived because they're speaking in
17  terms of sequence.  The key is sequence not how made.
18             THE COURT:  So let me ask you again then why -- why
19  did the Supreme Court -- looking for a governing principle
20  here.  The sequence of the nucleotides found in the mRNA, and
21  I understand that's RNA not DNA, that sequence is identical to
22  the nucleotide sequence that you have in the cDNA, is it not?
23             MR. GAEDE:  It is.
24             THE COURT:  So if it's the sequence that we're
25  focusing on, I guess your answer is the same as what you gave

```
 1   just a moment ago.  I'm comparing RNA against DNA, and that's
 2   an apples to oranges comparison here?
 3            MR. GAEDE:  Correct.  That's absolutely correct.
 4            The COURT:   Judge Bryson looks at the cDNA in his
 5   opinion I think and compares it against both the DNA, the
 6   native DNA, and the RNA, the mRNA.  Is that just nonsensical?
 7            MR. GAEDE:  I think at the end of the day, Your
 8   Honor, is we do have a Supreme Court decision, and they drew
 9   the line where they drew the line.  And the product of nature
10   and the claim were directed to a DNA, and that isolated DNA,
11   that cDNA sequence, was not naturally found because of the
12   introns.
13            THE COURT:  So we draw ourselves back to the
14   language of the claim, which is focused on DNA?
15            MR. GAEDE:  Correct, because it's a product of
16   nature, and the question is has it been markedly changed,
17   markedly different characteristics such that that DNA is no
18   longer a product of nature.
19       You've seen this.  You've obviously read Judge Sweet's
20   opinion as well, and he addresses the issue more -- in greater
21   detail Myriad in addressing many of the arguments.  And I
22   think what you heard this morning was an argument of just
23   differences rather than similarities.  And as we talked about,
24   the claims require you to take the sequence from nature.  They
25   require you to do that.
```

And so Judge Sweet looked at this issue and he found that the isolated DNA -- and he found that the applications for which the whole genomic DNA is unsuitable, namely the templates, primers, etcetera. But I think what's important here is exactly what you heard Dr. Roa say, that the sequence is exactly complementary. It draws on the natural principle and the natural structure of the existing sequence for its utility. And that's undisputed when you talk about the structure of the primer, that it operates by binding through natural laws of Watson-Crick base pairing mimicking that portion of the DNA and priming a reaction for DNA synthesis.

And as Judge Sweet found, the basis for this utility is the fact that the isolated DNA possesses the identical nucleotide sequence as the target DNA sequence, thus allowing target specific hybridization between the DNA primer and the portion of the target DNA molecule possessing the corresponding sequence.

And I don't think the experts are in dispute here. You just heard Dr. Roa discuss that, Dr. Pribnow as well. So the evidence before you is that it draws on that principle.

And, of course, as also Judge Sweet talked about the amplicons as well, it draws on maintaining that fidelity of sequence, that it doesn't change compared to the natural genomic sequence so that we can read it.

Now I want to go back because I slipped over this slide

too fast because I think it's important, and I want to make
sure this point is clear.  This is the Supreme Court talking.
And you have the isolated DNA claim, and it talks about
severing the bonds, but it also -- Myriad's claims are simply
not expressed in terms of chemical composition, nor do they
rely in any way on the chemical changes that result from the
isolation of a particular section of DNA.

You heard right before lunch these other examples which,
of course, it was attorney argument.  It's not before you in
the record.  But, in any event, Myriad's claim here to the
primers is not described in terms of somehow changing one
group on the DNA.  And in fact they are described in terms of
reference to the naturally occurring sequence.  So that's
right in the scope there of the Supreme Court's decision on
the primer claims that follow again the isolation claims.

So the evidence before you and that raises substantial
question is, first, the primer sequences are isolated from the
target.  That's a naturally occurring sequence, no question
about that.  Otherwise, the primers will not be able to anneal
to the target DNA.

The amplicons are exact portions of a portion of the DNA,
and the fact that something is chemically synthesized doesn't
change the property of the DNA in and of itself as compared to
cDNA or taking a piece naturally out of a larger piece of DNA,
because it's not to a process of how to make it, it's to the

thing itself, which is DNA.  And that product of nature is not markedly different, particularly here in these claims where it references the natural sequence.  Okay.

THE COURT:  Not markedly different how?

MR. GAEDE:  Well, first --

THE COURT:  Different in purpose is it?

MR. GAEDE:  Not really.

THE COURT:  Well, it's not being used to build amino acids and proteins; right?

MR. GAEDE:  No, but you have to remember, Your Honor, DNA also has to naturally replicate itself.  That's one of the other natural processes that goes on in the body as we speak.  And so DNA is not just -- functions not just to encode for a protein but also to replicate itself as part of maintaining life itself.

And so that process, what we're doing with the primers, is we're mirroring that process to make an exact copy of the DNA.  And so, no, I absolutely disagree given examples.  For example, they say, well, you have nucleant therapeutic.  No. That's a far more different subject matter than what we have here where what you're doing is harnessing the natural process of DNA replicating itself.

Slight difference with the RNA primers and the DNA primers.  You can read that in Dr. Pribnow's second declaration.  But the process of DNA replication is what's

being harnessed here.

Okay.  I don't think -- I don't think it's a dispute that isolated DNA means synthesized DNA, and they represented that multiple times in the Supreme Court.  They argued for that construction at Dr. Kay's declaration before the Court and that was the issue on review.  They're estopped.

Here is the collateral estoppel.  There's no question there's overlapping subject matter.  They're estopped.  Issue previously decided is identical to the one presented in this action.  Can a short sequence of DNA that's a product of nature, can it be patentable?  Supreme Court said no, claim five.  That subject matter is not patentable.  Fully adjudicated on the merits.  It has been.  They were present in the prior action, obviously, and had a full and fair opportunity to litigate the issue.

You also have judicial estoppel.  Tenth circuit follows the Supreme Court's New Hampshire v. Maine.  They're estopped as well from contending that isolated DNA didn't include synthesized DNA subject matter, and the issue of short DNA nucleotides and sequences was not before the Supreme Court.  Same factors.

Let's go to the method claims.  I think we all agree that Mayo v. Prometheus creates a framework for analysis.  Certainly AMP v. Myriad invalidates a simple gene comparison claim.   The Federal Circuit twice did that.

1    I think as you just heard, the asserted claims append

2    routine and noninventive steps, as demonstrated not only by

3    Dr. Roa's testimony but of course the evidence before you.

4    Their own patent specification provides no new inventive

5    steps.

6    Judge Sweet also found Myriad's subject matter is

7    unpatentable.  And we have raised undisputed evidence that the

8    asserted method claims effectively preempt the use of the gene

9    itself.  And you can see the undisputed first and second Tait

10   declarations for that evidence that's before you ties back to

11   the Ultramercial, that there's underlying factual issues here.

12   What's really going on here in Myriad's method claims?

13   What's going on here is the draftsman's art.  We know that the

14   gene itself is not patentable subject matter.  We know that a

15   woman in order to access her gene has to be able to amplify it

16   and has to be able to read it in some way.  We know these

17   facts.  And I'll show you here a statement from Myriad's

18   former president under oath in the former litigation which

19   says exactly that.

20   So what you see in these claims when you start to strip

21   them apart is the draftsman's art to build a fence to that

22   gene itself and to thereby lay claim to the unpatentable

23   subject matter in and of itself, which is the product of

24   nature or the comparison that is going on that is necessary

25   for a woman to understand whether she has a higher risk of

BRCA1 cancer or not, which exists naturally with inside her.
There's no dispute about that.

It existed before Myriad got here and it will exist after
Myriad is long gone.  And that's her information that is
inherited from her parents and from her grandparents and from
all of her forefathers.  And they're saying through their
claims you cannot access that without paying us tribute, or in
their case no one else can do it.

So I'll get to the claim in a minute, but when you start
to strip them apart, where there's a lot of words in there,
that's what they're doing.  So obviously a law of nature is
not patentable and neither is the process reciting a law of
nature, unless the process has additional features that
provide practical assurance, practical assurance, that the
process is more than a drafting effort designed to monopolize
the law of nature itself.  And I know the Mayo v. Prometheus
decision.

And so in all the claims, what we have is a comparison in
these method claims or you compare two sequences.  And the
sequences, of course, are naturally existing.  Myriad didn't
invent those sequences.  The information in those sequences,
as you heard, there's information in the sequences existed.

And so the question is what Judge Breyer in the unanimous
opinion describes as inventive concept.  And it says our cases
insist that a process that focuses upon the use of a natural

law also contain other elements or a combination of elements,
sometimes referred to as inventive concept, sufficient to
ensure that the patent in practice amounts to significantly
more than a patent upon the natural law itself.  And as you
heard, there's no inventive concept in these other steps.  And
it also can't be -- the notion cannot be circumvented also by
limited to a specific area.

So in the Mayo case, you're right, it's a little bit
different claim than what it is before you here.  One point I
would say, obviously synthetic subject matter was being used
in the Mayo claim because it's thiopurine, which is a man-made
drug.  So the fact that a man-made drug, there is some
synthetic subject matter arguably in the claim.  That doesn't
mean that you're outside the scope of Mayo.  That's the
Supreme Court.

So I understand what Judge Lourie said with respect to
that claim 20, which we have explained to you in Dr. Pribnow's
first declaration why it's completely different than the
comparison claims that are before you of the gene sequences,
but that's the Supreme Court.  The simple fact that there
might be some synthetic subject matter somewhere in the claim
doesn't take it outside the Mayo analysis.

All right.  You've heard Mr. Mangum talk about Diehr,
Flook.  I thought it was interesting when you go look at the
Mayo case.  They also provided an English case.  And they talk

about the natural principle and the mental comparison.  And
they talk about this also, several unconventional steps, not
just the law of nature but also several unconventional steps.
And what you just heard and what is uncontradicted before you
is that the steps here are not unconventional.  They're well
known and they just simply took the sequence and then
amplified it.  Nothing new, nothing unconventional in those
other steps.

The Diehr case again -- again is applying to a specific
process.  But when you're just curing rubber, there's a
particular way to do it.  Again, unconventional steps.
Contrast that with Flook, which we talk about in our papers,
and I'll move on from this point.  But you don't have the
unconventional steps in Myriad's claims.

Also, in this particular context there was some reference
in their brief -- we're not saying we preempt the use for all
genes.  That's irrelevant.  The issue is the BRCA1 and/or the
BRCA2 gene, and they are preempting there.

And, of course, future innovation.  As you've heard
Dr. Roa also state, the human genome had not been sequenced.
Next-gen sequencing was not in existence at the time.  Myriad
couldn't have thought of it, but they claim it -- or tried to
I should say.

Under the current state of the art -- and this is from
Mr. -- President Critchfield in Myriad, and I think this is a

very important admission that's before you, Your Honor.  He
says in earlier litigation in describing the state of the art,
under the current state of the art, the only practical way to
obtain a sufficient amount of BRCA1 or BRCA2 genomic DNA for
mutation detection purpose is to PCR amplify the genomic DNA
in segments.

Okay.  That obviously means, as you now know from the
technology, primers as well are a necessary part of that PCR
and that amplification process.  And under the current state
the only practical way is to use these tools in steps that
they append merely to their claims.

There's also -- you've heard the argument, well, the
BRCA1 sequence wasn't known, and therefore we're coming up
with a new application because we're applying the BRCA1
sequence.  Judge Breyer dealt with that issue in Mayo as well
where he expressly referenced the difference between 102 and
103 and 101, and he got it.  Because if you make that
argument, as he says, this approach of relying on section 102,
however, would make the law of nature exception to section 101
patentability a dead letter.

Why is that?  Because anytime you discover a new law of
nature or discover a new mental abstract process and you're
saying that if I append a step to it I'm not subject to 103,
102 because that law of nature or that mental step or that
product of nature was unknown.  And, therefore, you have no

1    meaningful life in section 101 if you say that the sequence
2    has to be known.  And he addressed that right in the Mayo
3    opinion.  And you have the cites here for you.  And their
4    argument is directly contrary to Mayo.

5         So briefly we've been over the claims.  Obviously claim
6    one of the 441 patent is invalid by both Judge Sweet and the
7    Federal Circuit.  The question is whether you append a claim
8    of comparing, which of course is the heart of the claim, by
9    amplifying, using a set of primers to produce amplified
10   nucleic acids and sequencing the amplified nucleic acids that
11   effectively preempts the use of the gene itself for
12   comparison.  Well, it does.  You heard Mr. Critchfield say
13   that in his declaration.  You have Dr. Tait's declaration
14   which establishes that fact before you.

15        There's a whole list.  You have the slides.  But in
16   brief, probes and amplification prior to sequencing were
17   routine -- uncontradicted.  The undisputed steps where they
18   contain no new inventive concept.  They effectively preempt a
19   woman's ability to compare her gene sequence through gathering
20   steps, data gathering steps of probing or amplifying.  The
21   patent specification identifies no new techniques for probing
22   or amplification.  Declarations are uncontradicted to this
23   effect.  We have raised undisputed evidence that there's a
24   substantial question.

25        And, you know, Judge Sweet did go on and address this

issue in his opinion.  And he says, in looking at the
comparison claims that were -- that his decision was confirmed
by the Federal Circuit, he says that even if the method
claims-in-suit were construed to include the physical
transformations associated with isolating and sequencing DNA,
it would still fail because the mere data gathering steps and
they effectively preempt the right to use your genetic
information in a comparison.

Claim two, same thing of the 857.  It's invalid by the
Federal Circuit.  It's a gene comparison.  That's the heart of
the claim.  This is what I talk about the draftsman's art.  If
you go down this list here, this is a Markush claim where
they're thinking of every way that you could get access to
that gene potentially, and then laying it all out in the
alternative.  They're taking possession of the gene.

You can't get the gene unless you can amplify it.  You
can't get the gene unless you can sequence it.  And you can't
perform the comparison that is all right and is a natural law
and a mental abstract process that all of us have the right to
perform, and even more so screening for a point mutation in
said tissue sample.  Some of the claims that were invalidated
before the Federal Circuit and by Judge Sweet include the
language screening, invalid subject matter.

In the reply they try to hang on the word assay, which is
up here is determined by an assay selected from the group

consisting of.  They say that's a physical test, Well, yeah,
you have to perform a physical test in order to screen.
There's no question about that.  And so they by this claim lay
claim to the gene itself.  You can't perform the mental
comparison which is unpatentable subject matter.

Very similar on the points here.  I won't go through it.
I'm going to go on to the next claim.  Again, this is just a
method for determining.  So you're determining the nucleotide
sequence of the BRCA1 gene.  That's just a mental step.
You're comparing to another sequence, and then you're
determining the presence of the following nucleotide
variations.  That, of course, exists in all of us, so you're
just determining and you're comparing.  And then for the
specific naturally occurring variations that exist, they're
not something Myriad invented.  They're Something that just
exists.

And what does claim five that they're asserting against
us append?  Just simply where the gene is amplified prior to
nucleotide sequencing.  Take Dr. Critchfield's declaration.
You have to amplify, and you have to sequence.  That's the
uncontradicted evidence before you.  Here is a summary that
you will have.

Same thing in terms of claim two.  You have to amplify.
You have to sequence in order to determine, because we have to
have sufficient subject matter.  And there's no new novel or

inventive step or inventive concept in these other steps.
They do try to point to these down here, the specific
Polymorphisms in the variations, but those of course are
naturally occurring.  There's nothing new and there's nothing
patentable in that.  That's not something that Myriad can
invent.  It naturally occurs.

And, again, to determine whether you have correlation
(unintelligible)--

(THE REPORTER ASKED COUNSEL TO REPEAT)

It's a method claim and a correlation for an absence of
increased genetic susceptibility to breast or ovarian cancer.
Same with claim four, the 155 patent.  Same point, we'll have
that for you.  Thank you.

THE COURT:  Thank you.

Mr. Mangum.

MR. MANGUM:  Would you like to continue on 101 or
are we ready to move on to the next module or what's your --

THE COURT:  Well, I know you have more to say about
101.  We'll hear that next time.  I think I understand where
we are.

MR. MANGUM:  Okay, fine.

THE COURT:  Let's move on to our next module, which
is what?

MR. MANGUM:  This is the 102, 103, 112, and
Mr. Singer will address those issues.

```
 1              THE COURT:  I'll tell you what.  Why don't we do
 2    this.  We've been going for about an hour and a half since we
 3    came in, just short of that, but let's take a short break and
 4    then come back and just plan to push through to 5:00 o'clock
 5    or so.  So we'll break for 10 or 12 minutes and then come
 6    back.
 7                   (RECESS FROM 3:11 pm UNTIL 3:36 pm)
 8              THE COURT:  All right.  We're back on the record.
 9              MR. SINGER:  May it please the Court, Jonathan
10    Singer.  We haven't had a chance to meet, Your Honor.  On
11    behalf of Myriad, I'll be talking about the issues of --
12    validity issues separate for the issues raised by
13    Defendants.
14              THE COURT:  Thank you, Mr. Singer.  The floor is
15    yours.
16              MR. SINGER:  Just by way of introduction, Your
17    Honor, defense have raised an awful lot of material, a lot of
18    which is highly technical.
19              The COURT:  I had not noticed that.
20              MR. SINGER:  And I'm mindful of your comment that
21    you said you want to try to look at the forest today and not
22    the trees, and we'll have closing argument.  So what I'm going
23    to try to do is I'm going to limit myself, not knowing what
24    Mr. Gaede is going to emphasize, what his team is going to
25    emphasize, to the arguments in the brief.  If things are
```

```
 1    argued about the declaration, I'll address those in the final
 2    arguments, and also try to keep it at a higher level to
 3    explain concepts in the law that I think are important here
 4    for you to keep in mind.
 5            THE COURT:  I appreciate that.  I also realize that
 6    it's just a little bit unfair to the Plaintiffs that we're not
 7    allowing you a reply today.  It's your motion.  You're going
 8    to have the last word at the end of the day.  It's your
 9    burden.  You have to carry it.  I just think we need to get
10    through it, and I generally understand.
11        The briefing was very helpful from both sides.  There was
12    a lot of it, but you pretty clearly set forth your opinions.
13    I think I know where we are generally, but, please, go
14    ahead.
15            MR. SINGER:  That's certainly better than the
16    alternative.  I've put this together, Your Honor.  These are
17    the arguments from the Defendants' brief.  I've not put
18    anything in here that was only addressed in the declaration.
19        And there's just a piece of common sense I think we need
20    to keep in mind.  There's a lot of issues here, but none of it
21    at the end of the day should detract from sort of a common
22    sense notion here, that if these patents do in fact cover
23    patentable subject matter under 101, and I think Mr. Mangum
24    has demonstrated so amply today and will, I'm sure, at the
25    closing, that these patents cover a genuine discovery worthy
```

of protection under the other provisions of the patent act.

There's a reason, right, it was the lead story on NBC News. This was a revolutionary discovery for its time, very difficult process to do it, and a very unusual result at the end of the day. And it's not anticipated by the prior art, and it's not obvious in the prior art. And one or two claims that they say are not described are in fact described.

So let me start with the issue of anticipation. The Defendants, of course, bear the burden of proof at the end of the day on invalidity, and it's important to keep in mind that that standard is higher; right? And it also applies to the 101 argument. It's clear and convincing evidence, not simply a preponderance. And they must raise a substantial question of validity on all the asserted claims.

Anticipation, one reference; obviousness -- obviousness, of course, more than one reference. Anticipation, one reference, identity, expressly or inherently in that one reference, all elements of the claims. If one element is missing, end of anticipation.

Okay. Let's talk and start sort of the same organizational principle that we already had. I'm going to start with the primer pair patents. I've actually lumped them together a little bit differently, Your Honor, based on sort of the invention, if you will, than we heard before because I think it's easier from this perspective looking at them this

way.

We've got the primer pair patents and the method patents, which are an obvious issue only in the briefs. And I'm just putting the BRCA claims together, the BRCA1, BRCA2, and then what we're calling the consensus sequence claims. And I think that's an easier way to look at the obviousness issue. And hopefully, you know, if there are issues raised by Defendants, that that organization will hold for you.

Okay. Let's go to the primer pair patents. And as I say here, I start off you've got three main points that I want to talk about. And the first is a claim construction issue, which is actually fairly important. And as was pointed out repeatedly, of course, this is something for the court to determine independent of any fact issues.

And when you actually look at Defendants' anticipation arguments, Your Honor, they hinge upon an erroneous claim construction, that essentially in the primer pair patents assigns the same scope of the independent claim to the dependent claim.

If you look at what their experts say, and I'll show you in a minute, the experts look at the independent claim and the dependent claim and assign them fundamentally the same scope, which is why they rely on the same prior art to anticipate those claims in both the BRCA patents, BRCA1 patent and the BRCA2 patent.

How do they do that?  So here are the primer pair
patents.  And we see we have an independent claim and a
dependent claim.  I think as we all know now, SEQ ID NO:1 in
the BRCA1 patent, that is the exons only sequence, i.e., the
cDNA.

       Just on its face, right, claim 16 should have, as is
presumed, a different scope than claim 17.  Same is true
BRCA2.  SEQ ID 1 in that patent is the cDNA of BRCA2.  Claim
30 talks about the BRCA2 gene having the nucleotide sequence
set forth in SEQ ID 1, i.e., the cDNA.  Claim 29, the
independent claim does not have that requirement.  Same across
the board on both patents.

       What do the experts or Defendants do in applying the
prior art to those claims?  I think they make some arguments
that they're indefinite.  And I'm not going to get into that
because I think the Court will see in the case law that unless
there's just no construction the Court can reach on the
claims, and I'll be happy to address it in closing, unless
there's no construction that you can reach, the claims are not
indefinite.

            The Court:  I don't think we need to spend a lot of
time on that.

            MR. SINGER:  Right, Okay.  And so what is
Dr. Gregory saying here.  He's saying I couldn't understand
the claims.  They were indefinite.  But when I look at the

dependent claim, what that means to me is that the
corresponding cDNA of the BRCA1 gene is in SEQ ID NO:1, not
that the primer pairs have to amplify the cDNA or a portion of
the cDNA, but the corresponding cDNA of the amplicon is in
SEQ ID NO:1.

And, of course, the corresponding cDNA of an amplicon --
excuse me.  The corresponding -- the corresponding cDNA of an
amplicon that has SEQ ID 1 is going to be the genomic DNA,
which of course is in the independent claim.

So they say, nonetheless, for the purpose of comparing
claim 17, I assume that claim 17 means that the primer pairs
amplify a fragment of the BRCA1 genomic sequence, right?  So
anything.  And that the corresponding DNA is SEQ ID No:1, not
that it has to amplify the cDNA.  Same for 29 and 30.

So they're assigning the identical scope through --
through a claim that they don't understand the claims and then
say, well, to make sense of them, this is what I'm going to
do.  That's not what the claims say.  I think this is a fairly
straightforward claim construction issue for the court
governed by Federal Circuit precedent, and it can be resolved
readily.  And it puts an end to all of the anticipation
arguments.

If you look at the claims of the primer pair patent, you
will see -- not quite all, most all.  I should be a little
more careful with my words.  Look at the claims 16 and 17.

You can see -- and Mr. Gaede I think when he was talking about
infringement reminded the Court, and he was correct, that the
first source of claim construction is the plain language of
the claim.  And we have two different claims with two
different claim languages.

17 says the BRCA1 has the nucleotide sequence set forth
in SEQ ID NO:1.  Claim 16 just uses the term BRCA1, ergo, the
proper construction from the claims should be that the BRCA1
gene must at a minimum encompass SEQ ID NO:1.  It also
encompasses the genomic DNA, but it also must, based on the
claim structure, encompass SEQ ID NO:1.  And that is the
proper construction.  17 is SEQ ID NO:1.  16 encompasses it.
It's the independent claim.  17 then, as the patent law
requires, further narrows claim 16 with its additional
limitation that the BRCA gene has to have that sequence.

We cited the Allergan case, Your Honor.  And I
actually -- this is a case I argued with the Federal Circuit.
It's right on point.  In that case the independent claim --
this is a chemical case.  And in chemistry you see all the
structures that are out there, and oftentimes, rather than
specify a particular -- you saw the hydroxyl group.  Rather
than specify that, chemists will just put an R there, and that
means you can have multiple substitutions where that might be.
And the way this claim was was N(R)4 2.  And what that meant
was you have a nitrogen, and then an R 4, which meant, okay, R

4 could be the claim then specified a bunch of different
things it could be.  And they had a 2 there.  The dependent
claim in the case had N(R) 4 2 where the R 4's weren't
identical.  And you might look at that and say, well, N(R) 4 2
that means the -- there must be two of those R 4's, and maybe
that means they're identical, maybe it doesn't mean they're
identical.  How am I supposed to figure that out.

Well, they looked at the dependent claims, right, and the
dependent claims, they weren't identical.  And the Federal
Circuit said, okay, we have a construction on the one hand
from the Plaintiff in that case that says the dependent claim
is given meaning if you say R 4 are not identical.  And, on
the other hand, we have a construction from the Defendants in
this case that says, oh, no, no, that dependent claim is
nonsensical, in this case not infringed, because the R 4's
have to be identical, and it doesn't cover what is explicitly
recited in the claim.

The Federal Circuit said, no, no, no.  That's not what we
do.  We look at the claims.  We construe them to make sense.
And in this case the way they made sense was to construe the
R 4's not identical.  Just here the same thing.  We construe
the term BRCA1 gene and BRCA2 gene to include the cDNA
sequence that is then identified in the dependent claim.

And this isn't a case, Your Honor, where the
specification is somehow inconsistent.  The specification is

exactly consistent and says the same thing.  This is the
definition section that both parties have gone to to look at
how do you define BRCA1 gene.  And there's a definition
section.  The patent, of course, we have -- we have to apply
those within their bounds.  And I put a little kind of
asterisk there at the top because it talks about BRCA1 gene
and talks about it being defined, because Defendants would
have you stop reading where I put those asterisks.

They say, well, BRCA1 gene is likely expressed in normal
tissue which is in the BRCA1 gene, so -- region, therefore, it
must be the genomic DNA.  That's how they get their argument.
BRCA1 gene, genomic DNA, this makes no sense to have BRCA1
then meet the cDNA.  But if you continue to read, you see it
explicitly references SEQ ID No:1 right there.  These terms,
when applied to nucleic acid, refer to nucleic acid which
encodes a BRCA1 polypeptide.  And then it gives the coding
sequence for a BRCA1 polypeptide as shown in SEQ ID NO:1,
i.e., the BRCA gene must be able to encode for SEQ ID NO:1 --
or excuse me -- the polypeptide that's shown in SEQ ID NO:1.
BRCA1 gene encompasses the cDNA.

And if it need be any clearer, it goes on to say that the
Polynucleotide compositions of this invention include, and
then it lists cDNA.  So the specification is at one with the
structure of the claims, and the construction the Defendants
have offered you in support of their anticipation arguments,

most of them, is erroneous and should not be adopted by this
court.

And I've put here, Your Honor, why this is the proper
claim construction, claim 16, 29 of -- put them together for
you since they're quite similar for the BRCA1, BRCA2.  A pair
of single-stranded DNA primers, and there are, of course,
other limitations in the claim, amplifies a sequence that is
all or part of the BRCA1/2 gene.

Claim 17/30, pair of single-stranded DNA primers,
amplifies sequence that is all or part of SEQ ID NO:1, i.e.,
BRCA1/2 cDNA.  The BRCA1/2 gene encompasses the genomic DNA,
it encompasses cDNA and the other things listed in the
definition.

All right.  So that is really the scope of the claims
that applies to most of the arguments being made.  I'm going
to go a little bit into the trees here and talk about the
prior art itself, with the expectation that we'll have a
chance at closing, Your Honor, to do it in a little more
rigorous fashion, little more detail.

Really four -- really three pieces of prior art raised
against the 282 patent, and just one against the 492 patent.
I'll discuss the 282 patent first.

Okay.  And this is very straight forward.  Now that we
see the proper claim construction, the prior art starts to
fall away.  And that's what's going on here.  They're putting

forward a claim construction not supported by the plain
language of the claims, not consistent with that construction
in the specification to then bring this prior art in.  Let me
talk about the dependent claims first, then the independent
claims.

So we have dependent claim 17.  Again, that's the BRCA1
cDNA.  As conceded, or I don't think there's any argument
here, that the primer pair in Abel and Anderson is intron
only.  So you are not going to meet the limitation of claim 17
of SEQ ID NO:1, so it can't anticipate.

The marker deposits also.  I don't think there's any
dispute that the marker deposits, which, you know, we don't
think can be used as primers at all, but put that aside, that
they're also in the intron region.  Again, that dependent
claim primer to cDNA can't be anticipated by intron-only, if
you will, prior art.  That's it.  Just that simple.

As to the independent claim, Your Honor, this is a tricky
issue.  The claims has a preamble.  And, you know, the Court,
as we've talked about, doesn't need to find in our favor on
more than one claim.  And we don't have to address this issue
if you don't want because claim 17 is clearly not anticipated.
It's patentable subject matter, and it's not going to be
obvious either, which I'll show you in a minute.

But claim 16, if the Court wants to address it, the
Defendants dispense with a large portion of the claim.  The

1    claim has a preamble right there, for determination of a

2    nucleotide sequence of a BRCA1 gene by a polymerase chain

3    reaction.  The primer pairs have to be for that purpose.

4         And the case law is quite clear that language in a claim

5    preamble has limitation or limits a claim if it recites

6    essential structure or steps, or necessary to give life,

7    meaning and vitality, or, also, if it gives antecedent basis.

8         So preambles can be, Your Honor, in the patent law, they

9    can be just as Defendants claim, intended uses, that is

10   possible.  It's not that they're arguing something that's

11   impossible under the law that these things would just be

12   intended uses, it's just incorrect in this instance.  And you

13   can see it just by looking at the claim.

14        Put aside -- just look at the antecedent basis.  You

15   need -- the antecedent basis alone tells you that the preamble

16   is a limitation.  But, also, this is, if you will, the essence

17   of the invention.  These primers are for determining a

18   nucleotide sequence of the BRCA1 gene, in the case of claim 16

19   and in the case of claim 17 that BRCA1 gene being cDNA.

20   That's the purpose of the primers.  It gives life and meaning

21   to the claim.  That was the invention.  So there are

22   limitations in the claim and they need to be met by the prior

23   art.

24        Defendants essentially -- and we cited the Vizio case,

25   and I think there's been some argument about, well, it's a

composition claim so it has to be an intended use.  The Vizio
case is talking about a composition claim, or in that case it
was an electronic invention.  I'm not sure composition is
the -- apparatus, that's probably the better word.  It's an
apparatus claim for decoding.  And the Federal Circuit said,
no, that's not just an intended use.  That is the, if you
will, giving life and meaning to the invention at issue here.
It's the same thing.  The primers don't exist independent of
being able to encode for the BRCA1 gene in the independent
claim and in the cDNA dependent claim.

And if you look at the analysis you've been given, Your
Honor, it just ignores it.  And it's not our burden to
demonstrate that the patents are valid.  They must come to you
with a substantial issue, and they can't get there by just
simply ignoring these limitations.  There's Dr. Bowcock's
declaration, for example, in a claim chart in appendix one.
This is her analysis of the marker prior art, and just
dispenses with it.  The intended use, not a claim limitation.
Intended use, not a claim limitation.

And the reason they're doing that in the case of markers
is because these things weren't used for PCR.  They're not
used for determining a nucleotide sequence of a BRCA1 gene.
So it's just inconvenient that those limitations are required.
They're not met by the prior art in any way, as demonstrated
in our brief.  And you can't simply dispense with them to

create a substantial issue at this stage of the proceedings.

Okay. That's really it on the 282 patent. The erroneous claim construction dispenses with the dependent claim, prior art, intron only. And then on the independent claims, because those, of course, do cover amplifying introns, the preamble, as I've described, is not met.

Okay. Turning now to the 492 patent, the Schutte art. Mr. Swedlund is dutifully waiting out in the hallway. He's not in here. He's waiting in the hallway. He'll come and testify very briefly, Your Honor, just to lay a few additional lines of foundation this morning just for the Court's benefit.

But the Schutte art was not prior art. The inventors of the Myriad patents had come up with primers that meet, if you will, the essence of what are the exactitude actually of what Schutte discloses. And this is a basic proposition. I'm not going to go into great detail, but people can swear behind, right, prior art. That is not a statutory bar. There's the one year stuff. You can't get behind that. We have that now. In the future we won't have that anymore, the absolute novelty. But there's the one year. You can't get behind that.

But this prior art is in that intervening one year period, and if that's the case, people can swear behind that and show that, oh, no, no, that's not prior art to me; right? Might be prior art to the rest of the world, but not to me

1   because we had what was in that reference before that
2   reference was available to the public.  Just that simple.
3   That's our old system, invention first.  Our new system is not
4   that anymore.  That's our old system.  These patents, of
5   course, come under the old system.
6       The dates, as you see, we quibble with the 102(g) date as
7   to whether that's proper.  But it doesn't matter, Your Honor,
8   whether you use either of their 102(g) dates, the one that we
9   believe is improper, the article received, or the one that we
10  believe is proper, article accepted -- or actually publication
11  perhaps.  It doesn't matter.  The primers that Mr. Swedlund
12  identified in his declaration done by Dr. Tavtigian meet those
13  dates.  And there's just the point of law that I just said.
14      And here is Mr. Swedlund's declaration.  As I said, it
15  will come in very shortly and give a few extra points about
16  where he found the documents.  I think that was the question
17  from their side is where was this document, since he wasn't
18  employed at Myriad at the time.
19      And as Mr. Swedlund's declaration says, the pair -- it
20  was a pair of single-stranded DNA primers greater than 15
21  nucleotides in length.  And if you take their kind of point of
22  view, Your Honor, that you don't need to consider the
23  preambles, it was used in the same way that was used in
24  Schutte.  And that's what we said in our brief.
25      If you sort of adopt their view of the world and how

these claims work, that the preambles don't, and you don't
have to know that you're sequencing the BRCA1 -- excuse me --
in this case the BRCA2 gene, and that you're not using it to
sequence exons because you don't know that, certainly these
primers meet that limitation clearly.  They both ended up
actually amplifying things that were exonic, so they actually
meet also any contention on a dependent claim.  And it wasn't,
of course, known at the time they did them that that's what
they did, so they disclose every bit of what Schutte's prior
art reference does, exact same disclosure and prior in time.

     There it is.  It's -- you've got to have really good
eyes, Your Honor, to see it on this.  I'm not sure we were
smart enough to highlight it on the document we gave you but
it's right here highlighted.  And, of course, we will get you
presentations.  I think maybe we'll include a slide that maybe
blows that up a little bit so it's a little easier to see.
And the date, of course, prints out at the top as to when the
printout was made or the program that was used.  And as you'll
hear, it's the same -- it's the program that's referenced in
the patent.  It's what people of skill in the art use.

     And just very briefly, Your Honor, because it -- I think
it's quite clear that for this stage of the proceeding
there -- this is prior Schutte reference and not prior art.
Even if it is, again you have the same issues as in the other
claims.  The amplicons in Schutte, one was intron only and one

1  was intron-exon, or the amplicons that would be produced I

2  think is a better way of putting it.  The claim requires exon

3  for claim 30.  And again on claim 29 the Defendants' experts

4  do not account for the claim preambles.  Can't raise a

5  substantial issue by simply dispensing with them.

6       All right.  Last point on anticipation, then we'll move

7  to obviousness, and this will be very short.  It's fair to say

8  that it's a highly technical argument that markers deposited

9  or double-stranded DNA molecules somehow anticipate these

10 claims to single-stranded primers.  And I think the scientists

11 debate as to what that really means and would someone really

12 ever do this?  I think that's the debate that was going on

13 between Dr. Kay and their experts.  Would someone ever do

14 this; right?

15      And I think they're trying to be fair when they say,

16 well, it's possible that you could do this.  I think Dr. Kay

17 can speak for himself, but our view is no one would ever do

18 this.  This Is not what people are doing in PCR.  But that's

19 an interesting debate, and I think if the court is required to

20 resolve it for this proceeding, you should come down on our

21 side of that point.  And why?  Well, first off there's no

22 evidence that this was ever actually done.  Prior art requires

23 identity; right?  You have to have two single-stranded primers

24 used for PCR to amplify -- capable of amplifying the

25 particular sequences.

```
1      Taking a double-stranded deposit and having to do all the
2   things that Defendants' experts say you have to do,
3   implausible as that might be, is not identity.  It's something
4   different.  It's a different argument.  It's not identity of
5   disclosure of the language of the claim.
6      And just to summarize, Your Honor, this goes right back
7   to the tutorial.  I mean the Court was shown how PCR works,
8   and the idea behind the primers is that they shouldn't be --
9   they should be complementary to each other because then
10  they'll bind to each other as opposed to binding to the
11  sequence that you're trying to amplify.
12     And that's, of course, the problem with the
13  double-stranded DNA.  You heat it up and it denatures but
14  then, of course, it will bind back together.  And that's why
15  people would not use it in this fashion and did not use it in
16  this fashion.
17     Okay.  Let's move on to obviousness, which I think will
18  be -- I can be a little -- we can be a little less precise
19  because it's a less precise defense.  Anticipation is a very
20  precise defense.  We need to look at the exact language of the
21  claim.  And defendants have that clear and convincing evidence
22  burden at this stage, the burden to show a substantial issue
23  under that burden with the exact language of the claim.
24  Obviousness, of course, the prior art by its nature doesn't
25  have (inaudible) --
```

Everything that's in the claim. That's the nature of the obviousness defense. And then I'll talk very briefly at the end, Your Honor, about discretion before we put Mr. Swedlund on the stand.

Okay. Obviousness, this is the Graham case both sides have cited. These are the well known factors that one considers in the obviousness inquiry. I'm going to focus on really one, two and four. The level of ordinary skill in the art doesn't really appear to be much in dispute between the parties and wouldn't be an issue of great moment at this stage of the case in any event.

This is the -- I think it's fair to say that they're talking about obvious to try here in these kind of cases from the Federal Circuit. There are many, many that talk about them. Motivated to combine the teachings of the prior art to achieve, have to have a reasonable expectation of achieving the claimed invention.

And then a critical point for the Court when assessing this issue. You don't use the patent as a road map to find the invention. And it's hard. You know, this is not an easy exercise, obviousness, for a court because we have a success in this courtroom. The inventors of the Myriad patents succeeded in this hunt for this gene, and they succeeded by doing things unconventionally in different and difficult ways

and got a result that itself is surprising.

But now it's 20 years later, and we look at that and we go -- and people can find genes left and right it seems. But that's not what we do, and it's very hard to avoid that temptation. And I'll talk a little bit more about this at the end again.

And as you can see, the inventor's own path never leads to invention. That is hindsight. That probably is the BRCA method claims just because what the parties are arguing about is was it obvious to discover BRCA1 and BRCA2? Despite all the plaudits we saw, was that nonetheless obvious?

And I'm going to talk about the state of the art not in terms of the public or press, but let's talk about the state of the art in terms of molecular biology because that's what matters and that's what the Court is supposed to do.

And we've heard a lot about the Human Genome Project being years from conclusion. Well, that's -- you're darn right, it was years from conclusion when these folks made the discovery that they did. And unknown number of genes in the human genome. Full sequence of the genome not even close to being available for purposes of the study. These unidentified genes coined BRCA1 and BRCA2.

And it's important -- I read the tutorial with interest about the difficulties of vocabulary. And it's important to keep -- to understand that just because someone called them

BRCA1 before, that doesn't mean anybody knew where they were,
right, or knew how to find them in any particular way.  They
had a name.  Doesn't mean they were obvious.

No protein products identified.  So we'll see that's very
important in the case law.  And extremely large regions
thought to contain the genes.  They were localized, yes.  They
weren't looking on any chromosome.  We were looking on one
chromosome, and, yes, we had it down to a region.  But it's
important to keep in mind these are enormous regions.  I mean
this is not, you know, I'm just going down the block.  It's
one of three houses.  I've got to find that one house.  We're
talking about a huge city that we're looking in as a fairer
way to look about this.

Millions of base pairs in the regions that were being
looked for BRCA1, BRCA2 no less than 900,000.  There's a
dispute between the sides as to how large the area is, but,
nonetheless, a very large area, given that people thought the
average size of a gene, or that there was one gene every
30,000 base pairs at the time.  Dr. Bowcock's article talks
about that.  That's what people thought at the time.

Okay.  There's really only one case that the parties have
cited that really is kind of in a fully approved version.  You
know, the Federal Circuit hasn't said, oh, that part of that
case is wrong, and that part -- you know how they do that.

In re Kubin, and that is the most recent Federal Circuit

teaching on the obviousness of these types of claims. And

when you look at the facts of Kubin, which finds nucleic acid

unpatentable, you will see a stark difference than what we see

in the state of the art here. And I've listed, if you will,

sort of the key points there. That's the case about the nail

protein, if the court hasn't read it. And in that case,

right, the protein was identified in the prior art. It was an

antibody specific to the protein. And that same prior art

reference described a process for cloning nucleic acid

molecules encoding the protein using the antibody.

So we heard a lot of talk about road maps. That's a road

map. And what they were doing in that case, right, is prior

to Kubin. Even those facts oftentimes led to conclusions that

the nucleic acid was not obvious, Deuel, Bell, those cases.

And what the Federal Circuit said, no, we've got a change in

the law. KSR has meaning in Molecular biology as well.

So if you have an identified protein, and you've got an

antibody specific to the protein, and you have a process

described how to clone it, well, that is going to be obvious.

And that's what they ruled. None of that available to the

Myriad inventors, none.

And the other part of Kubin that I think gets less

play -- Your Honor, it caused a stir in the molecular biology

community, as you might imagine. It's the case that changed

the rules, if you will. But the Federal Circuit went out of

its way.  Chief Judge Rader wrote the opinion and went out of
his way to emphasize, by the way, I'm not telling you that
this is somehow a change, other than what KSR, and emphasized
what is not obvious to try in here.  And these are quotes from
in re O'Farrell, which is sort of the foundational
biotechnology case from the Federal Circuit, one of the very
early ones.  And he's quoting and explaining that if the
inventor has a lot of choices, very -- lots of parameters, try
a lot of possible choices, that is not obvious.  And those
that -- that those choices might be things that are out there
doesn't make it obvious either.

Second scenario.  Not obvious to try a general approach
in a promising field of experimentation.  Not obvious to do
that either.  You need to have specific instruction in the
prior art in this area to find something obvious.

And you can see just by looking at the science Defendants
are using hindsight.  They're violating both scenarios that
are laid out in Kubin, and violating the basic sort of
fundamental one, two, three, four of Graham versus John Deere.

I'll spend about five minutes on this and then we'll
conclude obviousness.  Just where to look for the gene,
dispute between the parties.  Where do you look for it?  I
think it's fair to say from Dr. Kay, who will explain himself,
there are a lot of different possibilities in even the
locations where it had been confined down to.  We put forward

this chart for Your Honor and these are the prior art references, which show these are what the prior art is saying. Look here.  It's in this region.  These are, by the way, big regions where they're broad, and relatively big regions when they're narrow.

But you can see even as late, right, as November and May of 1994, they don't include where the gene was ultimately found.  And this is at the time of the invention, these articles by peers.  These are peer reviewed literature of publishing regions which don't include the gene.  Where to look for it?  Uncertain in the prior art.  Lots of approaches. Candidate genes.  Talked about those in the tutorial, but that's just taking genes that have been identified and trying out and seeing whether or not they're the right ones associated with breast cancer.  They might have been associated with another disease, maybe they'll be associated with breast cancer.  You can do that.  That's things that people try, and you see it in the prior art, all these other approaches.

And the Myriad folks describe these possible approaches you can take in their patent.  And I think it's fair to say Defendant looked at that and said, well, see, those are techniques that Myriad people didn't invent, so therefore this is obvious.  Having tools, using regular established tools to find something, doesn't make what you find obvious.  That is

Hornbook obviousness law. If that were the case, the number
of patents that we would strip from the books would be
staggering.

The inventors though, even in applying some of these
techniques that were used in the art, they came up with their
own way of doing it, right? They had access to unique
familial data, right, and they used a hybridization technique
that they describe and came up with on their own to do that.

The other two things talked about in the patents, the
YACs. I'm not going to get into the technology, but just
someone described it to me yesterday, my colleagues who are
experts in this area, it's trying to assemble a map of the
United States from clones, and in this case the pieces being
the various states, but without the outside borders of the
United States, and pieces where you might have a piece of the
State of Utah erroneously attached to a piece of the State of
North Carolina.

That's what it is trying to map with these clones.
They're imperfect, they're imprecise, and you don't know how
they end up at the end of the day fitting into the puzzle.
It's the inventors who came up with how they fit into the
puzzle.

Also, lastly, the assembly of the sequences. The gene is
of unknown length, size, and the starting and ending points.
You don't know where it starts. You don't know where it

stops, you don't know how big it is, and you don't know how
big the coding sequences are.

     And all of that shows you that this was an art with a lot
of choices to be made by the inventors, and they used the
exercise of inventive skill to come up with finding the BRCA1
and BRCA2 genes.

     Okay.  I want to close the obviousness section on these
claims, Your Honor, and go to the what I call the consensus
sequence claims with the objective indicia.  And it's not for
any -- I mean these are things that we like to call the common
sense factors, okay?  You know, I've got this technical
analysis.  I've put together A, B, C.  How do I break the tie?
How do I figure out whether this is obvious or not?

     And that's why courts say they're so useful.  They often
are the most probative and cogent evidence of nonobviousness
in the record.  They check against this tendency to use
hindsight.  Say, well, they succeeded.  They used tools that
were available in the art, so could someone else.  Because
knowing that the inventors succeeded, a fact finder might
develop a hunch that the claimed invention was obvious, and
then construct a selective version of the facts that confirms
the hunch.

     This is precisely why the Supreme Court -- talked a lot
today about the Supreme Court -- Supreme Court explained that
objective considerations might prevent a fact finder from

falling into such a trap.

The objective evidence here is overwhelming.  The
long-felt need for these tests, undeniable.  That goes into
the hunt; right?  You have a long-felt need for something, the
idea being someone should have discovered it sooner than they
did in the years of effort that it took to find.

Recognition and praise we saw.  Go into it very briefly
again.  Unexpected results I'll talk about.  Commercial
success of these tests.  Federal Circuit has recognized that
commercial success is a very important obviousness factor.

And failure of others to identify the genes at the same
time.  We saw even coming up with the wrong regions just the
month before, or month of the patent being filed.

The praise.  We saw all this.  I don't need to repeat it
again.  But these, again, clear evidence that this -- this
gene, finding this gene -- and I recognize the come back was,
well, the gene itself isn't patentable, but that doesn't mean
finding the gene was obvious, which is what the Defendants
would have you believe.  No.  All that praise shows you that
this was regarded both in the popular press and everywhere
else as a landmark important discovery.

Unexpected results.  And this is something that we
haven't really talked about except in just sort of glancing,
but this gene is really, really big, and that's really, really
unusual.  When you look -- for example, I think I mentioned

Dr. Bowcock's paper talking about one gene every 30,000 base pairs, this gene, the BRCA1 gene, is 100,000 base pairs. BRCA2 is 70,000 base pairs. A large number of exons, and each gene includes an extremely large exon.

And the reason that's important is these large genes are unstable, makes them harder to find, as Dr. Kay has explained, and harder to work with if you think you've got something. So as a surprising unexpected result that we see a gene this large come out of the hunt that was underway.

And then lastly I think the failure of others. And this is not something we say lightly. I mean Defendants' own experts failed to find the gene. There's been some argument in the briefs that there was simultaneous invention. There wasn't simultaneous invention. It was simultaneous failure is what there was.

Dr. Bowcock's research group did not identify BRCA1, despite having what she says is a road map to do so. Dr. Gregory's research group identified an incomplete and incorrect BRCA2 sequence in December 1995, the same time the BRCA2 patent was filed.

And even going back to show how difficult this was -- and this is -- this is relevant to show both a failure, but really it's more about how hard this really is. Dr. Bowcock, an esteemed scientist, in 1990 published an article excluding chromosome 13 as the size of a primary -- as the site of a

1    primary lesion for human breast cancer.  And, of course,

2    ultimately BRCA2 was discovered on chromosome 13.  That's no

3    knock on her.  It just shows how difficult and unpredictable

4    the science was at the time the inventions were made, just

5    that simple.

6         Okay.  I will quickly go over the consensus sequence

7    method claims, and I've called them that because what these

8    claims are really getting at, Your Honor -- where is it?  Is

9    they cover methods for ruling out common benign alterations in

10   the BRCA1 gene.  And they're different than the BRCA claims I

11   called because, you know, the point of novelty or

12   nonobviousness, as the case may be, is not the gene itself

13   because the genes were not known; right?  The genes are in

14   fact prior art.

15        And first off just want to point out that the prior art

16   the Defendants have raised in front of you to establish a

17   substantial issue is art that was considered by the patent

18   office.  That does not end the inquiry.  Looking at the case

19   law, you still have to assess the arguments that they make.

20        But what the cases teach us, Your Honor -- and you can

21   see it.  I just put it here for your benefit where these

22   things are cited from the patents.  It makes it harder to meet

23   that clear and convincing evidence, if you will, if you

24   start -- the hurdle is here, and normally maybe you start

25   here.  You start lower, if you will, because the PTO has

already looked at this and has granted some deference; right? That's' why presumption exists. And if the arguments are essentially the same, the factfinder should be skeptical that the conclusion being offered is correct. It's not impossible, that's not what I'm saying, but skeptical. That the conclusion based on prior art record raising essentially the same arguments that were raised at the PTO, and that the PTO somehow just made a mistake. Different when you don't have the prior art in front of you.

So these cover essentially, as I've grouped them, methods for ruling out common benign alterations in the gene. And we talked -- I read the tutorial that talked about mutations, and then there's also polymorphisms, which are benign, things that don't cause any problems but nonetheless differencees in the sequence from the wild-type genes.

And what these claims do essentially, Your Honor, is assemble the most common sequences that are benign so that you can quickly rule out, as it were, oh, I've got a difference from the wild-type. Oh, thank goodness, it's one of the common benign polymorphisms so, therefore, I don't need to be worried about it. Essentially that's what the claims cover in different ways.

They talk about if you see something different from the benign polymorphisms, then you should be worried about that and investigate, as it were, whether or not that's a mutation

of concern.  So it's a -- if you will, a quick and easy way of
ruling out those changes in the sequence that aren't of
concern.  It's really just that simple.

     And the reason they're not obvious under the prior art
that's of record, and the reason examiners found the same, is
the prior art did disclose a couple of these benign
polymorphisms, but disclosed a bunch more than I recited, so
it wasn't known which ones were the most common, but it also
did not disclose others that are in the claims.  So in essence
what the invention is is a combination of the seven that lead
to the quick, if you will, quick result that these things are
not to be worried about.

     Skilled artisans could not have reasonably expected that
combination would define, if you will, as we put it, the
benign signature of the claimed consensus sequence.  That's
what we were looking at, sort of the benign signature that's
any one of these seven or any combination of them.

     This is what the patent office said, Your Honor, in
allowing the claims, essentially the same thing.  The art did
not suggest, and there's the same references again, that a
consensus sequence limited to a specific set of seven neutral
polymorphisms, and did not suggest excluding others, such as
taught by Skolnick, to arrive at those selected from --
selected in the claim.

     So in looking at this invention, what you're looking for

is it obvious to come up with the combination in the claim?
Not is it obvious to try to test it for polymorphisms?  I
think that's the argument.  The question is is it obvious to
come up with these seven as the benign signature?  And I don't
think they've come close to showing with prior art of record
that that is the case.

That's it, Your Honor, on obviousness.  Two minutes on
written description, the other argument raised.  It's very
lightly touched on, but it's in their brief, and I said I
would try to touch on the things that are in their brief.

Written description most typically, Your Honor, is a
defense of you saw what I was doing in the marketplace.  You
changed your patent to try to cover me, and so therefore what
you now are claiming it's not there in your patent.  Usually
that's sort of the standard -- I was trying to figure out a
way to describe it.  Sort of you've got -- patents are
property.  And I like to look at regular property.  It's
easier to understand.  And, you know, if you will, you've
moved the boundary of your deed, and it's different than the
description of the deed.  You're saying this is my property,
but your deed describes it within these metes and bounds, so
you can't do that.

And the deed in this case, description of the metes and
bounds, is the patent specification, and we look at it.  But
we don't have to get down in the weeds or into that -- those

trees because the Defendants are relying essentially on an
erroneous claim construction.  They're reading out the word
potential.  Do you see there, Your Honor, we underline it at
the end?  What they say is, well, the patent doesn't disclose
the mutations that do correlate with increased susceptibility.
And, you know, there's some disclosure in the patent and we
could argue about that, but that -- for purposes of this
proceeding, that's just the wrong way of looking at the claim.

The claim talks about that you're trying to avoid these
benign -- excuse me -- understand the benign signature, so if
the mutation is different, or the difference in sequence is
different than the benign signature, then you might have a
potential problem and you need to go investigate.
Essentially, like I said, a quick way to let those in the
field determine that an alteration might be a problem.  They
have to go then figure out whether it is a problem.  But a
quick way to determine whether something might be a problem or
whether most commonly it's not a problem.

And, again, that's exactly the reading of the claims that
the examiner put, wherein the presence of the mutation, other
than the polymorphisms recited in the claim, is neutral is
correlated with the potential of increased genetic
susceptibility to breast or ovarian cancer.  And then in
parens the examiner says mutations identified will still have
to be tested to determine whether they are themselves neutral

or causative.

So there's no requirement that the patent actually disclose the mutations. The whole idea is to identify those that might be problematic. The written description defense of Defendants rests on erroneous claim construction, right where we started on the anticipation defense earlier.

Your Honor, that's all I have. I'm happy to answer any questions, but if not, I'm sure Mr. Swedlund would love to come testify for you.

THE COURT: Why don't we hear from him.

MR. SINGER: Okay. Let's get him. And, Your Honor, my examination will be on the order of three or four minutes I think.

The Court: Take your time. We're here to hear what the parties have to share with us.

MR. SINGER: And, Your Honor, Just one note for the record as we wait for Mr. Swedlund. We realized last night as we were getting ready that there was actually -- says -- my note here says chicken scratch. There was a little writing on the back of one of the pages of the attachment to Mr. Swedlund's declaration that we did not file, and we did not notice it until last night. We provided it to opposing counsel. We can file it if the Court wants or we can just go with what he has without it. It's up to the Court.

THE COURT: I don't need to see it unless Mr. Gaede

```
 1  thinks there's something of significance in it.
 2              MR. GAEDE:  If they think there is.
 3              Mr. Singer:  I don't.
 4              MR. GAEDE:  I didn't see it last night.
 5              MR. SINGER:  Chicken scratch is really good.
 6              THE COURT:  We'll leave the record as it is then.
 7         Why don't you come forward, sir.  We'll have you sworn.
 8              The CLERK:  Please raise your right hand.
 9              (BRAD SWEDLUND, PLAINTIFFS' WITNESS, SWORN)
10         Thank you.  Please be seated.  Please state and spell
11  your name for the record.
12              THE WITNESS:  My name is Brad Swedlund,
13  S-W-E-D-L-U-N-D.
14                      DIRECT EXAMINATION
15  BY MR. SINGER:
16  Q    Good afternoon, Mr. Swedlund.  If you could just
17  introduce yourself to the Court we'd all appreciate it.
18  A    As I said, I'm Brad Swedlund.  I work for Myriad Genetics
19  as a scientist.
20  Q    And how long have you worked at Myriad?
21  A    For just about 18 years now.
22  Q    Okay.  And are you the same Brad Swedlund that swore out
23  a declaration in this matter?
24  A    That's correct.
25              Mr. Singer:  Okay.  Permission to approach, Your
```

```
 1   Honor?

 2              THE COURT:  Please.

 3   Q (BY MR. SINGER)  Mr. Swedlund, you have -- or Swedlund, get

 4   that right, you have a document in front of you captioned

 5   Declaration of Brad Swedlund.  Is this the declaration you

 6   swore out in this case?

 7   A    Yes, it is.

 8   Q    And is that your signature at page three of the

 9   declaration?

10   A    Yes, it is.

11   Q    Okay.  Does this declaration accurately reflect the

12   testimony you've already given in this proceeding?

13   A    Yes.

14   Q    And do you understand it to be as if you had just

15   testified to the matters contained therein?

16   A    Okay, thank you, yes.

17   Q    Okay, thank you.  When we did your declaration we

18   neglected to tell the Court about your educational background.

19   Maybe you could do that, sir.

20   A    I have Bachelor of Science degrees in biology and botany

21   from South Dakota State University, and a Master's Degree in

22   botany from the University of Florida.

23   Q    And before coming to Myriad in 1995, were you employed,

24   sir?

25   A    Yes, at Agridyne Technologies here in Salt Lake City.
```

1    Q    And what did you do there at Agridyne?

2    A    I worked on molecular genetics, transformation of plants

3    mostly.

4    Q    At Agridyne did you learn techniques of molecular

5    biology?

6    A    Yes, that and in college also.

7    Q    Okay.  In your declaration you say that when you came to

8    Myriad you began working with a team of scientists whose goal

9    was to identify the BRCA2 gene, and that's in paragraph two of

10   your declaration if you need to refer to it.  Just tell the

11   Court if you could what generally you did on the BRCA2

12   discovery team.

13   A    When I first came to Myriad I worked on what we call

14   genomic walks where we would try to connect jumps of genomic

15   sequence that we had found by using -- developing primers and

16   then doing PCR and sequencing to see if we could connect the

17   pieces.

18   Q    As part of that project did you and the team regularly

19   generate records as part of your work?

20   A    Yes, we did.

21   Q    Were the records electronic or paper or both?

22   A    Both.

23   Q    Were those records to your knowledge kept at Myriad as

24   part of Myriad's business?

25   A    Yes, they were.

1    Q    The Exhibit-A attached to your declaration, just so it's

2    clear, what type of document is that?  What are we looking at

3    there?

4    A    It's the output from a computer program that we used at

5    Myriad.

6    Q    And what's the name of that program?

7    A    It's called Sequencher.  That's with a C-H-E-R.

8    Q    Is that a program that you worked with at Myriad in

9    1995?

10   A    Yes, I did regularly.

11   Q    Was it used by the BRCA2 team to your knowledge?

12   A    Yes.

13   Q    Okay.  Did you ever print out documents from

14   Sequencher?

15   A    Oh, yeah, yes.

16   Q    Do they look like Exhibit-A when you print them out?

17   A    Very similar, yes.  Different sequences of course, but,

18   yeah.

19   Q    We showed the Court the date stamp.  Do the documents you

20   printed out normally have a date stamp?

21   A    Yes.

22   Q    And is that the date printed or the date that whatever is

23   being reflected in the document was undertaken?

24   A    It would have been the date the document was saved, and

25   then the date -- doesn't reflect the date it was printed,

```
1   no.
2   Q    All right.  Where did you locate Exhibit-A?
3   A    In some archive files that belong to a previous employee
4   of Myriad, Dr. Sean Tavtigian.
5   Q    And how are those archive files stored?
6   A    They're stored in a storage room at Myriad Genetics.
7   Q    And what is kept in those archives in your experience?
8   A    Lots of materials related to past projects, papers,
9   things like that.
10  Q    Have you gone into that archive to find documents prior
11  to this case?
12  A    Yes I have.
13  Q    Are these -- do you rely on those documents in your work
14  at Myriad when you need them?
15  A    Yes, when I need them.
16  Q    Are those documents stored, or used by Myriad, excuse me,
17  in its daily business to your understanding?
18  A    Yes, as I understand, yes.
19           MR. SINGER:  Pass the witness, Your Honor.
20           THE COURT:  All right, thank you.
21       Mr. Gaede.
22                        CROSS-EXAMINATION
23  BY MR. GAEDE:
24  Q    Mr. Swedlund, a couple of questions for you.  The
25  document that you identified, you were not there at Myriad at
```

1  the time it was generated to the best of your knowledge;

2  correct?

3  A    That's correct.  I started in September of that same

4  year.

5  Q    Okay.  And it's true that when you started in September,

6  Myriad did not know the sequence of the BRCA2 gene; correct?

7  A    That's correct.  We didn't know that it was -- any

8  specific gene was BRCA2.

9  Q    Right.  You knew it was in the 1.5 -- approximately 1.5

10 centiMorgan range; correct?

11 A    You're testing my memory on the actual size, but

12 that's -- that sounds about right, yes.

13 Q    Okay.  And then from that you were using approaches that

14 had been used in locating the precise location of the BRCA1

15 gene; correct?

16 A    Yes.

17 Q    And you were using positional cloning techniques that had

18 been used for BRCA1 that were being used for BRCA2; correct?

19 A    Yes.  They were common to all positional cloning projects

20 I believe.

21 Q    Okay.  And the two primers that are shown in the exhibit

22 that you have attached, to the best of your knowledge, at the

23 time when you joined Myriad in September of 1995, myriad did

24 not know that they were priming a sequence of the BRCA2 gene;

25 correct?

1    A    If I may correct part of that.

2    Q    Sure.

3    A    So there's actually four primers listed on -- in document

4    Exhibit A, is it?  The sequential file, and then there's two

5    primers there listed in the following exhibit.  And so I

6    think -- could you repeat your question, I'm sorry.

7    Q    Sure.  So there was four primers in the first exhibit?

8    A    Yes.

9    Q    Okay.  And are they separate primers in the second

10   exhibit, different set of primers?

11   A    In the second exhibit it was just a demonstration of how

12   those primers would align, so that was my own alignment --

13   Q    Right.  It's one of the set in the first --

14   A    Yes, they were part of the first set.

15   Q    All right.  Got it.  So let's take the set that you used

16   in your Exhibit B.

17   A    Okay.

18   Q    At the time when you joined Myriad in 1995, September

19   1995, Myriad did not know that those primers would prime a PCR

20   reaction to amplify a portion of the naturally occurring BRCA2

21   sequence; correct?

22   A    We knew that it primed a gene within the BRCA2 region.

23   We didn't know necessarily that it was specifically a BRCA2.

24   Q    Okay.  So you knew it primed a gene in the region, you

25   just know specifically that it wasn't the BRCA2 gene section

```
 1   that was being primed and amplified; correct?

 2   A    That would be correct.

 3   Q    I'm sorry?

 4   A    That would be correct, sorry.

 5   Q    Thank you.  And the same is true for the other set of

 6   primers in your Exhibit A?

 7   A    Yes.

 8              MR. GAEDE:  If I may, Your Honor, just one question

 9   for my colleague and then --

10                        (Brief Pause)

11         Thank you so much, sir.

12              THE WITNESS:  Thank you.

13              MR. SINGER:  No redirect, Your Honor.

14              THE COURT:  Thank you, Dr. Swedlund.  You're welcome

15   to step down if you'd like.

16         Mr. Singer, anything more from you?

17              MR. SINGER:  Nothing from me, Your Honor.  Our next

18   module, if you will, is Dr. Kay, if the court would like to

19   hear from Dr. Kay.  I don't know that they can finish their

20   direct, maybe they can, today.  It's unclear.

21              THE COURT:  Well, I think -- I think we need to

22   afford the Defendants an opportunity to respond to the

23   Plaintiffs' presentation in this module before we move on to

24   the next one.

25              MR. SINGER:  Okay.  This is part of the module, so I
```

```
 1   think this is --

 2              MR. GAEDE:  This is the time to call him and, you

 3   know, we'll stipulate to he's an -- stipulate to his

 4   qualifications and his declaration is true and correct

 5   testimony in the best of his ability so I can start crossing.

 6   We'll be done by 5:00 o'clock.

 7              THE COURT:  All right.

 8              MR. GAEDE:  And then we can go into our presentation

 9   tomorrow morning.

10              THE COURT:  That's fine with me.  And, Mr. Singer,

11   does that present an issue for you?

12              MR. SINGER:  No, it certainly doesn't, Your Honor.

13              THE COURT:  I'm sure Dr. Kay would like to get

14   finished with this today.  Why don't we call him.

15              MR. SINGER:  And, Your Honor, my colleague, Geoff

16   Biegler, is going to be presenting Dr. Kay.

17              The COURT:   The name one more time.

18              MR. SINGER:  Geoff Biegler, B-I-E-G-L-E-R.  He's

19   appeared and should be noted in the record.

20              THE COURT:  Thank you.

21              The CLERK:  Please raise your right hand.

22              (MARK ALLAN KAY, PLAINTIFFS' WITNESS, SWORN)

23         Thank you.  Please be seated.  Please state and spell

24   your name for the record.

25              THE WITNESS:  Mark Allan Kay, Mark, M-A-R-K, Allan,
```

A-L-L-A-N, Kay, K-A-Y.

MR. BIEGLER:  Your Honor, we have binders with a few exhibits in them, if I may approach?

THE COURT:  I would be disappointed if you didn't.

MR. BIEGLER:  May I proceed, Your Honor?

The COURT:   Please do.

MR. BIEGLER:  I'll try to -- I understand defense has stipulated to Dr. Kay's credentials so we'll try to make this fast, but we'll try to introduce him at least --

MR. GAEDE:  Your Honor, seriously, if we're stipulating, I don't see the need to spend time here on this.

MR. BIEGLER:  Your Honor, I think Dr. Kay does have some new comments in light of the declarations that were submitted last Friday by Dr. Bowcock and Dr. Gregory, so we were planning on providing some testimony in response to that.

THE COURT:  Well, it's --

MR. BIEGLER:  And we notified Defendants' counsel of that I think yesterday, so they were aware of this.

MR. GAEDE:  Your Honor, this is the first I've heard of it, and admittedly yesterday was a little bit of a blur. It's the first I've heard of it.  This clearly contravenes the Court's order in terms of the testimony is through the declarations and then cross-examination.

MR. BIEGLER:  Our position, Your Honor, is that the

1  Court didn't anticipate getting brand new fact expert
2  declarations on Friday night which were close to 100 pages for
3  the ones relevant to Dr. Kay, and he has not had a chance to
4  respond to those new opinions from Defendants' experts.  We'll
5  be planning to present today's brief that's only about 20
6  minutes or so.
7            MR. GAEDE:  Object, Your Honor.
8            MR. MANGUM:  Well, I would indicate for the records,
9  David Mangum, that we did in fact communicate to them, as we
10 were discussing which witnesses would be called, that we
11 intended to have Dr. Kay address and respond to the
12 supplemental declarations and any additional information that
13 came from those, and Mr. Gaede at the time said he would
14 reserve his objection about that.
15            THE COURT:  The subject matter, Mr. Biegler,
16 briefly?
17            MR. BIEGLER:  There's a large amount of subject
18 matter in Dr. Bowcock's and Dr. Gregory's declaration, but I
19 think Dr. Kay wants to respond to the comments on linear PCR
20 with respect to the deposit markers and some of Dr. Bowcock's
21 comments about the predictability of gene discovery and some
22 of the techniques that were used by the inventors and others
23 in the field.
24            THE COURT:  Mr. Gaede, I'm going to hear this
25 evidence.  We have the witness here.  I understand that you

haven't had an opportunity to receive it and review it. We
have by necessity, because of the pace at which we've all been
moving, been dealing with I think a fluid situation. This is
unlike most of our instances where the record's clearly
defined well in advance of a hearing. That's just a necessity
borne out of the urgency of this issue.

I think -- I think we'll allow the Plaintiffs an
opportunity to respond to those declarations that were
received late last week. You'll have a chance to consult with
your colleagues overnight because we'll break after we hear
this direct testimony. Your objection is noted.

MR. GAEDE: Thank you, Your Honor.

THE COURT: Thank you. And I don't think it will be
necessary, but if it is, if you think that there's something
further to address by way of testimony from one of your
experts and he's -- he or she is here tomorrow and you want to
put them on the stand, let's have it out. That's what we're
here to do is to hear from the witnesses.

So, Mr. Biegler, go ahead.

MR. BIEGLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BIEGLER:

Q    Dr. Kay, what do you do for a living?

A    I'm a professor of pediatrics and genetics at Stanford
University.

1    Q    And how long have you been a genetics professor at

2    Stanford?

3    A    Since 1998.

4    Q    So approximately 15 years?

5    A    That's correct.

6    Q    Have you been asked to provide opinions about the

7    validity of the patents asserted in this case?

8    A    Yes.

9    Q    And have you also been asked to respond to the

10   declarations of Doctors Bowcock and Gregory submitted on

11   behalf of the defendants?

12   A    Yes.

13   Q    Have you in fact formed opinions if the patents asserted

14   are valid?

15   A    Yes.

16   Q    And you submitted a declaration that contained those

17   opinions?

18   A    Yes, I did.

19   Q    Okay.  If you could turn to tab one in your binder.

20   A    Uh-huh.

21   Q    Is that the declaration that you submitted in this

22   case?

23   A    Yes, it is.

24   Q    Does it accurately reflect all the opinions you have to

25   date in this matter?

A    It reflected my opinions as of August 30th on prior to

receiving additional declarations after last Friday.

Q    And you just heard between the attorneys and the Court

you have new opinions or at least responses to some of what

was said in the new declarations?

A    Yes, that's correct.

Q    Okay.  Just briefly before we get into that, I'd like to

just go over your credentials at a very high level.  I've been

calling you doctor.  Are you an M.D. or a Ph.D.?

A    I'm an M.D. and a Ph.D.

Q    You hold both degrees?

A    Yes, I have both.

Q    And where did you get those degrees from?

A    Case Western Reserve University.

Q    How did you manage to get both a Ph.D. and an M.D. from

Case Western?

A    I was enrolled in the Medical Scientist Training Program,

which is a duel degree program to train physician

scientists.

Q    And how many years have you conducted research and been

teaching in the field of genetics?

A    Since the early 1980s.

Q    So 30 years?

A    Yes.

Q    Before Stanford where did you teach?

```
 1   A    I was at the University of Washington in Seattle.

 2   Q    Okay.  And how many peer reviewed articles have you

 3   published in the field of genetics?

 4   A    Over 200.

 5   Q    And how many journals in the field of genetics are you

 6   affiliated with?

 7            MR. GAEDE:  Your Honor, object.  We stipulated and,

 8   you know, our time is limited.

 9            MR. BIEGLER:  We're almost finished, Your Honor, if

10   you'd just indulge for another question or two.

11            THE COURT:  All right.  Go ahead and wrap it up.

12   This is information that's contained in his reports already.

13            THE WITNESS:  I'm the associate editor of one

14   journal and on the editorial board of several others, and do

15   peer review for a number of journals.

16            THE COURT:  I don't believe anyone is taking issue

17   with Dr. Kay's credentials.

18   Q (BY MR. BIEGLER)  Your current C.V. is attached to the

19   declaration; correct?

20   A    Yes, correct.

21   Q    Thank you.  We're going to go through a summary of your

22   opinions in the declaration, but if we can fast forward past

23   that for a second time.  Have you formed new opinions since

24   receiving the declarations of Dr. Bowcock and Gregory?

25   A    Yes.
```

```
 1    Q    Have you reviewed those declarations?

 2    A    Yes.

 3    Q    Okay.  Let's talk first about Dr. Gregory's opinions --

 4    sorry, I'm going to skip forward a little bit here.  Did you

 5    review Dr. Gregory's comments on linear PCR?

 6    A    Yes, I did.

 7    Q    Okay.  And do you agree with Dr. Gregory that the claims

 8    at issue, the primer pair claims, cover lineal PCR?

 9    A    No, I do not agree with Dr. Gregory's opinion.

10    Q    And just looking at the language of the claims that we

11    put up here on the slide, what's the first reason that you

12    think the claims do not cover linear PCR?

13    A    Well, linear PCR involves the use of a single-stranded

14    DNA primer for determination of a nucleotide sequence, and PCR

15    involves the use of a primer pair for amplification.

16    Q    Does the language PCR standing alone have any connotation

17    to you?

18    A    PCR standing alone, especially in the years -- in the mid

19    1990s and even now generally refers to routine or regular

20    PCR.

21    Q    So without any modifier, you understand it to refer to

22    regular PCR?

23    A    That's correct.

24    Q    Okay.  And the additional language in the claim that

25    refers to a single-stranded pair of DNA primers, that also
```

1  supports your conclusion?

2  A    Yes, it does.

3  Q    And why is that?

4  A    Well, because a pair of single-stranded DNA primers in a

5  single reaction is really what the definition of general or

6  regular PCR would be called.

7  Q    So you wouldn't use double-stranded DNA in a linear PCR

8  reaction?

9  A    That's correct.

10 Q    Did you have a chance to review the references that

11 Dr. Gregory cited on linear PCR?

12 A    I did have a chance to review those.

13 Q    Did those change your opinion in any way?

14 A    No, they did not.

15 Q    Okay.  Let's first talk about the Rosenthal article that

16 was cited.  And if you'll turn to -- it's tab 6 in your

17 binder -- I'm sorry, two.

18 A    Yes.

19 Q    Is that the Rosenthal paper that Dr. Gregory relied on?

20 A    Yes.

21 Q    What does the Rosenthal paper disclose at a high level?

22 A    The Rosenthal paper describes a process of genomic

23 walking and sequencing using a process of linear PCR.

24 Q    Does Rosenthal disclose the use of a double-stranded DNA

25 fragment in a PCR reaction?

```
1    A    No.

2    Q    What does it disclose?

3    A    It discloses the use of a single-stranded primer for DNA

4    amplification.

5    Q    And here you've put in your slides a blowout of a figure

6    from the Rosenthal paper.  Can you explain what that shows,

7    and especially the highlighted portion.

8    A    Right.  So the process here is a way to identify DNA

9    sequences, and in this process genomic DNA is cleaved and a

10   single-stranded primer is then used in a region where one

11   knows of the sequence and then does an amplification step to

12   actually elongate past the known sequence into unknown

13   sequences.

14   Q    And so the language you're looking at there is where it

15   says a linear PCR with only one biotin-labeled specific

16   primer --

17   A    That's correct.  So in this case you are not using a pair

18   of primers, you're using a single strand of DNA.

19   Q    Okay.  Let's turn next to the Murray paper that

20   Dr. Gregory cited.  And if you turn to tab three in your

21   binder, what's tab three?  Is that the Murray paper?

22   A    Yes.

23   Q    What does the Murray paper disclose at a high level?

24   A    Yeah.  So the Murray paper describes again another use or

25   modification of linear PCR where you're using one
```

oligonucleotide as a primer to identify a sequence of a region

of DNA.

Q    So, again, the Murray paper does not show the use of a

double-stranded DNA fragment in a linear PCR?

A    That's correct.

Q    Let's move on.  Now, did you review Dr. Bowcock's

discussion of the literature about the possible regions where

the BRCA1 gene might be located?

A    Yes, I did.

Q    Okay.  Did Dr. Bowcock's comments change your opinion on

obviousness at all?

A    No, they did not.

Q    Can you tell the court why not, please.

A    Well, I mean there's a lot of points at issue here, but

the fact is that at the time of the discovery of the BRCA1

gene, there was still some debate in the -- in the literature

about the region that actually the gene actually fell into,

and even if one debates about which range is correct or not

correct, even the smallest range still was quite large and

there was still no obvious way to go about it to identify that

sequence.

Q    Do you recall how big the range was for the -- the

smallest range identified by Dr. Bowcock?

A    I believe it was in the range of six centiMorgans.

Q    Approximately how many base pairs?

1   A    That would be 6,000,000 base pairs.

2   Q    So why would it not be obvious to locate the BRCA1 gene

3   even starting from a region of five or six centiMorgans?

4   A    Well, the point is that even within a six centiMorgan

5   region there were clearly hundreds of genes that were in that

6   region.  So then the question is how do you identify a gene

7   for which you have no known information about the protein or

8   where and how it's expressed.

9   Q    Was the route from that region predictable or

10  unpredictable?

11  A    Oh, it's absolutely unpredictable because how would one

12  know which gene it was in that group?

13  Q    So let's talk a little more briefly about the

14  predictability of gene discovery in this time frame.  Did you

15  also read Dr. Bowcock's assertion that the techniques and the

16  methods of gene discovery were routine and predictable?

17  A    Yes, I did.

18  Q    I take it you don't agree with it?

19  A    I disagree with that.

20  Q    Okay.  Do you have examples that show how unpredictable

21  gene discovery can be?

22  A    Well, one of the examples listed in Dr. Bowcock's

23  declaration is the use of positional cloning to identify the

24  cystic fibrosis gene, and in fact positional cloning

25  technologies and techniques were used to identify the gene,

but the first identification of the gene that was published in
Nature, a very high profile journal, turned out to be
incorrect.

Q    And if you could turn to tab four of your binder, please.
Can you tell me what -- what's in tab four.

A    Right.  So in tab four was a publication in April of 1987
in Nature in which a candidate gene for C.F. was identified
based again on a number of different positional cloning
technologies, and it turned out that this was -- turned out to
be not the correct gene.

Q    And does the C.F. example, does that -- what does that
tell you about the predictability of gene discovery?

A    I mean that makes it clear that it's not predictable
because even when you have a range whittled down, it's still
hundreds and -- depends on the range, could be hundreds,
thousands of genes in that region, and still the way to go
about identifying it isn't so -- isn't predictable or
clear-cut.

Q    Do you recall how much time passed before they realized
that it was the wrong gene?

A    Yeah, I believe it was five or six years.

Q    Now, do you recall that Dr. Bowcock also mentioned --

        MR. GAEDE:  Your Honor, I object again to this whole
line of inquiry.  This was addressed in his reply declaration,
and this subject matter he's now testifying here in court has

already been dealt with by him in his reply.

THE COURT:  It's overruled.  We're going to take a short amount of testimony on this point.  You'll have a chance to address it with Dr. Kay in the morning.

MR. BIEGLER:  Thank you, Your Honor.

Q (BY MR. BIEGLER)  Dr. Kay, do you also recall Dr. Bowcock in her supplemental declaration talk about the search for Huntington's disease and the example that provided with respect to the search for BRCA1?

A    Yes, I do.

Q    If you could turn to tab five in your binder, please. And what's tab five?

A    Tab five is a paper describing a novel gene that was identified in the Huntington -- for Huntington's disease.

Q    Why do you think the Huntington's example is relevant here?

A    Well, the Huntington's disease gene was a gene for which people had localized to a specific region on chromosome 4q, but it still took 10 years to actually identify the gene itself.

Q    So we put a little blowout on the slide here that shows -- can you explain what the first clause that we have there shows?

A    The -- well, first of all, that the gene is identified on Huntington's disease chromosome, but the genetic disease

1  causing Huntington's disease was assigned to this chromosome 4

2  back in 1983 but it wasn't until 1993 I believe that it was

3  actually identified, so a 10 year period.

4  Q    And what does that tell you about the predictability or

5  unpredictability of gene discovery?

6  A    Again, that makes it unpredictable.

7  Q    Did the search for Angelman syndrome influence your

8  opinion at all?

9  A    Yes.  And that's another interesting disease where people

10  had it narrowed down to a very specific region, and in fact

11  there were a lot of known genes that had already been

12  identified in that region.  And in fact when people found that

13  region, they looked at a couple genes that they thought would

14  be prime candidate genes, but based on the way those genes

15  were being expressed, they actually ruled it out as the

16  candidate gene because it wasn't expressed in the way one

17  might have predicted based on the phenotype of that particular

18  disease.

19        But it turns out four years later the gene -- one of the

20  genes they actually dismissed turned out to actually be the

21  gene because they didn't really understand the expression

22  patterns as well and, you know, in hindsight it makes a lot of

23  sense now.

24  Q    If you can look at tab six and seven of your binder.  I

25  think those were the papers you wanted to show with respect to

1    Angelman syndrome; is that correct?

2    A    That's correct.

3    Q    Okay.  And if we look at the slide, you've blown out some

4    portions of each paper, and can you just explain what this

5    shows to the court.

6    A    Right.  So in the first paper that was published in Human

7    Molecular Genetics in 1994, it basically says based on the

8    biological information for the gene called E6-AP, and on the

9    imprinting analysis of this gene and then another gene, which

10   were thought to be strong candidates for causing Angelman

11   syndrome, but it turned out neither -- neither -- that in the

12   end it -- this particular -- these particular genes were

13   thought not to be involved in this disorder because of the

14   expression pattern.

15   Q    So first they thought this E6-AP gene was not the right

16   one, and three years later they realized it was the correct

17   one?

18   A    That's correct.

19   Q    How does Dr. Bowcock's -- Dr. Bowcock and chromosome 13

20   play into your analysis?

21   A    Well, Dr. Bowcock in 1990 published a manuscript that

22   actually suggested that chromosome 13q was an unlikely

23   candidate region for a BRCA gene locus.

24   Q    If you could turn to the next tab of your binder, please.

25   It's tab eight.  Is that the tab that you were -- that you

1  were referring to?

2  A    Yes, it is.

3  Q    We've blown out part of that paper.  Can you just explain

4  to the Court what the blowouts are showing.

5  A    So there was some thought at the time again that 13q may

6  encode a locus for a human breast cancer gene locus.  But

7  based on the studies that they did, they looked at some

8  expression profiles on cells from patients and from human

9  breast cancer tissues, and based on that analysis they were

10 looking at a particular cancer causing gene that was in that

11 region, and then what they concluded in the end when they were

12 able to determine that that wasn't the actual gene causing

13 locus, that then they concluded that chromosome 13q is

14 unlikely to be the site for the primary breast cancer gene.

15 Q    And eventually the BRCA2 gene was identified in

16 chromosome 13q; correct?

17 A    That's correct.

18 Q    And does that indicate to you that the art of gene

19 discovery for the relevant time was predictable or

20 unpredictable?

21 A    Oh, that's again unpredictable.

22          MR. BIEGLER:  Thank you.  That's all I have.

23          The Court:  All right.  We've had a -- we've had a

24 good, full day today.  We have more to cover tomorrow.  What

25 do we have to cover tomorrow?

1    Dr. Gaede -- I keep trying to do that.

2          MR. GAEDE:  Just an English major, Your Honor.

3          THE COURT:  Mr. Gaede, you'll have a chance, of

4    course, to conduct some cross-examination of Dr. Kay, and then

5    I gather you have a response to obviousness and anticipation

6    and the like, and then where are we after that?

7          MR. GAEDE:  And we'll move right -- we'll move

8    quickly through that, and then we're into the three, what I'll

9    call, equitable factors with the presentation by both sides

10   plus Mr. Ford's testimony.  I would ask Your Honor, since the

11   witness is currently under oath, that it would be improper for

12   him to discuss his testimony in any way even with attorneys

13   and he should be so instructed.

14         THE COURT:  Well, what would be the basis for an

15   instruction to this witness as an expert that he not

16   communicate with his lawyers or with --

17         MR. GAEDE:  Well, right now he's under oath and he's

18   testifying in this court.

19         THE COURT:  Well, he'll be under oath tomorrow and

20   he'll offer honest answers to your questions.  I'm confident

21   of that.  I am going to instruct you, Dr. Kay, not to discuss

22   your testimony with anyone except counsel for the Plaintiffs

23   until after we conclude sometime tomorrow.

24         THE WITNESS:  Okay, thank you.

25         The Court:  All right.  Your estimate, counsel,

1    about how much time we need tomorrow?

2              MR. MANGUM:  Your Honor, I think that probably --

3    and I don't know how long their presentation with regard to

4    validity issues would be, but I would think that the equitable

5    factors we could do quite quickly, that our presentation would

6    probably be on the order of a half-an-hour.  Then Mr. Ford

7    will be put on the stand very briefly by us just to lay the

8    foundation for his declaration, and then turn it over for

9    cross-examination.

10             MR. GAEDE:  And I don't anticipate a long

11   cross-examination of Mr. Ford in the subsequent presentation.

12   Perhaps if we could -- is there a time that the court would be

13   finished if we could perhaps start a half hour earlier at

14   9:00?  I'm sure we'll be done by noon.

15             The Court:  Well, I thought we could, and then we

16   ended up with a matter, a criminal matter, that could only be

17   set tomorrow morning at 10:00 o'clock, and so we'll be

18   proceeding with that.  It's a sentencing that involves four

19   related cases in four different states and it just had to be

20   done tomorrow.  We'll be done before 11:00, and we'll have

21   that completed and we'll clear the courtroom so we can start

22   promptly at 11:00 here.  And then I'm free until another

23   sentencing at 2:30.  And then the afternoon is booked.  So I

24   have between 11:00 and about 2:30.  And if we need to go over

25   to a third day, then we'll do that.  But can we conclude in

```
 1    three-and-a-half hours tomorrow if we go through lunch?

 2                MR. MANGUM:  I believe that we can.

 3                MR. GAEDE:  Yeah, if we work right through lunch, I

 4    don't see why we can't.

 5                THE COURT:  So we'll be hungry and mean but we'll be

 6    done?

 7                MR. MANGUM:  That's the way we like it.

 8                THE COURT:  All right.  I think that's what we'll do

 9    then.  Is there anything else we should take up while we're

10    all here today?

11                MR. MANGUM:  Nothing that I'm aware of, Your Honor.

12                MR. GAEDE:  No, nothing, Your Honor.

13                The Court:  I appreciate your hard work today and

14    your organization, counsel.  We'll be in recess.

15                        (Adjourned at 5:00 pm)

16                              *  *  *

17

18

19

20

21

22

23

24

25
```

```
 1
 2
 3
 4
 5                    Certificate of Reporter
 6        I, Raymond P. Fenlon, Official Court Reporter for the
 7   United States District Court, District of Utah, do hereby
 8   certify that I reported in my official capacity, the
 9   proceedings had upon the hearing in the case of
10   University of Utah Research Foundation, et al. Vs.
11   Ambry Genetics Corporation and Gene By Gene, case No.
12   2:13-CV-640RJS, 2:13-CV-643, in said court, on the 11th day
13   of September, 2013.
14        I further certify that the foregoing pages constitute
15   the official transcript of said proceedings as taken from my
16   machine shorthand notes.
17        In witness whereof, I have hereto subscribed my name
18   this 19th day of September, 2013.
19
20
21
22                                    /s/ Raymond P. Fenlon
23
24
25
```